UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | IN ADMIRALTY |
| v. | ) | |
| | ) | **COMPLAINT OF THE UNITED** |
| BP EXPLORATION & PRODUCTION INC., | ) | **STATES OF AMERICA** |
| ANADARKO EXPLORATION & | ) | |
| PRODUCTION LP, ANADARKO | ) | Section: |
| PETROLEUM CORPORATION, MOEX | ) | |
| OFFSHORE 2007 LLC, TRITON ASSET | ) | Magistrate No.: |
| LEASING GMBH, TRANSOCEAN | ) | |
| HOLDINGS LLC, TRANSOCEAN | ) | |
| OFFSHORE DEEPWATER DRILLING INC., | ) | |
| TRANSOCEAN DEEPWATER INC., AND | ) | |
| QBE UNDERWRITING LTD., LLOYD'S | ) | |
| SYNDICATE 1036, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

Plaintiff, the United States of America, alleges upon information and belief as

follows:

## NATURE OF THE ACTION

1.      This civil action arises from one of the worst environmental disasters in American history:  the oil spill into the Gulf of Mexico that began on April 20, 2010, when explosions and fires destroyed the Mobile Offshore Drilling Rig ("MODU") *Deepwater Horizon* approximately 50 miles from the Mississippi River delta (the "Deepwater Horizon Spill").  Eleven people aboard the rig lost their lives; many other men and women were injured.  Oil flowed into the Gulf of Mexico unchecked for months. Ultimately, the "Macondo Well" was finally sealed on September 19, 2010, nearly five months after the blowout began.  By that time, millions of barrels of oil had been discharged into the Gulf and upon adjoining shorelines, causing immense environmental and economic harm to the entire region.

2.      While the full scope and impact of this disaster are not yet known, the consequences include lost lives, destroyed livelihoods, and grave harm to natural resources across several States and related waters.  The spill necessitated a government response unprecedented in size, duration, and expense.

3.      As a result, the United States has sustained, and will continue to sustain, significant costs and damages.  The United States thus seeks in this action a declaration that the Defendants are responsible and strictly liable for unlimited removal costs and damages under the Oil Pollution Act of 1990.

4.      Federal law also imposes civil penalties, under the Clean Water Act, against those who unlawfully discharge oil into and upon the navigable waters of the United

States and adjoining shorelines, into or upon the waters of the contiguous zone, or in connection with activities under the Outer Continental Shelf Lands Act.  Polluters are strictly liable under this Act, with penalties based in part on the number of barrels of oil discharged.  The United States thus also seeks in this action the imposition of Clean Water Act civil penalties for each barrel of oil that the Defendants discharged into the Gulf of Mexico.

5.      Investigation of other potential claims, ongoing administrative proceedings, assessment of damage amounts, and additional removal actions continue.  Therefore, the United States reserves its rights in full to amend this Complaint by, among other things, adding new claims and new defendants.

6.      This civil action is a case of admiralty and maritime jurisdiction and is brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, the Clean Water Act, ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and Section 1017(f)(2) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2717(f)(2).

7.      The Defendants named in this action are BP Exploration & Production Inc. ("BP"), Anadarko Exploration & Production LP ("Anadarko Exploration"), Anadarko Petroleum Corporation  ("Anadarko Petroleum") (Anadarko Exploration and Anadarko Petroleum, unless stated otherwise, collectively shall be referred to as the "Anadarko Defendants"), MOEX Offshore 2007 LLC ("MOEX"), Triton Asset Leasing GmbH ("Triton"), Transocean Holdings LLC ("Transocean Holdings"), Transocean Offshore Deepwater Drilling Inc. ("Transocean Offshore"), Transocean Deepwater Inc.

3

("Transocean Deepwater") (Triton, Transocean Holdings, Transocean Offshore, and

Transocean Deepwater, unless stated otherwise, collectively shall be referred to as the

"Transocean Defendants"), and QBE Underwriting Ltd., Lloyd's Syndicate 1036

("Lloyd's"), *in personam*.

## JURISDICTION AND VENUE

8.     The United States is authorized to bring this suit and the Court has

jurisdiction pursuant to 28 U.S.C. §§ 1331 (Federal question), 1333 (Admiralty), 1345

(United States as plaintiff), 1355 (fine, penalty, or forfeiture); 33 U.S.C. §§ 1321(b)(7)(E)

and 1321(n) (CWA); and 33 U.S.C. § 2717(b) (OPA).

9.     Venue is proper in the Eastern District of Louisiana ("this District")

pursuant to 28 U.S.C. §§ 98(a) (Louisiana), 1391(b) (venue generally), and 1395(a) (fine,

penalty, or forfeiture); 33 U.S.C. § 1321(b)(7)(E) (CWA); and 33 U.S.C. § 2717(b)

(OPA).

## THE *DEEPWATER HORIZON*

10.     At all times material herein, the *Deepwater Horizon* was flagged under the

laws of the Republic of the Marshall Islands.  Hereafter the *Deepwater Horizon* and its

engines, gear, tackle, apparel and appurtenances shall be referred to as the "*Deepwater*

*Horizon*."

11.     At all material times prior to the Deepwater Horizon Spill, the MODU

*Deepwater Horizon* was a vessel and/or an offshore facility, capable of being used to drill

offshore wells.

12.     At all times material herein, the *Deepwater Horizon* had as part of its operating equipment and appurtenances a Blowout Preventer ("BOP") and a Lower Marine Riser Package ("LMRP") (together the "BOP stack"), a marine riser and associated piping, and other equipment, all of which constitute, *inter alia*, "appurtenances" under Admiralty law.

13.     Since approximately April 22, 2010, the wrecked hulk of *Deepwater Horizon* has rested on the seafloor of the Gulf of Mexico and Outer Continental Shelf of the United States offshore Louisiana, and in the Exclusive Economic Zone of the United States.

14.     Certain appurtenances of *Deepwater Horizon*, including the BOP stack and portions of the marine riser, have been recovered and are stored ashore within the jurisdictional boundaries of this Court.

## THE DEFENDANTS

15.     At all times material herein, Defendant BP is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein.  Furthermore, actions of BP have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the *Deepwater Horizon.*

16.     At all times material herein, Defendant Anadarko Exploration is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein.  Furthermore, actions of Anadarko Exploration have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the *Deepwater Horizon.*

17.     At all times material herein, Defendant Anadarko Petroleum is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein.  Furthermore, actions of Anadarko Petroleum have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the *Deepwater Horizon.*

18.     At all times material herein, Defendant MOEX is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein.  Furthermore, actions of MOEX have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the *Deepwater Horizon.*

19.     At all times material herein, Defendant Triton is believed to have been a foreign corporation and/or entity headquartered in Switzerland and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein, including, but not limited to, through its ownership and/or operation and/or demise charter of the *Deepwater Horizon.*  Furthermore, actions of Triton have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the *Deepwater Horizon.*

20.     At all times material herein, Defendant Transocean Holdings is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein, including, but not limited to, through its ownership and/or operation and/or demise charter of the *Deepwater Horizon.* Furthermore, actions of Transocean Holdings have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the *Deepwater Horizon.*

21.     At all times material herein, Defendant Transocean Offshore is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein, including, but not limited to, through its ownership and/or operation and/or demise charter of the *Deepwater Horizon.*

Furthermore, actions of Transocean Offshore have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the *Deepwater Horizon.*

22.   At all times material herein, Defendant Transocean Deepwater is believed to have been incorporated in the State of Delaware and to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon herein, including, but not limited to, through its ownership and/or operation and/or demise charter of the *Deepwater Horizon*. Furthermore, actions of Transocean Deepwater have had direct impacts within the State of Louisiana and within this District, including, but not limited to, direct impacts resulting from the fire, explosion, sinking, and oil spill associated with the *Deepwater Horizon.*

23.   At all times material herein, Defendant Lloyd's is believed to have been doing business within the United States of America and within this District and within the jurisdiction of this Court, including, but not limited to, by insuring and/or providing a Certificate of Financial Responsibility ("COFR") and certain guarantees pertaining to liabilities incurred by or pertaining to the *Deepwater Horizon.*

## GENERAL ALLEGATIONS

### *Agreements Between or Among the Lessees and the Transocean Defendants*

24.   On or about May 8, 2008, BP, as lessee, executed the document known as the "Oil and Gas Lease of Submerged Lands under the Outer Continental Shelf Lands

Act," "Serial number OCS-G 32306" (hereinafter the "Lease"), pertaining to "All of Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10."

25.     On or about May 14, 2008, the United States, by and through the Minerals Management Service (hereinafter "MMS"), as lessor, executed the Lease, which became effective on June 1, 2008.

26.     On various dates, BP, the Anadarko Defendants, and MOEX entered into various agreements whereby BP, the Anadarko Defendants, and MOEX became co-lessees under the terms of the Lease and, further, whereby said Defendants assumed the obligations of the Lease.

27.     Effective October 1, 2009, BP and MOEX entered into the "Macondo Prospect Offshore Deepwater Operating Agreement" (hereinafter a "Joint Operating Agreement" ("JOA")), pursuant to which BP assigned to MOEX an undivided 10% record title leasehold interest, also known as a "working interest," in the Lease.

28.     On February 23, 2010, the "Assignment of Record Title Interest in Federal OCS Oil and Gas Lease" pertaining to Lease No. OCS-G 32306, filed by BP and MOEX, was approved by the MMS, whereby BP assigned to MOEX a 10% record title/working interest in Lease No. OCS-G 32306.

29.     On December 17, 2009, the Anadarko Defendants and BP entered into a Lease Exchange Agreement, Ratification, and Joinder of the JOA, all of which were identified as effective as of October 1, 2009.  Pursuant to the Lease Exchange Agreement,

BP assigned to the Anadarko Defendants a 25% record title/working interest in Lease No. OCS-G 32306.

30.     On February 23, 2010, the "Assignment of Record Title Interest in Federal OCS Oil and Gas Lease" pertaining to Lease No. OCS-G 32306, filed by BP and Anadarko Exploration, was approved by the MMS, whereby BP assigned to Anadarko Exploration a 22.5% record title/working interest in Lease No. OCS-G 32306.

31.     On February 23, 2010, the "Assignment of Record Title Interest in Federal OCS Oil and Gas Lease" pertaining to Lease No. OCS-G 32306, filed by BP and Anadarko Petroleum, was approved by the MMS, whereby BP assigned to Anadarko Petroleum a 2.5% record title/working interest in Lease No. OCS-G 32306.

32.     As a result of the foregoing agreements between BP, the Anadarko Defendants, and MOEX, each of said Defendants became co-lessees under the terms of the Lease, whereby BP held a 65% interest in the Lease, Anadarko Exploration held a 22.5% interest in the Lease, Anadarko Petroleum held a 2.5% interest in the Lease, and MOEX held a 10% interest in the Lease.

33.     As of April 20, 2010, and continuing until at least April 28, 2010, BP held a 65% interest in the Lease, Anadarko Exploration held a 22.5% interest in the Lease, Anadarko Petroleum held a 2.5% interest in the Lease, and MOEX held a 10% interest in the Lease.

34.     As of April 28, 2010, a change to the foregoing percentages of interests in the Lease was made, such that BP currently holds a 65% interest in the Lease, Anadarko

10

Petroleum holds a 25% interest in the Lease, and MOEX holds a 10% interest in the Lease.

35.    At all times material herein, the JOA required that BP obtain the approval of the Anadarko Defendants and MOEX to proceed with nondiscretionary operations in connection with the Lease by, *inter alia*, seeking their authorization for the expenditure of funds and/or by seeking their election or vote to participate in the next stage of operations.  The JOA also provided for the sharing, in amounts proportionate to the working interest of each party, of any oil and gas discovered in connection with the Lease and of losses resulting from the approved activities.

36.    The JOA required BP to provide the Anadarko Defendants and MOEX with detailed technical information regarding exploration and other operations performed in connection with the Lease, including applications for and modifications of permits to drill, mud logs, mud checks, and other information.  The Anadarko Defendants and MOEX had the right to obtain "real time" data as set forth in Section 5.7 of the JOA.  Pursuant to the JOA, the Anadarko Defendants and MOEX received detailed technical information regarding operations conducted in connection with the Lease and the JOA, including daily reports, access to a secure website containing sampling and other data, and access to real time data from the rig.

37.    The JOA provided for the prompt invoicing by BP of costs incurred under the JOA and prompt payment of their agreed-upon share by the Anadarko Defendants and MOEX, including, on information and belief, the costs of the well casing and wellhead

and other materials purchased by BP.  The JOA was and is an enforceable contract, and provided the Anadarko Defendants and MOEX with a mechanism to object to, prevent, control, address, and/or abate discharges or health and safety issues in connection with the Lease.

38.     On various dates, the Anadarko Defendants and MOEX each designated BP as the operator and local agent for the Anadarko Defendants and MOEX, with full authority to act on said co-lessees' behalf in complying with the terms of the Lease and applicable regulations.

39.     As co-lessees of the Lease, BP, the Anadarko Defendants, and MOEX, and each of them, at all material times were subject to, *inter alia*, the requirements of 30 C.F.R. § 250.400 and the regulations specified therein.

40.     On December 12, 1998, and through subsequent amendments, BP contracted with one or more of the Transocean Defendants for operation and use of a MODU for, *inter alia*, the purpose of drilling wells in the federal waters of the Gulf of Mexico.  Under this contract and its amendments, one or more of the Transocean Defendants drilled an exploratory well at and within Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10.

### *Drilling the Macondo Well*

41.     On information and belief, on or about October 2009, drilling began of an exploratory well pursuant to the Lease at and within Block 252, Mississippi Canyon, OCS

Official Protraction Diagram, NH 16-10.  The well hereinafter shall be referred to as the "Macondo Well."

42.     At all times material herein, the Macondo Well was an "offshore facility" within the meaning of OPA, 33 U.S.C. § 2701, *et seq.*, and the CWA, 33 U.S.C. § 1321(b)(7).

43.     On information and belief, from at least October 1, 2009, the MODU *Transocean Marianas* was owned and/or operated by the Transocean Defendants.  In or about October 2009, the *Transocean Marianas* began to be used for drilling of the Macondo Well.

44.     Beginning in or about February 2010, the MODU *Deepwater Horizon* replaced the *Transocean Marianas* for the purpose of continuing the drilling of the Macondo Well.  Drilling of the Macondo Well using the *Deepwater Horizon* continued in February 2010 and through March and a portion of April 2010.

45.     As of April 20, 2010, various sub-sea equipment and components of the Macondo Well had been installed on or below the seafloor of the Outer Continental Shelf, including, but not limited to, the well casing and the well head.

46.     As of April 20, 2010, *Deepwater Horizon* and various appurtenances of the *Deepwater Horizon,* including, but not limited to, the BOP stack and marine riser*,* were installed on and/or attached to the seafloor of the Outer Continental Shelf, purportedly for purposes of, *inter alia*, operation of the Macondo Well, including well control.

## *The Defendants' Failure to Maintain Control of the Well*

47.     On April 20, 2010, the Macondo Well experienced an uncontrolled well event and an uncontrolled blowout of, *inter alia*, oil and methane gas.

48.     On information and belief, the April 20, 2010 uncontrolled well event and uncontrolled blowout of oil and methane gas was not prevented by Defendants, or any of them, or by the *Deepwater Horizon* or its equipment and appurtenances, including, but not limited to, the BOP stack.

49.     On information and belief, in violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, each Defendant (other than Lloyd's) failed, *inter alia*, to take necessary precautions to keep the Macondo Well under control, including, but not limited to, on April 20, 2010.

50.     On information and belief, in violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, each Defendant (other than Lloyd's) failed, *inter alia*, to use the best available and safest drilling technology to monitor and evaluate the Macondo Well's conditions and to minimize the potential for the Macondo Well to flow or kick.

51.     On information and belief, in violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, each Defendant (other than Lloyd's) failed, *inter alia*, to fulfill its respective responsibilities to maintain well control of the Macondo Well.

52.     On information and belief, in violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, each Defendant (other than Lloyd's) failed, *inter alia*, at times relevant herein to maintain continuous surveillance on the rig floor.

53.     On information and belief, in violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, each Defendant (other than Lloyd's) failed, *inter alia*, to maintain equipment and materials, including, but not limited to, the BOP stack, that were available and necessary to ensure the safety and protection of personnel, equipment, natural resources, and the environment.

54.     On information and belief, each Defendant (other than Lloyd's) failed, *inter alia*, to comply with applicable federal regulations at 30 C.F.R. Part 250, including, but not limited to, 30 C.F.R. §§ 250.107, 250.198 (and industry standards expressly incorporated therein), 250.300, 250.401, 250.420, 250.440, 250.442, 250.446, and 250.451.

55.     On information and belief, each Defendant (other than Lloyd's) caused and/or contributed to the Deepwater Horizon Spill by failing to assure well control of the Macondo Well through, *inter alia*:  actions, corporate actions, and/or corporate practices of disregarding federal regulations, as evidenced by various safety and other audits of *Deepwater Horizon*, reflecting the known failure, prior to the Deepwater Horizon Spill, to properly design, install, maintain, repair, and operate equipment intended to prevent personal injury, loss of life, harm to the environment, and disasters like the Deepwater Horizon Spill.

15

56.     On information and belief, each Defendant (other than Lloyd's) caused and/or contributed to the Deepwater Horizon Spill by failing to assure well control of the Macondo Well through, *inter alia*:

(a)     Failing to assure that well control was maintained by proper and adequate cementing of the Macondo Well;

(b)     Failing to assure that well control was maintained by mechanical barriers, including, but not limited to, the BOP stack;

(c)     Failing to assure that well control was maintained by proper and adequate inspection and maintenance of the BOP stack;

(d)     Failing to assure that well control was maintained by proper and adequate pressure testing;

(e)     Failing to assure that well control was maintained by the use of appropriate fluids to maintain hydrostatic pressure on the wellbore;

(f)     Failing to assure that well control was maintained by proper and adequate well monitoring;

(g)     Failing to assure that, once well control initially was lost, well control was regained by proper and adequate well control response;

(h)     Failing to assure that, once well control initially was lost, well control was regained by proper and adequate surface containment and overboard discharge and diversion of hydrocarbons; and

16

(i)     Failing to assure that, once well control initially was lost, well control was regained by proper and adequate BOP stack emergency operations.

### *The Deepwater Horizon Spill*

57.     As a result of the April 20, 2010 uncontrolled well event and uncontrolled blowout, multiple explosions and fires occurred aboard the *Deepwater Horizon*.

58.     As a result of the discharge of oil and methane gas, and the resulting multiple explosions and fires that occurred aboard the *Deepwater Horizon*, eleven persons aboard *Deepwater Horizon* lost their lives and other people sustained personal injuries.

59.     As a result of the discharge of oil and methane gas, and the resulting multiple explosions and fires that occurred aboard the *Deepwater Horizon*, equipment was damaged and/or destroyed, which equipment, on information and belief, could have prevented and/or limited further damage and injury, including the prevention and/or limitation of discharge of oil into and upon waters of the Gulf of Mexico and adjoining shorelines of the United States.

60.     As a result of the uncontrolled well event, uncontrolled blowout, multiple explosions, and fires, millions of barrels of oil were discharged into and upon waters of the Gulf of Mexico and adjoining shorelines of the United States.

61.     On and after April 20, 2010, oil flowed from the Macondo Well, associated equipment, the BOP stack, the marine riser, and the *Deepwater Horizon*, and into and upon waters of the Gulf of Mexico and adjoining shorelines of the United States.

62.     Within the meaning of the CWA, oil discharges in "such quantities as may be harmful" include oil spills that cause "a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines."  40 C.F.R. § 110.3(b).

63.     The Deepwater Horizon Spill caused large quantities of oil to coat the surface of and flow through the waters of the Gulf of Mexico and be deposited upon shorelines of the United States.  Oil from the spill remains in the waters of the Gulf of Mexico and upon the adjoining shorelines of the United States.

64.     The Deepwater Horizon Spill was a discharge of oil "in such quantities as may be harmful," within the meaning of the CWA, 33 U.S.C. § 1321(b)(3).

65.     As a result of the Deepwater Horizon Spill, "natural resources," as that term is defined in OPA, 33 U.S.C. § 2701(20), have been injured, destroyed, or lost.

66.     Natural resources under the trusteeship of the United States and other sovereigns have been injured, destroyed, or lost as a result of discharged oil and associated removal efforts.  The discharged oil is harmful to natural resources exposed to the oil, including aquatic organisms, birds, wildlife, vegetation, and habitats.  Discharged oil and some of the response activities to address the discharges of oil have resulted in injury to, loss of, loss of use of or destruction of natural resources in and around the Gulf of Mexico and along adjoining shorelines of the United States, and also have impaired or caused the loss of services that those resources provide.  The full extent of potential injuries, destruction, loss and loss of services is not yet fully known and may not be fully

18

known for many years.  On information and belief, resources and resource services that have been injured, destroyed, or lost include, but are not limited to, hundreds of miles of coastal habitats, including salt marshes, sandy beaches, and mangroves; a variety of wildlife, including birds, sea turtles, and marine mammals; lost human-use opportunities associated with various natural resources in the Gulf region, including but, not limited to fishing, swimming, beach-going, and viewing of birds and wildlife; and waters of the Gulf of Mexico, including various biota, benthic communities, marine organisms, coral, fish, and water-column habitat.

67.     The amount of damages and the extent of injuries sustained by the United States as a result of the Deepwater Horizon Spill are not yet fully known, but far exceed $75,000,000.

68.     As a result of the Deepwater Horizon Spill, the United States has expended and/or sustained and/or will expend or sustain, *inter alia*, "removal costs" and "damages," within the meaning of OPA, 33 U.S.C. § 2702(b).

69.     On information and belief, the Deepwater Horizon Spill was proximately caused by one or more of the following:  acts, joint acts, omissions, fault, negligence, gross negligence, willful misconduct, and/or breach of federal safety and/or operating and/or construction regulations by Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, one or more of the Transocean Defendants, and/or their respective agents, servants, employees, crew, contractors and/or subcontractors with whom said Defendants had contractual relationships.

## FIRST CLAIM FOR RELIEF

### (Civil Penalties Under Section 311(b) of the Clean Water Act)

70.    Plaintiff, the United States of America, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

71.    At all times material herein, Defendant BP was an owner, an operator, and/or a person in charge of, *inter alia*, the well, the well casing, the well head, and the *Deepwater Horizon,* including the BOP stack, the marine riser and associated piping, and other equipment, with respect to the matters sued upon herein.  BP was an owner, operator, and/or person in charge of an offshore facility and, additionally, an operator and/or person in charge of a vessel within the meaning of the CWA, 33 U.S.C. § 1321(b)(7).

72.    At all times material herein, the Anadarko Defendants were each an owner, operator, and/or a person in charge of, *inter alia*, the well, the well casing, and the well head, with respect to the matters sued upon herein.  The Anadarko Defendants were each an owner, operator, and/or person in charge of an offshore facility within the meaning of the CWA, 33 U.S.C. § 1321(b)(7).

73.    At all times material herein, defendant MOEX was an owner, operator, and/or a person in charge of, *inter alia*, the well, the well casing, and the well head, with respect to the matters sued upon herein.  Defendant MOEX was an owner, operator and/or

person in charge of an offshore facility within the meaning of the CWA, 33 U.S.C. § 1321(b)(7).

74.     At all times material herein, the Transocean Defendants were each an owner, operator, and/or person in charge of the *Deepwater Horizon,* including the BOP stack, the marine riser and associated piping, and other equipment, with respect to the matters sued upon herein.  The Transocean Defendants were each an owner, operator, and/or person in charge of a vessel and/or an offshore facility within the meaning of the CWA, 33 U.S.C. § 1321(b)(7).

75.     Pursuant to 33 U.S.C § 1321(b)(7) and 40 C.F.R. § 19.4, Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater are each subject to a judicially assessed civil penalty of up to $1,100 per barrel of oil that has been discharged or up to $4,300 per barrel of oil that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct by such Defendant.

76.     Pursuant to 33 U.S.C. § 1321(b)(7), Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater are each liable to the United States for a judicially assessed civil penalty in an amount to be determined at trial.

21

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment That All Defendants Are Liable
### Under the Oil Pollution Act)

77.     Plaintiff, the United States of America, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

78.     At all times material herein, Defendant BP was and is a lessee or permittee with respect to the leased area known as "All of Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10."  In addition, BP was an operator of the *Deepwater Horizon* with respect to the matters sued upon herein.

79.     At all times material herein, Defendant Anadarko Petroleum was and is a lessee or permittee with respect to the leased area known as "All of Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10."

80.     At all times material herein, at least until April 28, 2010, Defendant Anadarko Exploration was a lessee or permittee with respect to the leased area known as "All of Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10."

81.     At all times material herein, Defendant MOEX was and is a lessee or permittee with respect to the leased area known as "All of Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10."

82.     As a result of the various agreements alleged herein and the foregoing "Assignment(s) of Record Title Interest in Federal OCS Oil and Gas Lease" pertaining to

22

Lease No. OCS-G 32306, BP became and remains a "responsible party" for an "offshore facility" within the meaning of OPA, 33 U.S.C. §§ 2701 *et seq*., and BP has admitted that it is a "responsible party" within the meaning of OPA.

83.    As a result of the various agreements alleged herein and the foregoing "Assignment(s) of Record Title Interest in Federal OCS Oil and Gas Lease" pertaining to Lease No. OCS-G 32306, the Anadarko Defendants became and remain "responsible parties" for an "offshore facility" within the meaning of OPA, 33 U.S.C. §§ 2701 *et seq.*

84.    As a result of the various agreements alleged herein and the foregoing "Assignment(s) of Record Title Interest in Federal OCS Oil and Gas Lease" pertaining to Lease No. OCS-G 32306, MOEX became and remains a "responsible party" for an "offshore facility" within the meaning of OPA, 33 U.S.C. §§ 2701 *et seq.*

85.    At all times material herein, the Transocean Defendants were the owners and/or operators and/or owners *pro hac vice* and/or demise charterers of the *Deepwater Horizon*, and have been and remain "responsible parties" for a "vessel" and/or "offshore facility" within the meaning of OPA, 33 U.S.C. §§ 2701 *et seq.*

86.    The United States has sustained "damages," as that term is defined in 33 U.S.C. § 2702(b)(2), for, *inter alia*, injuries to, destruction of, loss of, or loss of use of natural resources and net loss of taxes, royalties, rents, fees, and net profit shares due to the injury to, destruction of, and loss of real property, personal property, and natural resources, said damages far exceeding $75,000,000.

87.     An actual controversy exists between the United States and Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater.

88.     Lloyd's has provided evidence of financial responsibility and certain guarantees pertaining to one or more of the Transocean Defendants and *Deepwater Horizon.*

89.     Pursuant to Section 1016(f) of OPA, 33 U.S.C. § 2716(f), the United States may bring this action directly against Lloyd's, in its capacity as a guarantor providing evidence of financial responsibility for one or more of the Transocean Defendants, for removal costs and damages available under OPA, 33 U.S.C. § 2702.

90.     While denying that it acted improperly, through its filings with the Court and other public statements by its high-ranking officers, BP has, through binding waivers, estoppels, admissions, and judicial admissions, waived any potential limit of its strict liability that it otherwise may have attempted to assert pursuant to, *inter alia*, Section 1004 of OPA, including 33 U.S.C. § 2704.

91.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and OPA, 33 U.S.C. § 2717(f)(2), the United States is entitled to, and hereby seeks, a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and

without any limitation, and Lloyd's, the latter up to the amount of its COFR guarantee, that said Defendants are liable for removal costs and damages in this action and in any such subsequent action or actions.

## RESERVATION OF RIGHTS AND NOTICE

92.    The United States reserves the right to amend this complaint and/or file additional complaints under statutory law, common law, and/or general maritime law, to assert claims for penalties, damages, and any other legal and equitable remedies authorized by law and regulation, including, but not limited to, claims under the CWA, OPA, the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1301 *et seq.,* the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq.*, the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 *et seq.*,  the National Marine Sanctuaries Act,16 U.S.C. §§ 1431 *et seq.*, and the Park System Resource Protection Act, 16 U.S.C. §§ 19jj *et seq.*, against the present Defendants and/or against any additional parties.  The United States further expressly reserves the right to conduct administrative proceedings as warranted against the present Defendants and/or additional parties under federal statutes, including but not limited to the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1301 *et seq.*, and the Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court:

1.     Assess a civil penalty, under Section 311(b)(7) of the Clean Water Act, 33 U.S.C. § 1321(b)(7), against each Defendant (except Lloyd's) in an amount to be determined by the Court;

2.     Enter a declaratory judgment that all Defendants are jointly and severally liable without limitation under Section 1002(a) of OPA, 33 U.S.C. § 2702(a), for all removal costs and damages resulting from the Deepwater Horizon Spill (except that Lloyd's be declared liable only to the limit of its COFR), which will be binding on this action and on any subsequent action or actions to recover removal costs or damages;

3.     Award injunctive relief against the Defendants as appropriate; and

4.     Grant such other relief as the Court deems just and proper.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources
   Division

TONY WEST
Assistant Attorney General
Civil Division

JAMES NICOLL
  Senior Counsel
NANCY FLICKINGER
  Senior Attorney
SARAH HIMMELHOCH
  Senior Attorney
DEANNA CHANG
  Trial Attorney

PETER F. FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
Trial Attorney

26

SCOTT CERNICH
  Trial Attorney
A. NATHANIEL CHAKERES
  Trial Attorney
JUDY HARVEY
  Trial Attorney
MATT LEOPOLD
  Trial Attorney

SHARON SHUTLER
Trial Attorney
JESSICA SULLIVAN
Trial Attorney
JESSICA MCCLELLAN
Trial Attorney
DAVID PFEFFER
Trial Attorney
Torts Branch, Civil Division
P.O. Box 14271
Washington, D.C. 20044-4271
Telephone: 202-616-4000
Facsimile: 202-616-4002

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone: 415-436-6648
Facsimile: 415-436-6632
E-mail: mike.underhill@usdoj.gov

JIM LETTEN
United States Attorney
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras Street, Ste. B-210
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

27