**Appendix 5: Plea Agreement**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. |
| BP EXPLORATION & PRODUCTION, INC. | : | |

<u>GUILTY PLEA AGREEMENT</u>

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and in compliance with the holding of <u>Bryan v. United States</u>, 492 F.2d 775 (5th Cir. 1974), the Department, the defendant, and the defendant's counsel enter into the following guilty plea agreement. Any reference to the Department in this agreement shall mean the United States Department of Justice, including, but not limited to, the *Deepwater Horizon* Task Force, the Criminal Division of the Department of Justice and all of the Criminal Division's sections, and all of the United States Attorney's Offices for each judicial district of the United States.

1. The defendant agrees to waive prosecution by indictment and plead guilty to an information charging it with: eleven counts of violations of 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), one count of a violation of 18 U.S.C. § 1505 (Obstruction of Congress), one misdemeanor count of a violation of 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3) (Clean Water Act), and one misdemeanor count of a violation of the 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act), all arising from the defendant's conduct relating to the *Deepwater Horizon* blowout, explosion, oil spill and response. The defendant agrees to the factual allocution contained in Exhibit A to this plea agreement.

1

2.      The defendant, BP plc and any other BP plc entity, including but not limited to any former, present or future parent, affiliate, division and subsidiary (collectively, "any other BP plc entity" or "the other BP plc entities"), and all predecessors, successors and assigns of any of the above, agree to cooperate fully and truthfully with the *Deepwater Horizon* Task Force in any criminal investigation related to or arising from the *Deepwater Horizon* blowout, explosion, oil spill and response.   Cooperation shall include but not be limited to (a) promptly disclosing any and all related criminal or potentially criminal conduct of which the defendant, BP plc or any other BP plc entity are currently aware, (b) promptly producing documents to the *Deepwater Horizon* Task Force upon request, (c) promptly making employees and agents available to the *Deepwater Horizon* Task Force upon request for interview or for testimony in any proceeding, subject to those employees' and agents' own legal rights, and (d) making reasonable efforts to ensure its employees and agents provide full and truthful information; provided, however, that compliance with this paragraph shall not be construed as requiring or effecting a waiver of the attorney-client privilege or work product protections.

3.      The defendant understands, agrees, and has had explained to it by counsel that the Court may impose the following statutory maximum sentences:

(a)      Counts One through Eleven, 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), for each count:

(i)      A fine of $500,000 or twice the gross gain or loss, whichever is greater;

(ii)      Five years of probation; and

(iii)      A $400 special assessment;

2

(b)    Count Twelve, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3) (Clean Water Act):

      (i)    A fine of $200,000, or $25,000 per day of the violation, or twice the gross gain or loss, whichever is greater;

      (ii)    Five years of probation; and

      (iii)    A $125 special assessment;

(c)    Count Thirteen, 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act):

      (i)    A fine of $15,000 or twice the gross gain or loss, whichever is greater;

      (ii)    Five years of probation; and

      (iii)    A $50 special assessment;

(d)    Count Fourteen, 18 U.S.C. § 1505 (Obstruction of Congress):

      (i)    A $500,000 fine;

      (ii)    Five years of probation; and

      (iii)    A $400 special assessment;

4.    The parties agree that this plea agreement is made pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure and that the following specific sentence is the appropriate disposition of this case.    If the Court rejects this plea agreement, it is further agreed that the defendant may withdraw its plea.    If acceptable to the Court, the parties agree to waive the presentence investigation and report pursuant to Fed. R. Crim. P. 32(c), and to request that the

3

defendant be sentenced at the time the guilty plea is entered.   The agreed-upon sentence pursuant to Rule 11(c)(1)(C) is as follows:

(a)     Payment of criminal recoveries totaling $4 billion ($4,000,000,000), as set forth below in paragraphs 4(b) and 4(c)(viii).

(b)     Payment of criminal fines totaling $1.256 billion ($1,256,000,000), as follows:

(i)     <u>Fine allocation</u>.   The fine payments shall be allocated as follows:

(A)     As to Counts One through Eleven, the maximum statutory fine pursuant to 18 U.S.C. § 3571(c) of $500,000 per count shall be paid, totaling $5.5 million.

(B)     As to Count Twelve, a total of $1.15 billion ($1,150,000,000) shall be paid to the Oil Spill Liability Trust Fund, pursuant to 33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3), 18 U.S.C. § 3571(d) and 26 U.S.C. § 9509(b)(8).

(C)     As to Count Thirteen, a total of $100 million ($100,000,000) shall be paid to the North American Wetlands Conservation Fund, pursuant to 16 U.S.C. §§ 703, 707 and 4406(b) and 18 U.S.C. § 3571(d), for

4

the purpose of wetlands restoration and conservation projects located in States bordering the Gulf of Mexico or otherwise designed to benefit migratory bird species and other wildlife and habitat affected by the Macondo oil spill.

(D)    As to Count Fourteen, the maximum statutory fine of $500,000, pursuant to 18 U.S.C. § 3571(c), shall be paid.

(ii)    Schedule.  The fines shall be paid according to the following schedule:

(A)    As to Counts One through Eleven and Fourteen, all fines shall be paid within 60 days of sentencing.

(B)    As to Counts Twelve and Thirteen, fines shall be paid on a pro rata basis as follows:   $250 million to be paid within 60 days of sentencing; an additional $250 million to be paid within one year of sentencing; an additional $250 million to be paid within two years of sentencing; an additional $150 million to be paid within three years of sentencing; an additional $150 million to be paid within four years of sentencing; and the remainder to be paid within five years of sentencing.

5

(c)    A statutory-maximum term of five years of probation.  Probation shall include the following mandatory and discretionary special conditions, pursuant to 18 U.S.C. §§ 3563(a) and (b):

      (i)    The defendant shall not commit another federal, state, or local crime.

      (ii)    The defendant shall notify the probation officer within seventy-two hours of any criminal prosecution against the defendant.

      (iii)    The defendant shall answer truthfully all inquires by the probation officer.

      (iv)    The defendant shall provide to the probation officer full access to any of the defendant's business operating locations.

      (v)    The defendant shall give ten days' prior notice to the probation officer of any intended change in principal business location or mailing address.

      (vi)    The defendant shall notify the Court and the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay the fines and other financial obligations set forth herein.

      (vii)    The defendant shall pay the fines set forth in paragraph 4(b) above.

      (viii)    Pursuant to 18 U.S.C. § 3563(b)(22), an order, attached

hereto as Exhibit B, shall be entered.  The terms of the order

shall be enforceable as additional special conditions of

probation.

The parties agree and stipulate that the specific discretionary terms of probation enumerated

herein are appropriate, and further agree that no additional discretionary terms of probation

should be imposed.  The defendant, BP plc and any other BP plc entity shall not capitalize

into inventory or basis or take as a tax deduction, in the United States or elsewhere, any

portion of the monetary payments made pursuant to this plea agreement.  The defendant,

BP plc and any other BP plc entity shall not reference this plea agreement and any payments

pursuant hereto or other compliance herewith in any public relations, marketing or

advertising; provided, however, that the defendant, BP plc and any other BP plc entity shall

be permitted to make required disclosures under applicable securities laws.  The defendant

further agrees that payments made pursuant to paragraph 4(c)(viii) above shall have no

effect on, and shall not be argued by the defendant, BP plc or any other BP plc entity, to

reduce in any way, any civil claims by any party arising out of the *Deepwater Horizon*

blowout, explosion, oil spill and response, including but not limited to natural resource

damage claims.

(d)     The defendant further agrees to pay the special assessments, totaling

$4,975, before the time of sentencing and shall provide a receipt from the Clerk to the

Department before sentencing as proof of this payment.

(e)     The defendant shall pay any mandatory restitution specified in 18

U.S.C. § 3663A(b)(3), to the extent applicable, to the Clerk of the Court for the benefit of

7

the families or other designated representatives of the eleven men who died onboard the *Deepwater Horizon*. Restitution is not otherwise authorized for certain offenses in the plea agreement and, pursuant to 18 U.S.C. § 3663(a)(1)(B)(ii), is not otherwise appropriate because (i) restitution need not be addressed in this matter given that compensation for victims has been or is being addressed in other proceedings, including in MDL-2179 and (ii) fashioning of any restitution order would unduly complicate and prolong the sentencing process.

5.     The defendant stipulates that there is a factual basis for the imposition of a criminal fine in the amount of $1,256,000,000 pursuant to 18 U.S.C. § 3571(d) and that the payments made pursuant to paragraphs 4(b) and 4(c)(viii) do not together exceed the statutory-maximum fine available under that statute. The defendant hereby waives any right to jury or bench trial as to those payments.

6.     The defendant will acknowledge acceptance of this plea agreement by the signature of its counsel and shall provide to the Department, as Exhibit C hereto, a certified resolution of the Board of Directors of BP Exploration and Production, Inc. authorizing the defendant to enter a plea of guilty and authorizing an agent to execute this agreement. The defendant will further provide to the Department, as Exhibit D hereto, a certified resolution of the Board of Directors of BP plc providing as follows:

(a)     BP plc and other BP plc entities shall be bound by those specific terms of this agreement that expressly apply to BP plc and other BP plc entities. BP plc shall secure and deliver to the Department from both BP Corporation North America Inc. ("BPCNA") and BP plc guarantees for all payments due from the defendant under this

8

agreement, with BPCNA as the primary guarantor and BP plc as the secondary guarantor in the event of a default by BPCNA. BP plc and BP BPCNA consent to the jurisdiction of U.S. courts solely for purposes of enforcing the guarantees. Any legal successor or assign of BPCNA or BP plc shall remain liable, as the case may be, for the guarantee of defendant's payment obligations hereunder, and an agreement to so remain liable shall be included by BPCNA or BP plc, respectively, in the terms of any sale, acquisition, or merger of those entities. Any legal successor or assign of defendant shall remain liable for defendant's obligations in this plea agreement, and an agreement to so remain liable shall be included by defendant in the terms of any sale, acquisition, or merger of defendant.

(b) The defendant, BP plc and other BP plc entities waive any statute of limitations as of the date of this agreement through the full term of defendant's probation and until all of the defendant's obligations under this agreement have been satisfied with regard to any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response.

7. The Department agrees that, subject to paragraph 2 of this agreement, the Department shall not further prosecute the defendant, BP plc or any other BP plc entity, including all predecessors, successors and assigns of any of the above, for any conduct regarding any matters under investigation by the *Deepwater Horizon* Task Force relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response. This agreement shall not apply to individuals. Should a court determine that the defendant has breached this agreement, the defendant will not be entitled to withdraw its plea of guilty, and the Department may prosecute the defendant, BP plc and any other BP plc entity, and any predecessors, successors and assigns of any

9

of the above, for any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response, notwithstanding the expiration of any applicable statute of limitations following the signing of this plea agreement. In any such prosecution, the Department may use the defendant's admissions of guilt as admissible evidence against the defendant, BP plc and any other BP plc entity.

8. The Department agrees that, if requested to do so, it will advise any appropriate suspension or debarment authority that, in the Department's view, the defendant has accepted criminal responsibility for its conduct relating to the Deepwater Horizon blowout, explosion, oil spill and response by virtue of this guilty plea, and that BP is obligated pursuant to this agreement to cooperate in any ongoing criminal investigation by the Department relating to the Deepwater Horizon blowout, explosion, oil spill and response. Nothing in this agreement limits the rights and authority of the United States of America to take further civil or administrative action against the defendant including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans and benefits from United States government agencies.

9. In exchange for the undertakings made by the Department in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

10

10. The defendant waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

11. The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the criminal investigation or prosecution of this criminal case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

12. The defendant is satisfied with the legal representation provided by the defendant's lawyer; the defendant and its lawyer have fully discussed this plea agreement; and the defendant is agreeing to plead guilty because the defendant admits that it is guilty.

13. Both parties agree that the parties' guilty plea agreement contains no additional promises, agreements, or understandings other than those set forth in this written guilty

11

plea agreement, and that no additional promises, agreements, or understandings will be entered into

unless in writing and signed by all parties.


JIM LETTEN                                        LANNY A. BREUER
United States Attorney                     Assistant Attorney General
Eastern District of Louisiana          Criminal Division


JOHN D. BURETTA, Director
DEREK A. COHEN, Deputy Director
Deepwater Horizon Task Force



BP EXPLORATION AND PRODUCTION, INC., BP plc and BP Corporation
North America Inc.


BY:   MARK FILIP and JOSEPH WARIN, PC
       Counsel for BP Exploration and Production, Inc., BP plc and BP Corporation North
       America Inc.


Date:   November 15, 2012

12

Exhibit A

<u>Exhibit A</u>

Defendant BP Exploration & Production, Inc. ("BP") agrees that, if the case were to proceed to trial, the Government could establish beyond a reasonable doubt that:

At all relevant times, BP resided in, and engaged in regular business throughout, the states bordering the Gulf of Mexico, including in the Eastern District of Louisiana.  On or about April 20, 2010, BP was the leaseholder and operator of the Macondo Well located off the coast of Louisiana.  In this capacity, BP, as the designated operator under BOEMRE regulations, was ultimately responsible for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment.  BP hired Transocean, Ltd., the owner of the drilling rig *Deepwater Horizon*, a vessel, to provide the rig and drilling crew to implement BP's drilling plan for the Macondo Well.  Transocean was also responsible for conducting safe operations and for protecting personnel onboard.  At all times relevant to the Information, the *Deepwater Horizon* was temporarily attached to and erected on the seabed of the Outer Continental Shelf in the Gulf of Mexico to explore and develop resources from the Outer Continental Shelf, to wit: oil and natural gas.

BP's responsibility as the leaseholder and operator of the Macondo Well and Transocean's responsibility as the rig owner imposed on each a duty to insure that the negative pressure test performed prior to temporarily abandoning the well was done safely, in accordance with the standard of care applicable in the deepwater oil exploration industry.  On the night of the explosion, BP had two Well Site Leaders on the *Deepwater Horizon*, who were BP's employees, agents, and highest-ranking representatives on the rig.  The Well Site Leaders were responsible for supervising the negative pressure test conducted by Transocean.

On or about April 20, 2010, between approximately 5:00 and 8:00 p.m. Central Daylight Time, the negative pressure test performed on the Macondo Well provided multiple indications that the wellbore was not secure. BP's Well Site Leaders negligently supervised the negative pressure test during this time, failed to alert engineers on the shore of these indications, and, along with others, ultimately deemed the negative pressure test a success, all in violation of the applicable duty of care. The negligent conduct of BP's Well Site Leaders is attributable to BP.

BP's negligent conduct, among others, was a proximate cause of the deaths of eleven men and pollution resulting from the Macondo Well blowout. As a result of this negligent supervision and decision-making, BP and the Transocean rig crew proceeded with removing drilling mud from the Macondo well until it became so underbalanced that natural gas and oil migrated through the well, up through the riser, and onto the rig floor. This migration of natural gas and oil in turn caused multiple explosions and a fire which burned for two days, and resulted in the *Deepwater Horizon* sinking on or about April 22, 2010.

On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, BP, being a charterer of a vessel, to wit: the *Deepwater Horizon*, engaged in neglect through which the lives of the following persons were destroyed: Jason Christopher Anderson; Aaron Dale Burkeen; Donald Neal Clark; Stephen Ray Curtis; Gordon Lewis Jones; Roy Wyatt Kemp; Karl Dale Kleppinger Jr.; Keith Blair Manuel; Dewey Allen Revette; Shane Michael Roshto; and Adam Taylor Weise, in violation of Title 18, United States Code, Section 1115.

On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, BP did negligently discharge and cause to be discharged oil in connection with activities under the Outer Continental Shelf Lands Act and which may have affected natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, in such

quantities as may be harmful in violation of Title 33, United States Code, Sections 1319(c)(1)(A) and 1321(b)(3).

On or about and between April 20, 2010, and December 31, 2010, in the Eastern District of Louisiana and elsewhere, BP did unlawfully kill and cause to be killed one or more migratory birds, including Brown Pelicans, Laughing Gulls, Northern Gannets, and other protected species, when defendant negligently discharged and caused to be discharged oil from the Macondo well.

All in violation of Title 16, United States Code, Sections 703 and 707(a).

On or about May 24, 2010, in the Eastern District of Louisiana and elsewhere, BP did corruptly, that is, with an improper purpose, endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation was being had by a Committee of the United States House of Representatives into the amount of oil flowing from the Macondo Well ("flow rate") through the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:

1. BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

2. BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

3. BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology. At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4. BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD. At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5. BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results." In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

6. On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack." At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after

subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

BP's former vice president's knowledge and actions are attributable to BP.

All in violation of Title 18, United States Code, Section 1505.

Exhibit B

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | Case No. _____ |
| BP EXPLORATION & | * | |
| PRODUCTION, INC. | * | |
| | * | |
| | * * * | |

## ORDER

Pursuant to 18 U.S.C. § 3563(b)(22), IT IS HEREBY ORDERED:

### Monitors

1. Retention of Monitors and Duties:

   a. *Process Safety Monitor*: The defendant shall retain, subject to approval by the

   Assistant Attorney General, Criminal Division, Department of Justice ("DOJ"), or

   his/her designee, a process safety monitor who shall be experienced in process safety

   and risk management and familiar with complex industrial operations such as

   deepwater oil and gas drilling (hereinafter the "Process Safety Monitor"). The

   Process Safety Monitor's duties will be to review, evaluate and provide

   recommendations for the improvement of defendant's process safety and risk

   management procedures, including, but not limited to, the defendant's major

   accident/hazard risk review of drilling-related process safety barriers and mitigations,

   for the purpose of preventing future harm to persons, property and the environment

   resulting from deepwater drilling in the Gulf of Mexico by the defendant and its

   Affiliates. For the purposes of this Order, the term "Affiliates" shall mean any entity

- 1 -

controlled, directly or indirectly, by BP plc that participates in deepwater drilling in the Gulf of Mexico, whether such entity is in existence now or in the future. The Process Safety Monitor shall among other things participate in defendant's major accident/hazard risk review for drilling, intervention, and completion, including: reviewing of relevant materials, participating in meetings and other deliberations, and making suggestions on the strength and effectiveness of the risk mitigation and prevention measures, and changes in such measures.

b. *Ethics Monitor:* The defendant shall retain, subject to approval by the Assistant Attorney General, Criminal Division, DOJ, or his/her designee, an ethics monitor who shall be familiar with best practices with respect to corporate codes of conduct, including implementation, training and enforcement thereof (hereinafter the "Ethics Monitor"). The Ethics Monitor's duties will be to review and provide recommendations for improvement of BP plc's Code of Conduct and its implementation and enforcement for the purpose of preventing future criminal and ethical violations with respect to dealings with regulatory and enforcement authorities by the defendant and Affiliates, including, but not limited to, violations related to the conduct giving rise to the Information filed in this matter. In the event that any federal suspension and debarment authority requires a monitor with responsibilities related to ethics and compliance in any agreement with a suspension and debarment authority, the defendant may petition DOJ to have the Ethics Monitor replaced by (or have the duties combined with that of) such other monitor.

- 2 -

2.  <u>Monitorship Scheduling and Compensation</u>:

    a.  Within 60 calendar days after the Court imposes sentence (the "Effective Date"), the defendant shall forward to the Assistant Attorney General, Criminal Division, DOJ, or his/her designee, the names of no more than five proposed monitors ranked in order of preference as to each of the two categories of monitorships. DOJ will promptly review and assess the defendant's proposals. The defendant shall retain each monitor as soon as possible, but not later than 60 calendar days after the date that DOJ approves each such proposed monitor.

    b.  The monitorships shall exist for a period of four years from the date of the monitor's engagement unless earlier terminated pursuant to paragraph 4(f) herein.

    c.  Each monitor shall have the authority to employ personnel reasonably necessary, and with appropriate professional qualifications, to assist in the proper discharge of the monitor's duties, as specified herein. The defendant shall have the opportunity to perform routine conflict checks on individuals or entities the monitor proposes to engage, and within two weeks of a proposed engagement, the defendant shall advise the monitor if any conflict exists. Any disputes in this respect shall be decided by DOJ in its sole discretion.

    d.  The reasonable compensation and expenses of each monitor, and any persons hired by each monitor pursuant to his/her authority hereunder, shall be paid by the defendant. Each monitor, and any persons hired by each monitor, shall be compensated in accordance with their typical hourly rates or a reasonable fee determined by the monitor based on applicable market rates.

Appendix 5-022

3.  Powers of the Monitors:

a.  Each monitor shall have the authority to take such reasonable steps as, in the monitor's view, may be necessary to be fully informed with respect to the monitor's duties.

b.  The defendant, BP plc and Affiliates shall cooperate fully with the monitors to allow each monitor to fulfill his or her respective duties under this Order, including providing each monitor with access to all information, documents, records, facilities and/or employees, as reasonably requested by the monitor.

c.  Each monitor shall maintain as confidential all non-public information, documents and records it receives from the defendant, subject to the monitor's reporting requirements herein.  Each monitor shall take appropriate steps to ensure that any of his/her consultants or employees shall also maintain the confidentiality of all such non-public information.

d.  Should any monitor, or staff assisting any monitor in fulfilling his or her responsibilities, be provided access to materials ("Subject Materials") that may be protected by the attorney-client privilege or work product doctrine (or any other legally cognizable privilege or protection), the following conditions shall apply:

i.  Any provision of Subject Materials to a monitor pursuant to this order will not constitute waiver of any applicable privilege.

ii. In the event the monitors or DOJ seeks disclosure of Subject Materials for any reason, the monitor shall provide the defendant with timely notice of its intention to do so.

iii. Each monitor shall return all Subject Materials to defendant, BP plc, and Affiliates upon the date the respective monitor is finished using Subject Materials for the purpose of fulfilling his or her responsibilities.

4. Monitors' Reviews and Reports:

    a. Each monitor shall conduct an initial review and prepare an initial report, followed by up to three follow-up reviews and reports as described below. With respect to each review, whether initial or follow-up, after consultation with the defendant and DOJ, each monitor shall prepare a written work plan, which shall be submitted to the defendant and DOJ for review and comment no fewer than 60 calendar days prior to commencing each review. The defendant and DOJ shall provide comment no later than 30 calendar days after receipt of the written work plan. The monitors' work plans for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review. In developing each work plan and in carrying out the reviews pursuant to such plans, the monitors are encouraged to coordinate with the defendant. Any disputes between the defendant and the monitors with respect to the work plan shall be decided by DOJ in its sole discretion.

    b. Each monitor's initial review shall commence no later than 120 calendar days from the date of the engagement of the monitor, unless otherwise agreed between the defendant, the respective monitor and DOJ.

    c. Each monitor shall issue a written report within 120 calendar days of completing the initial review setting forth the monitor's assessment and making recommendations reasonably designed to improve the effectiveness of the defendant's process safety and risk management as to deepwater drilling. Each written report shall set forth the

- 5 -

monitor's assessments, recommendations, and the reasons for the recommendations. The monitors are encouraged to consult with the defendant concerning the monitors' findings and recommendations on an ongoing basis.  If a monitor identifies a potential violation of the law, the monitor shall promptly report the potential violation to the Probation Office, DOJ and the defendant.  The monitors shall provide the written report to the Probation Officer, the Assistant Attorney General, Criminal Division, Department of Justice, or his/her designee, the Board of Directors of the defendant and the Board of Directors of BP plc.  After consultation with the defendant, the monitors may extend the time period for issuance of the written report for up to 60 calendar days with prior written approval of DOJ.

d.  Within 120 calendar days after receiving the monitor(s)' report, the defendant, and to the extent set forth in the report, BP plc and Affiliates, shall adopt all recommendations in the report; provided, however, that within 30 calendar days after receiving the report, the defendant shall notify the monitor and DOJ in writing of any recommendations that the defendant, BP plc or Affiliates considers inconsistent with applicable law or regulation or otherwise inadvisable.  As to any recommendation on which the defendant and the monitor do not agree, the defendant and the monitor shall attempt in good faith to reach an agreement within 45 calendar days after the defendant serves the written notice.  In the event the defendant and the monitor are unable to agree on an acceptable alternative proposal, the defendant shall promptly consult with DOJ, and may request that DOJ consult with the Bureau of Safety and Environmental Enforcement ("BSEE") regarding the dispute.  DOJ will submit a written opinion to the defendant as to whether the defendant should adopt the

monitor's recommendation or an alternative proposal, and the defendant shall abide by that determination. Pending such determination, the defendant shall not be required to adopt any contested recommendation(s). With respect to any recommendation that the monitor determines cannot reasonably be adopted within 120 calendar days after receiving DOJ's report, the monitor may extend the time period for adoption with prior written approval of DOJ.

e. Each monitor shall undertake up to three follow-up reviews. Within 120 calendar days of initiating each follow-up review, the monitors shall complete the review and report on the monitors' findings in the same fashion as set forth above with respect to the initial review. The first follow-up review shall commence one year after the initial review was completed. The second follow-up review shall commence one year after the first follow-up review was completed. The third follow-up review shall commence one year after the second follow-up review was completed. After consultation with the defendant, the monitor(s) may extend the time period for these follow-up reviews for up to 60 calendar days with prior written approval of DOJ.

f. If, reasonably promptly after completing two follow-up reviews, a monitor and the defendant mutually agree that the defendant's applicable policies and procedures, and implementation and enforcement thereof, are appropriate, and that further monitoring and review is not warranted, then the monitor may apply to DOJ for permission to forego the third follow-up review. If DOJ approves, then DOJ shall make a recommendation to the Probation Officer and the Court to forego the third follow-up review, and, upon approval by the Probation Officer and the Court, the engagement of the monitorship shall terminate.

- 7 -

## Safety and Environmental Management Systems Audits

5. For every contracted drilling rig currently in the defendant's fleet with a remaining contract term of at least three but less than six years as of the Effective Date, the defendant shall conduct at least one Safety and Environmental Management System ("SEMS") audit as described in 30 C.F.R. Part 250 during the remaining contract term. For every contracted drilling rig currently in the defendant's fleet with a remaining contract term of six years or more as of the Effective Date, the defendant shall conduct at least two SEMS audits during the remaining contract term under applicable BSEE regulations. For drilling rigs that are contracted after the Effective Date, the defendant shall comply with applicable BSEE regulations concerning SEMS audits.

6. For its current contracts with rig contractors with respect to deepwater drilling rigs, the defendant shall request that its rig contractors join the Center for Offshore Safety ("COS"), which requires its members to conduct SEMS audits. For new contracts with rig contractors with respect to deepwater drilling rigs, the defendant shall require rig contractors to join COS. The defendant may choose to conduct joint SEMS audits with its contractors for contracted deepwater drilling rigs.

7. The defendant shall conduct one SEMS audit for each of its operated platforms, including BP-owned platform rigs, within five years of the Effective Date.

8. With respect to defendant-operated platforms, the defendant shall follow Third Party SEMS Auditing and Certification of Deepwater Operations Requirements as specified by COS.

## Operational Oversight

9. Third Party Verification of Blowout Preventers. Each time the defendant or its contractors brings a subsea blowout preventer system as referenced in 30 CFR 250.440 ("BOP") into service on a moored or dynamically positioned drilling rig, and each time a subsea BOP from

- 8 -

Appendix 5-027

a moored or dynamically positioned drilling rig is brought to the surface, the defendant or its contractors, through a third party, will verify that all required and recommended testing and maintenance of the BOP were performed in accordance with manufacturer recommendations and API Recommended Practice 53 (and Standard 53 when it becomes final).

10. <u>Deepwater Well Control Competency Assessments</u>.  The defendant shall implement the following measures to strengthen its well control competencies:

    a.  The defendant shall develop, within 6 months of the Effective Date, a deepwater well control competency assessment plan for the defendant personnel responsible for oversight of deepwater drilling operations on defendant-owned or contracted rigs. The plan shall exceed the competency requirements set forth in 30 CFR §§250.1500-1510 (Subpart O), and shall include, but not be limited to: identifying skill sets and other competencies needed to recognize, evaluate, respond, and remediate well control events; providing for the training, assessment of skills and competencies; and undertaking appropriate corrective actions for personnel who do not demonstrate the identified skills or competencies.

    b.  The defendant shall provide to BSEE, on an annual basis, a summary report regarding competency assessment plan implementation, including the types and aggregate number of people assessed, found competent, found in need of further training, and the number who have completed training and reassessment.

11. <u>Cement Design and Competency.</u>

    a.  The defendant shall require review and approval by subject matter experts of the defendant, BP plc, or the Affiliates of cement designs used for primary cementing of casing and exposed hydrocarbon-bearing zones during drilling operations at deepwater wells.

b. The defendant shall require that lab testing of cement slurries for primary cementing of casing and exposed hydrocarbon bearing zones relating to drilling operations of deepwater wells be conducted or witnessed by a defendant engineer competent to evaluate such lab testing or a competent third party independent of the cement provider. The defendant shall provide lab results to the applicable BSEE field office within a reasonable period of time.

c. The defendant shall develop and provide to BSEE, within 6 months of the Effective Date, a framework document setting forth the defendant's competency requirements for cement subject matter experts, subject to review and approval at BSEE's option.

12. Houston Monitoring Center ("HMC"). The defendant shall maintain a real-time drilling operations monitoring center at its Houston office or other appropriate location. The well control data to be monitored will include, at a minimum, active pit volume, pump pressure, flow rate out, gas units, and trip displacement. The HMC shall monitor such data for all defendant-owned or contracted rigs conducting drilling with a subsea BOP installed on the wellhead. The defendant shall provide BSEE personnel with reasonable access to the HMC.

13. Incident Reporting. The defendant shall provide to BSEE, on an annual basis, a summary report documenting incidents operators are required to report under 30 CFR 250.188. For each item reported, the defendant shall describe the actions implemented to correct the item and/or to prevent recurrence. This report shall be submitted by March 31st of each year covering incidents during the previous calendar year.

### Oil Spill Response Training and Drills

14. The defendant shall train each Command Officer and Staff, General Section Chiefs, and Staff including the Oil Spill Response Coordinator and alternates of the GoM Incident

- 10 -

Management organization at least once per year and require their participation in at least one table top oil spill response exercise per year.

15. The defendant shall maintain a crisis management organization, including two crisis management centers, consisting of at least 6 crisis management professionals (including a supervisor) to assist in oil spill response training and drills.

16. The defendant shall conduct annual training with the Marine Well Containment Company ("MWCC"), or a similar organization, for its Operations Section chiefs and Source Control Section chiefs in the Gulf of Mexico.

17. The defendant shall participate in MWCC or industry oil spill response drills at least once per year.

18. The defendant shall, at least once per year, conduct or participate in a table top exercise involving activation of MWCC to simulate mobilization of assets and personnel necessary to cap or cap/contain a subsea loss of well control.

19. The defendant shall invite the United States Coast Guard and BSEE to participate in at least one internal oil spill response drill per year.

### Best Practices

20. <u>Oil Spill Response Plan (OSRP).</u> Within 60 days of entry of this Order, the defendant shall revise its Oil Spill Response Plan as necessary to include:

   a. Provisions to maintain access to a supply of dispersant and fire boom for use in the event of an uncontrolled long-term blowout for the length of time required to drill a relief well;

   b. Contingencies for maintaining an ongoing response for the length of time required to drill a relief well;

- 11 -

    c.   Description of measures and equipment necessary to maximize the effectiveness and efficiency of the response equipment used to recover the discharge on the water's surface, including methods to increase encounter rates;

    d.   Information regarding remote sensing technology and equipment to be used to track oil slicks, including oil spill detection systems and remote thickness detection systems (*e.g.*, X-band/infrared systems);

    e.   Information regarding the use of communication systems between response vessels and spotter personnel;

    f.   Shoreline protection strategy that is consistent with applicable area contingency plans; and

    g.   For operations using a subsea BOP or a surface BOP on a floating facility, a discussion regarding strategies and plans related to source abatement and control for blowouts from drilling.

21. Safety Technology Developed with Industry.  The defendant shall collaborate with industry and academic efforts to develop discrete technologies to enhance operational safety with respect to deepwater drilling.  Within one year of the Effective Date, the defendant shall propose and initiate collaboration on at least two pilot projects to evaluate technology enhancements over the course of the five year period following the Effective Date of this Order.  Upon conclusion of the pilot projects, the defendant will propose to BSEE at least two pilot projects for implementation and implement them unless the defendant demonstrates that one or more pilot projects is technically unsound or economically infeasible.

22. Other Safety Technology Development.  Over the course of the three years following the Effective Date of this Order defendant will advance to BSEE three proposals in one or more

- 12 -

of the following categories for pilot projects regarding the development of specific new technology in: (1) enhancing functionality, intervention, testing and activation of BOP systems such as acoustics and subsea communications capabilities; (2) enhancing well design; or (3) enhancing real-time monitoring on rig and onshore. Upon conclusion of the pilot projects, the defendant will implement at least two pilot projects, unless the defendant demonstrates that one or more pilot projects is technically unsound or economically infeasible.

### Transparency

23. The defendant will create, within 90 days after the Effective Date, a public website that contains the following information:

    a.  Lessons learned from the Deepwater Horizon incident;

    b.  Annual progress reports on its compliance with the special terms of probation contained in this Order;

    c.  Annual summaries of recordable safety incidents, days away from work, hydrocarbon spills and the volume thereof; and

    d.  An annual list of all incidents of non-compliance with BSEE or BOEM regulations or probation for which the defendant is cited, including corrective actions taken and penalties assessed.

### Rig Equipment: Two Blind Shear Rams

24. The defendant will use, and require its contractors to use, subsea BOPs equipped with no fewer than two blind shear rams and a casing shear ram on all drilling rigs under contract to the defendant for deepwater drilling operations in dynamic positioning mode. As to moored drilling rigs under contract to the defendant which use subsea BOPs, the defendant will require that each BOP used in deepwater drilling operations be equipped with two shear

- 13 -

rams, including at least one blind shear ram and either an additional blind shear ram or a casing shear ram.

## Safety Organization

25. The defendant shall maintain a safety organization that has the authority to intervene or stop any operation that it deems unsafe.

## Third-Party Auditor

26. The defendant will enter into a contract with an independent third-party (referred to herein as "the Auditor") who shall review and report to the Probation Officer, DOJ, and the defendant on the defendant's compliance with paragraphs 5 through 25 of this Order. The reasonable compensation and expenses of the Auditor shall be paid by the defendant. The Auditor shall be compensated in accordance with its typical hourly rates or a reasonable fee determined by the Auditor based on applicable market rates

27. The defendant will propose auditor(s) to perform these functions to DOJ within 90 days after the Effective Date, and the selection shall be subject to DOJ's approval.

28. On an annual basis, the Auditor shall perform his/her responsibilities by reviewing documentation and taking such other reasonable measures as may be appropriate to sample or test the defendant's compliance with paragraphs 5 through 25 of this Order. The Auditor shall identify and report annually its findings on the defendant's compliance with the terms of this Order to the Probation Officer, DOJ, and the defendant.

29. If the Auditor finds deficiencies in the defendant's compliance with paragraphs 5 through 25 of this Order, the Auditor will provide the Probation Officer, DOJ, and the defendant prompt notice and the defendant will, within 30 days, provide a plan to address the deficiencies and an opportunity to cure. In the event DOJ finds the defendant's plan to address the

deficiencies unacceptable, DOJ will submit a written opinion to the defendant identifying its objections and advising the defendant of an acceptable means of addressing the deficiencies. Within 30 days of receiving any such objections from DOJ, the defendant will provide an updated plan to the Auditor and DOJ which either provides for implementation of an option suggested by DOJ or an alternative means which DOJ determines to satisfactorily address its objections.

30. In addition to an annual report, the auditor shall periodically evaluate and report to the Probation Officer, BSEE, DOJ, and the defendant whether the defendant has complied with any plan to address deficiencies identified by the Auditor.

31. In the event the Auditor resigns, the defendant will propose to DOJ replacement auditor(s) to perform these functions promptly after such resignation. Selection of a replacement auditor shall be subject to the same process set forth immediately above.

### Development of Implementation Plan

32. The provisions in Paragraphs 5-31 constitute a framework and outline of the subject areas for the development of more specific measures that the defendant must implement pursuant to this Order. By no later than 60 days after the Effective Date of this Order, the defendant shall submit a detailed implementation plan for approval by the Probation Officer and DOJ. The defendant shall consult with DOJ or its designee in preparing the implementation plan, and the plan shall include among other things, and as necessary and appropriate, interim milestones covering each of the following areas: Safety and Environmental Management Systems Audits (Paragraphs 5-8), Operational Oversight (Paragraphs 9-13), Oil Spill Response Training and Drills (Paragraphs 14-19), Best Practices (Paragraphs 20-22), Transparency (Paragraph 23), Rig Equipment: Two Blind Shear Rams (Paragraph 24), Safety

- 15 -

Organization (Paragraph 25) and Third-Party Auditor (Paragraphs 26-31). Upon approval of the implementation plan by the Probation Officer and DOJ, the defendant shall comply with the plan. After approval of the implementation plan, the defendant may request in writing that the Probation Officer and DOJ approve modifications of the implementation plan for good cause. Upon approval of a modification by the Probation Officer and DOJ, the defendant shall comply with the implementation plan as modified. Compliance with the implementation plan's provisions is a special condition of the defendant's probation. The defendant is required to provide prompt notice to the Probation Officer in the event the defendant fails to comply with any of the provisions of the implementation plan, including meeting any of the interim milestones.

### Gulf of Mexico Research Initiative

33. The defendant will continue to fulfill its commitment to fund the Gulf of Mexico Research Initiative announced by BP on May 24, 2010, at the level established by the Master Research Agreement of March 14, 2011 between BP and the Gulf of Mexico Alliance.

### National Academy of Sciences

34. The defendant shall pay $350 million ($350,000,000.00) to the National Academy of Sciences for the purposes of oil spill prevention and response in the Gulf of Mexico, as provided for in an agreement between the defendant and the National Academy of Sciences attached hereto as Exhibit 1.

### National Fish and Wildlife Foundation

35. The defendant shall pay $2.394 billion ($2,394,000,000.00) to the National Fish and Wildlife Foundation ("NFWF"), a nonprofit organization established pursuant to 16 U.S.C. § 3701-3710. With respect to the work described in paragraph 37 below, the defendant shall assume

- 16 -

no responsibilities or obligations other than making the payments described in paragraphs 35 and 36.

36. The defendant's payments to NFWF shall be made according to the following schedule: (a) $100 million to be paid within 60 days of sentencing; (b) an additional $300 million to be paid within one year of sentencing; (c) an additional $300 million to be paid within two years of sentencing; (d) an additional $300 million to be paid within three years of sentencing; (e) an additional $500 million to be paid within four years of sentencing; and (f) the remainder to be paid within five years of sentencing. Payments shall be made by certified check payable to the National Fish and Wildlife Foundation and mailed to the attention of its Chief Financial Officer at 1133 15th Street, NW, Suite 1100, Washington, DC 20005, and including a reference to the case number in this proceeding; or by electronic funds transfer in accordance with written instructions to be provided to the defendant by NFWF at the time of transfer.

37. NFWF shall use the money it receives from the defendant pursuant to this Order for the following purposes and subject to the following conditions:

    a. To remedy harm and eliminate or reduce the risk of future harm to Gulf Coast natural resources, NFWF shall use approximately half of the payments to conduct or fund projects to remedy harm to resources where there has been injury to, or destruction of, loss of, or loss of use of those resources resulting from the Macondo oil spill. NFWF shall conduct or fund projects in the following states in approximately the following proportions: (1) Alabama, 28%, (2) Florida, 28%, (3) Mississippi, 28%, and (4) Texas, 16%. NFWF shall consult with appropriate state resource managers, as well as federal resource managers that have the statutory authority for coordination or

- 17 -

cooperation with private entities, to identify projects and to maximize the environmental benefits of such projects.

b. To remedy harm and eliminate or reduce the risk of future harm to the State of Louisiana and its natural resources, NFWF will use approximately half of the payments to create or restore barrier islands off the coast of Louisiana and/or to implement river diversion projects on the Mississippi and/or Atchafalaya Rivers for the purpose of creating, preserving and restoring coastal habitat, in order to remedy harm to resources where there has been injury to, or destruction of, loss of, or loss of use of those resources resulting from the Macondo oil spill. In conducting or funding these projects, NFWF will consult with State resource managers, as well as federal resource managers that have the statutory authority for coordination or cooperation with private entities regarding management or protection for coastal habitat, to identify the highest priority projects, and to maximize the environmental benefits of such projects. In identifying projects, NFWF shall consider the State's Coastal Master Plan, as well as the Louisiana Coastal Area Mississippi River Hydrodynamic and Delta Management Study, as appropriate.

c. In identifying and selecting projects to receive funding pursuant to this Order, NFWF shall not incur liability of any nature in connection with any act or omission, made in good faith, in the administration of the funds or otherwise pursuant to this Order, excepting, however, liability resulting from NFWF's gross negligence or willful misconduct. In addition, if and to the extent NFWF grants funds to or contracts with any governmental entity to implement any project under this Order: (a) NFWF shall be deemed to act solely as an administrative agent in contracting for, granting to, and

- 18 -

disbursing funds for any such project, and (b) NFWF shall not be deemed to incur any liability of any nature in connection with the design, engineering, construction, operation, or maintenance of any such project, including, without limitation, any impact or consequences of any such project on fish, wildlife, plant, or other natural resources, personal injury or property damage.

d. NFWF's use of funds received pursuant to this Order shall be subject to the reporting requirements of 16 U.S.C. § 3706. In addition, NFWF shall report to the Probation Officer and to the parties regarding the status and disposition of money it has received pursuant to this Order, on at least an annual basis, until all such money has been spent.

<u>Successors</u>

38. This Order shall be applicable to the defendant, and to the extent specified herein, to BP plc and Affiliates, during the defendant's term of probation.

39. In the event of a sale, assignment or transfer of all of the defendant's stock or assets to an unaffiliated third party pursuant to an arm's-length transaction, the terms of this Order shall continue to apply to the defendant and to any successor of the defendant.

40. With respect to the sale, assignment or transfer of some but not all of defendant's assets to an unaffiliated third party pursuant to arm's-length transaction, including but not limited to the transfer of operational control of a jointly owned asset to an unaffiliated third party, such third party shall not be liable for defendant's obligations, and the defendant and, as necessary, BP plc and Affiliates, shall remain obligated to comply with the obligations in this Order with respect to all non-disposed assets, but not with respect to the sold, assigned or transferred assets.

Appendix 5-038

41. With respect to a sale, assignment, or transfer covered in paragraph 39, a third party purchaser may petition the Court to be relieved from one or more terms of this Order upon a showing that (a) the third party purchaser has a SEMS system compliant with current BSEE regulations; and (b) all applicable regulatory approvals for the transaction have been or will be obtained. The third party purchaser may also petition the Court to be relieved from any particular term in Paragraphs 5 through 25 on the grounds that the particular term creates inconsistent, conflicting, or redundant obligations under the third party purchaser's existing SEMS systems and operational practices and procedures or other reasonable grounds. Prior to petitioning the Court for such relief, the third party will consult with DOJ regarding the requested relief, and DOJ will advise the Court of its conclusion as to whether the requested relief is appropriate.

42. The requirements of this Order are in addition to all other applicable requirements of law. This Order does not operate as a permit under federal, state or local regulations, and the defendant remains responsible for complying with all applicable federal, state and local laws, orders and permits. The defendant may not claim that compliance with this Order is a defense to any action commenced under applicable federal, state or local law. The government does not warrant that BP's compliance with this Order constitutes compliance with other applicable legal requirements, including but not limited to BSEE audit requirements.

43. The defendant's obligations pursuant to this Order expire five years after the Effective Date except as otherwise provided herein or as modified by the Court.

SO ORDERED this __ day of _____, 2012.

_____

UNITED STATES DISTRICT JUDGE

Appendix 5-040

Exhibit _B-1_

# AGREEMENT BETWEEN
# BP EXPLORATION AND PRODUCTION, INC. AND
# THE NATIONAL ACADEMY OF SCIENCES

This Agreement is entered into by BP Exploration and Production, Inc. (the "Company") and the National Academy of Sciences of the United States of America, a federally chartered private nonprofit corporation, 36 U.S.C. §§ 150301, *et seq*., with its principal place of business in Washington, D.C., acting on behalf of its principal component organizations, the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, and the National Research Council (collectively, "NAS"). The effective date of this Agreement is November __, 2012.

WHEREAS the *Deepwater Horizon* blowout and oil spill have demonstrated the need for improvement in offshore oil drilling safety, well monitoring, well design, oil-spill containment, oil-spill response strategies and technologies, and environmental monitoring;

WHEREAS the prevention of blowouts and oil spills resulting in harm to life, property, and the environment in the Gulf of Mexico and on the United States' outer continental shelf is a national priority;

WHEREAS reducing the environmental harm, loss of life or injury, and economic damage caused by any future blowout and discharge of oil associated with offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf is also a national priority;

WHEREAS basic and applied scientific and engineering research are essential to enhancing safety and minimizing the risk of future harm from spills from offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf; and

WHEREAS improved environmental monitoring can contribute to increased protection of the environment, human population, and natural resources in the event of future oil spills;

- 1 -

THEREFORE, the Company and NAS agree to the mutual covenants set forth in this Agreement:

## I.    Payments

1.    The Company shall pay $350 million to NAS according to the following schedule:

   a.   $5 million to be funded within 90 days of the date this Agreement becomes effective;

   b.   $15 million to be funded within one year of the date this Agreement becomes effective;

   c.   $45 million to be funded within two years of the date this Agreement becomes effective;

   d.   $80 million to be funded within three years of the date this Agreement becomes effective;

   e.   $90 million to be funded within four years of the date this Agreement becomes effective; and

   f.   $115 million to be funded within five years of the date this Agreement becomes effective.

2.    The Company shall assume no other responsibilities or obligations under this Agreement other than making the payments described in paragraph 1.

## II.    Purpose

3.    NAS shall use the payments described in paragraph 1 to establish a separate segregated account for a fixed-term endowment (the "Endowment"), the principal and earnings of which will be expended over a period of 30 years, subject to the provisions of paragraphs 28 and 29.

4.    NAS shall use the Endowment to establish a program focused on human health and environmental protection including issues relating to offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf (the "Program"). The Program will carry out studies, projects, and other activities that utilize the scientific, technical, engineering, medical, and health expertise

- 2 -

of the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, the National Research Council, and the nation's scientific, engineering, and health-care communities. The Program will seek to advance scientific and technical understanding with the objective of enhancing the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf. The Program will include the assessment and evaluation of strategies and technologies with the objective of enhancing the protection of human health and environmental resources in the Gulf of Mexico and on the United States' outer continental shelf. The manner in which the studies, projects, and other activities are to be conducted will be determined solely by NAS. In accordance with normal policies and procedures of NAS, the Program will be conducted by NAS based on scientific merit and integrity, with emphasis on freedom of inquiry and independent nonpartisan advice and recommendations.

5.　　The Program shall seek to carry out studies, projects, and other activities in the public interest that would not otherwise be adequately funded or supported by private industry.

## III.　Programmatic Objectives

6.　　To address the purpose described in paragraph 4, the Program shall fund and carry out studies, projects, and other activities in three basic categories: (a) research and development, (b) education and training, and (c) environmental monitoring. The Program should strive to achieve a balance of studies, projects, and other activities, consistent with paragraphs 4 and 18.

7.　　*Research and development.* The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to research and development related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

8.　　*Education and training.* The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to enhanced education and training for undergraduate, graduate, and professional-school students, private- and public-sector employees, and Gulf Coast regional communities, related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

- 3 -

9.   *Environmental monitoring.*  The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to the development of advanced environmental monitoring systems related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

## IV.   Structure and Organization

10.   NAS shall appoint a Board to provide general oversight for the Program.  The members of the Board shall be scientists, engineers, and other experts whose experience and knowledge can contribute to the oversight of the Program.  No current officer or current employee of the United States Government can serve on the Board.

11.   NAS shall appoint additional committees and panels of volunteer experts and establish or make arrangements with other entities as needed to carry out the Program.  At a minimum, NAS shall appoint committees for the following three topics:  (1) research and development, (2) education and training, and (3) environmental monitoring.  No current officer or current employee of the United States Government can serve on a committee or panel appointed by NAS under this paragraph.

12.   At least once a year, NAS shall seek the recommendations of each of the following entities (or its designees) concerning the administration of the Program, provided that the role of each such entity shall be solely advisory:

a.   In accordance with its statutory responsibilities and as necessary to meet the statutory requirement that it coordinate a comprehensive program "in cooperation and coordination with industry, universities, research institutions, State governments, and other nations, as appropriate," 33 U.S.C. § 2761, the Interagency Coordinating Committee on Oil Pollution Research (ICCOPR), including the Department of the Interior's Bureau of Safety and Environmental Enforcement (BSEE) and Bureau of Ocean Energy Management (BOEM); and

b.   The environmental-protection departments and other coastal natural-resource managers for the States of Alabama, Florida, Louisiana, Mississippi, and Texas.

13.   Appointments to the Board, committees, and panels shall be in accordance with (a) principles similar to those underlying section 15 of the Federal Advisory Committee Act, 5 U.S.C. App. 2; and (b) the implementing procedures of NAS, as applicable, including the

- 4 -

Conflicts of Interest Policy for Committees Used in the Development of Reports, and the Policy on Conflicts of Interest for Institutional Oversight and Non-Advisory Services, adopted by the NAS Council on May 12, 2003, and June 11, 2004, respectively, as may be amended or modified in the future.

14.     NAS shall establish periodic reporting procedures for grant recipients, including a statement of project accomplishments and a report on grant expenditures until project completion, as well as a final report after project completion. Each final report shall address the original objectives of the project as identified in the approved proposal, describe any changes in objectives, and provide a final project accounting. The final report of project accomplishments described in this paragraph shall be available to the public.

15.     NAS shall publish an annual report on studies, projects, and other activities funded or carried out by the Program during the preceding year. The annual reports shall be made available to the public and shall be disseminated in print and on the NAS Web site. Each annual report shall contain financial statements for the Program that are consistent with the audited financial statements of NAS, including a full and complete statement of income, expenditures, and investments. The report shall also include a list of each recipient of any grant funded by the Endowment, the amount of the grant, and a summary of the purpose of each grant made during the preceding year.

16.     The Company, its officers, and its employees shall not be involved in any decisions regarding the selection of studies, projects, activities, or award recipients.

## V.    Management of Funds

17.     NAS shall manage the Endowment in accordance with the policies established by the NAS Council, in accordance with the laws of the District of Columbia, including the Uniform Prudent Management of Institutional Funds Act of 2007, D.C. Code, Chapter 16A, as it may be amended from time to time, and any successor acts. NAS will invest the Endowment in a prudent manner for a 30-year fixed-term endowment whose entire principal and earnings will be expended within the 30-year period. NAS shall have the discretion to determine how to invest the funds in accordance with this standard of prudence, provided that at least half of all funds held in the Endowment shall be invested in United States Government securities, United States Government agency securities, and United States Government-backed securities.

18.     Nothing about the list of three categories of studies, projects, and other activities in paragraph 6 is meant to imply a relative priority or a particular funding allocation. NAS

- 5 -

should strive to achieve a balance of studies, projects, and other activities that supports the Program's overall purpose and programmatic objectives.

19.    All expenditures of Endowment funds by NAS for Program studies, projects, and other activities shall comply with OMB Circular A-122, 2 C.F.R. Part 230, as it may be revised from time to time, the NAS indirect-cost recovery rates established by the Office of Naval Research and any successor cognizant administrative contracting office, and the NAS disclosure statement on file with that Office (or an equivalent disclosure requirement).

20.    The funds expended from the Endowment for studies, projects, and other activities shall be audited annually by independent accountants in accordance with U.S. generally accepted accounting principles.

21.    NAS may at any time add to the Endowment using other sources of funding.

22.    NAS may not use the Endowment to support any study, project, or other activity that would expend funds for a purpose for which Congress has prohibited funding.

23.    If carrying out the Program's studies, projects, or other activities requires acquisition of real property, the property shall be located in the Gulf Coast region.

24.    NAS shall not use any money from the Endowment for the purpose of lobbying, attempting to influence legislation, participating in a political campaign, or otherwise influencing the outcome of any public election.

## VI.    Access to and Dissemination of Research

25.    The copyrights in all written materials, photographs, drawings, software, and other works subject to copyright protection created or generated under any grant made using the Endowment shall be owned by the recipient of the grant.  NAS will encourage the publication and dissemination and other use of these materials.  With respect to such copyrighted works, the United States Government and NAS shall have a royalty-free, nonexclusive, and irrevocable license to reproduce, publish, or otherwise use, and to authorize others to use such copyrighted works for Government or NAS purposes.  In addition to any other rights it may have, the United States Government shall have the rights provided in paragraph .36(d) of OMB Circular A-110, as it may be revised from time to time, subject to the terms and conditions set forth in that Circular.

26.    With respect to research data, which shall include the recorded factual material commonly accepted in the scientific community as necessary to validate research findings

- 6 -

(but not any preliminary analyses, drafts of scientific papers, plans for future research, peer reviews, or communications with colleagues), the researcher shall retain all rights in said data but shall provide timely and unrestricted access to the data to NAS and the United States Government.  Without limitation of the foregoing, the United States Government and NAS shall have the right to (1) obtain, reproduce, publish, or otherwise use the research data first produced under any grant funded by the Endowment, and (2) authorize others to receive, reproduce, publish, or otherwise use such data for Government or NAS purposes.

27.     The policies on patents outlined in 35 U.S.C. §§ 200-211, in 37 C.F.R. § 401, and in the Presidential Memorandum on Government Patent Policy dated February 18, 1983, will serve as basic guidance on patent rights so as to encourage the maximum participation in the Program by a diverse set of research entities.  Grantees will have the right to elect title to the patent rights in inventions resulting from work under any grant, subject to the United States Government and NAS each acquiring a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States or NAS, but in the case of NAS, solely in connection with the Program, the invention throughout the world in those inventions for which title is elected, and also subject to the "march-in-rights" of the United States Government as set forth in the above-cited statute and regulation.  Without limitation of the foregoing, the license provided herein to NAS shall include the right of NAS to sublicense its rights to contractors and grantees that perform studies, projects, or other activities under the Program, except that NAS shall not have the right to commercialize its rights outside the Program.

## VII.  Modification

28.     NAS shall conduct periodic reviews of the Endowment and Program at five-year intervals, to determine whether there is a continuing need for the Endowment and whether there is a need to modify the Agreement.  Any modification of the Agreement will be subject to paragraph 29.

29.     This Agreement may be modified only through application by NAS to the appropriate court in the District of Columbia pursuant to § 44-1635(b) or (c) of the Uniform Prudent Management of Institutional Funds Act, D.C. Code Ann. § 44-1635(b) or (c), as it may be amended from time to time, pursuant to comparable authority under a successor statute, or, in the absence of statutory authority, pursuant to principles of equitable deviation or cy pres.  This Agreement cannot be modified in a manner that violates paragraph 1, 2, or 22.

Appendix 5-047

## VIII. Miscellaneous Provisions

30. NAS shall comply with all local, State, Federal, and international laws or requirements that apply in connection with the performance of any studies, projects, or other activities of the Program.

31. This Agreement shall not be construed to create any rights in, or grant any cause of action to, any person not a party to this Agreement.

32. This Agreement shall be interpreted according to the laws of the District of Columbia.

33. The provisions governing the Endowment and Program are severable. Should any portion of the Endowment or Program, or its studies, projects, or other activities, be declared illegal or inoperable, the remaining provisions shall remain in effect so long as there remain valid purposes and continued funding to carry out any study, project, or other activity within the scope of the Program.

34. This Agreement may be signed in counterparts, each of which shall be an original and all of which together shall constitute the same Agreement.

_____

FOR BP EXPLORATION AND PRODUCTION, INC.

11-15-12
_____

Date

_____

FOR THE NATIONAL ACADEMY OF SCIENCES

- 8 -

Exhibit C

CERTIFICATION OF RESOLUTIONS ADOPTED BY
THE BOARD OF DIRECTORS OF BP EXPLORATION & PRODUCTION INC.

I, Mary Jane Stricker, a duly authorized representative of BP Exploration & Production Inc., a company incorporated under the laws of Delaware, do hereby certify that the following is a true and correct copy of certain resolutions adopted by the Board of Directors of BP Exploration & Production Inc. at a meeting held on November 15, 2012, at which a quorum of the Board was present and that such resolutions remain in full force and effect as of the date hereof.

Dated: November 15, 2012

Mary Jane Stricker
Assistant Corporate Secretary

WHEREAS, BP Exploration & Production Inc. (the "Company") has been engaged in discussions with the United States Department of Justice in connection with its investigations into potential criminal violations related to the causes and consequences of the April 20, 2010 explosion of the Deepwater Horizon ("Investigations");

WHEREAS, the Company's board of directors (the "Board") has been advised by executive management and both internal and external counsel on the progress of the Investigations at several meetings;

WHEREAS, the executive management of the Company and its affiliates and both internal and external legal counsel have been negotiating a resolution of the Investigations;

WHEREAS, the executive management of the Company and its affiliates and both internal and external legal counsel have reported to the Board the terms and conditions of a proposed resolution of the Investigations;

WHEREAS, the Board has been advised by executive management and both internal and external legal counsel of the Information and a Plea Agreement, with appendices, as circulated to the Board on November 14, 2012 (collectively the "Plea Agreement"), including, but not limited to, the criminal fine payment schedule, the remediation payments, the restitution payments, the terms of probation, and of two monitorships; and

WHEREAS, the Board acknowledges that the Plea Agreement fully sets forth the Company's agreement with the United States with respect to all criminal violations identified during the Investigations and that no additional promises or representations have been made to the Company by any officials of the United States or the States in connection with the disposition of the Investigations, other than those set forth in the Plea Agreement.

RESOLVED that:

1. The Board approves and agrees that it is in the best interest of the Company to enter the guilty plea provided for, and agrees to the other terms provided in the Plea Agreement with the United States Department of Justice in substantially the form and substance set forth in the form of Plea Agreement presented to this Board;

2. The officers of the Company and the Company's internal and external legal counsel are hereby each individually authorized, empowered and directed, on behalf of the Company, to execute and deliver the Plea Agreement, substantially in such form as reviewed by this Board with such changes as such officers or legal counsel may approve;

3. The officers of the Company and both the Company's internal and external legal counsel are hereby each individually authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement and other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing

resolutions (including execution and delivery of any such agreement or document on behalf of the Company);

4.      All of the actions of the officers of the Company and both internal and external legal counsel for the Company, which actions would have been within the scope of and authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company; and

5.      The Secretary or any Assistant Secretary of the Company are each individually authorized, empowered or directed, to provide to the United States Department of Justice a certified copy of these resolutions.

Exhibit D

## CERTIFICATION OF RESOLUTIONS ADOPTED BY BOARD OF DIRECTORS OF BP p.l.c.

I, David J. Jackson, a duly authorized representative of BP p.l.c., a company incorporated in England and Wales, do hereby certify that the following is an accurate excerpt of certain resolutions adopted by the Board of Directors of BP p.l.c. at a meeting held on November 15, 2012, and that such resolutions remain in full force and effect.

15.11.12
_____
[DATE]

_David J. Jackson_
David J. Jackson
Company Secretary, BP p.l.c.

### Resolutions of Board of Directors of BP p.l.c.

WHEREAS, BP p.l.c. (the "Company") has been engaged in discussions with the United States Department of Justice in connection with its investigations into potential criminal violations related to the causes and consequences of the April 20, 2010 explosion of the Deepwater Horizon ("Investigations");

WHEREAS, the Board has been advised by executive management and both internal and external counsel, and its own independent counsel, on the progress of the Investigations at several meetings, and has received reports at such meetings from the Board's Gulf of Mexico Committee, which has had numerous meetings with respect to the Investigations and the discussions with the United States Department of Justice;

WHEREAS, the Company's executive management and both internal and external legal counsel has been negotiating a resolution of the Investigations;

WHEREAS, executive management and both internal and external counsel, and independent legal counsel for the Board, has reported to the Board the terms and conditions of a proposed resolution of the Investigations;

WHEREAS, the Board has been advised by executive management and by internal and external counsel, and independent legal counsel for the Board, of the Information and a Plea Agreement, with appendices, as circulated to the Board on November 14, 2012 (collectively the "Plea Agreement"), including, but not limited to, the criminal fine payment schedule, the remediation payments, the restitution payments, the terms of probation, and of two monitorships, potentially to be entered into by BP Exploration & Production, Inc. ("BP E&P") and the United States Department of Justice;

WHEREAS, the Company and BP Corporation North America Inc. ("BPCNA") are, by the terms of the Plea Agreement, required to guarantee specified obligations of BP E&P under the Plea Agreement, and the Board of Directors has been briefed on those obligations by executive management, internal and external counsel and by independent legal counsel for the Board;

WHEREAS, the Board has also reviewed the terms of the related civil action against the Company by the United States Securities and Exchange Commission and a consent by the Company to the filing thereof, including certain undertakings set forth in such consent (the "SEC Settlement Agreement");

WHEREAS, the Board has been advised by independent counsel qualified in the applicable laws of the United States and England regarding the satisfaction of its duties prior to approving the Company's entry into the Plea Agreement, its guarantee of the specified obligations of BP E&P as set forth in the Plea Agreement and the execution and delivery by the Company of the SEC Settlement Agreement; and

WHEREAS, the Board has determined it is in the best interest of the Company to enter into the Plea Agreement, to guarantee the specified obligations of BP E&P as set forth in the Plea Agreement and to execute and deliver the SEC Settlement Agreement.

RESOLVED that:

1. The Company will enter into and, upon the execution of the Plea Agreement, have the guarantees and other obligations set forth in paragraph 6 of the Plea Agreement:

   a. BP plc and other BP plc entities shall be bound by those specific terms of this agreement that expressly apply to BP plc and other BP plc entities. BP plc shall secure and deliver to the Department from both BP Corporation North America Inc. ("BPCNA") and BP plc guarantees for all payments due from the defendant under this agreement, with BPCNA as the primary guarantor and BP plc as the secondary guarantor in the event of a default by BPCNA. BP plc and BP BPCNA consent to the jurisdiction of U.S. courts solely for purposes of enforcing the guarantees. Any legal successor or assign of BPCNA or BP plc shall remain liable, as the case may be, for the guarantee of defendant's payment obligations hereunder, and an agreement to so remain liable shall be included by BPCNA or BP plc, respectively, in the terms of any sale, acquisition, or merger of those entities. Any legal successor or assign of defendant shall remain liable for defendant's obligations in this plea agreement, and an agreement to so remain liable shall be included by defendant in the terms of any sale, acquisition, or merger of defendant.

   b. The defendant, BP plc and other BP plc entities waive any statute of limitations as of the date of this agreement through the full term of defendant's probation and until all of the defendant's obligations under this agreement have been satisfied with regard to any conduct relating to or arising

out of the *Deepwater Horizon* blowout, explosion, oil spill and response.

2.  Any director of the Company, the Company's Group General Counsel, and the Company's external legal counsel are hereby each individually authorised, empowered and directed, on behalf of the Company, to execute and deliver the Plea Agreement and any guarantee required under the Plea Agreement, and the SEC Settlement Agreement, substantially in such form as reviewed by this Board with such changes as the Group General Counsel of BP p.l.c. may approve;

3.  Any director of the Company, the Company's Group General Counsel, and the Company's external legal counsel are hereby each individually authorised, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement and other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions (including execution and delivery of any such agreement or document on behalf of the Company);

4.  All of the actions of the Company's directors, executive management and officers, and both internal and external legal counsel for the Company, which actions would have been within the scope of and authorised by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company; and

5.  The Company Secretary or the Deputy Company Secretary of the Company are each individually authorised, empowered or directed, to provide to the United States Department of Justice and the United States Securities and Exchange Commission certified copies of these resolutions.

**Appendix 6: Redacted Implementation Plan**

**BPXP REMEDIAL ORDER IMPLEMENTATION PLAN**
**March 28, 2013**

**A.**     <u>Introduction and Applicability</u>

This document ("Implementation Plan") sets forth BP Exploration & Production Inc.'s ("BPXP") plan to implement Paragraphs 5 through 31 of the Remedial Order contained in Exhibit B to the Plea Agreement and entered by the Court on January 29, 2013 This Implementation Plan is required by Paragraph 32 of the Remedial Order. Section H below includes the operative paragraphs of the Remedial Order, the actions required of BPXP for implementation and the applicable milestones and deliverables.

Unless otherwise specifically provided in this Implementation Plan, these requirements apply to all BPXP Deepwater Drilling Operations in Waters of the United States, both those existing on and after the Effective Date of the Remedial Order and any such operations that are acquired, commenced or otherwise engaged in or initiated by BPXP at any time after the Effective Date, until the termination of BPXP's probation. The provisions of this Implementation Plan shall be binding upon BPXP and its agents, successors and assigns, as provided in Paragraphs 39 through 41 of the Remedial Order. BPXP shall be solely responsible for ensuring that actions required under this Implementation Plan are undertaken in accordance with the deadlines and requirements contained in this Implementation Plan.

**B.**     <u>Definitions</u>

For purposes of this Implementation Plan, whenever the terms set forth below are used, the following definitions shall apply. Otherwise, the statutory and regulatory definitions in the Outer Continental Shelf Lands Act ("OCSLA") or the Clean Water Act ("CWA") or in the regulations implementing OCSLA or CWA shall apply. *See generally* 43 U.S.C. § 1331(a)-(q) (Definitions); 33 U.S.C. § 1362(1)-(25). If there is a conflict between a definition in the CWA and a definition in OCSLA, or the regulations under those statutes, the definition in the CWA or its regulations shall control.

1. <u>"Blowout Preventer" or "BOP"</u> shall mean the blowout preventer system equipment defined in API Standard 53 and used in Deepwater Drilling Operations as provided in 30 C.F.R. § 250.440.

2. <u>"BPXP Annual Report"</u> shall mean the report required for each calendar year as provided in Section E of this Implementation Plan.

Appendix 6-1

3. "Certification" and "Certify" shall mean the verification (or "to verify") documents and information required to be submitted under this Implementation Plan pursuant to Section D.

4. "Effective Date" shall mean the effective date of the Remedial Order, January 29, 2013.

5. "Contractor" and "Contract Personnel" shall have the meaning set forth in 30 C.F.R. § 250.1500.

6. "Date of Approval" shall mean the date on which the Probation Officer and DOJ approve this Implementation Plan (or the later date, if not approved on the same date).

7. "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Implementation Plan, where the last day would fall on a Saturday, Sunday or federal holiday, the period shall run until the close of business of the next business day.

8. "Deepwater Drilling Operations" shall mean deepwater operations in which a Drilling Rig is connected to a subsea well head utilizing a subsea BOP and, prior to moving off location to conduct another activity, conducts such well operations either: (a) pursuant to an approved Application for Permit to Drill ("APD"); or (b) as a subsequent related operation to temporarily abandon, permanently abandon or complete such well.

9. "Drilling Rig" shall mean a mechanical unit, vessel or facility engaged in Deepwater Drilling Operations.

10. "Implementation Plan" shall mean this plan as approved by the Probation Officer and the Department of Justice ("DOJ"), in accordance with Paragraph 32 of the Remedial Order, and as described in Section F below.

11. "Notice" shall mean the process for providing the required notice and service of deliverables as described in Section C of this Implementation Plan.

12. "Operator" shall have the meaning set forth in 30 C.F.R. § 250.105: The person the lessee(s) designates as having control or management of operations on the leased area or a portion thereof. An operator may be a lessee, the Bureau of Safety and Environmental Enforcement- ("BSEE") approved or Bureau of Ocean Energy Management- ("BOEM") approved designated agent of the lessee(s), or the holder of operating rights under a BOEM-approved operating rights assignment.

13. "Operating" shall mean conducting activities on a lease as an Operator.

14. "Platform" shall mean a facility, floating or fixed to the seafloor, primarily used for production of oil and gas. This facility may also be utilized for other operations such as drilling, well completion, well-workover or other operations (this term excludes Platform Rigs.

15. "Platform Rigs" shall mean a BPXP-owned Drilling Rig that is located on a Platform.

16. "Plea Agreement" shall mean the guilty plea agreement between BPXP and the United States filed with the Court on November 15, 2012 and accepted by the Court on January 29, 2013, including the exhibits thereto and the Remedial Order entered by the Court on January 29, 2013.

17. "Waters of the United States" shall mean all waters including navigable waters of the United States, adjoining shorelines, or waters of the contiguous zone, or waters in connection with activities under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*, or the Deepwater Port Act of 1974, 33 U.S.C. § 1501 *et seq.*, or water which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.*).

18. "Well Control" shall mean techniques used in Deepwater Drilling Operations to prevent the uncontrolled influx of formation fluids into the wellbore and the techniques used to regain control of the well if an influx of hydrocarbons or other formation fluids enters the wellbore.

### C.    Notices

1. Any notifications, submittals, reports or communications required by this Implementation Plan shall be made in writing and sent by (a) overnight or certified mail or courier and (b) email or facsimile to the addressees shown on Attachment A to this Implementation Plan.

2. Any recipient shown on Attachment A may change its contact information by sending written notice of the changes to all other addressees and providing them with an updated Attachment A.

3. Notices sent pursuant to this Implementation Plan shall be deemed given the Day of transmittal and deemed received the Day after transmittal.

### D.     Certification

1. Each submittal, or report for which certification is required pursuant to the Implementation Plan, shall be signed by an authorized representative of BPXP on the topics addressed in the document and include the following certification:

    I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information generated by the system, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

2. The reporting requirements of this Implementation Plan do not relieve BPXP of any reporting obligations required by any other federal, state, or local law, regulation, permit, or other requirement.

### E.     BPXP Annual Report

Annual compliance reports are required by Paragraph 23(b) of the Remedial Order. The annual reports must describe measures taken to comply with each of the requirements in Paragraphs 5 through 31 of the Remedial Order. BPXP Annual Reports will be due as follows: March 31, 2014; March 31, 2015; March 31, 2016; March 31, 2017; and January 19, 2018. BPXP shall organize the BPXP Annual Report to show the measures taken to meet each individual Remedial Order requirement, whether the measures were taken timely, and whether the measures amounted to compliance with the requirement. BPXP may designate information contained in the annual report as Confidential Business Information. Each report shall meet the requirements included in this Implementation Plan. BPXP shall post all BPXP Annual Reports on the public website required by Paragraph 23 of the Remedial Order, but may exclude from the BPXP Annual Report, or any attachment or appendix thereto, confidential business information or names of employees, employee records or other documents containing personal information.

### F.     Modification of the Implementation Plan

Any proposed modification to this Implementation Plan, including a modification of the SEMS audit schedule, a modification of another deadline or provision, or a submission required by this Implementation Plan subject to approval by DOJ or its designee, must be made in writing to DOJ in accordance with Section C above. Upon approval of a proposed modification by the Probation Officer and DOJ, BPXP shall comply with the Implementation Plan as modified. In

the event DOJ or its designee does not object to or comment on a proposed modification within 60 Days of submission BPXP shall comply with the provisions of the proposed modification.

G. **Non-compliance**

As provided in Paragraph 32 of the Remedial Order, compliance with this Implementation Plan is a special condition of BPXP's probation. Failure to comply with this Implementation Plan (including but not limited to failure to pay the reasonable compensation and expenses of the Auditor; failure to provide the Auditor with access to rigs, facilities, personnel, or data; and failure to satisfactorily address comments or objections made by DOJ or its designee in withholding approval of any plan, provision, or modification of this Implementation Plan) may be grounds for the revocation or modification of BPXP's probation. Failure to comply with regulatory requirements incorporated as requirements of this Implementation Plan shall, if the Court so determines, constitute a violation of BPXP's conditions of probation. BPXP shall comply with the provisions of this Implementation Plan. In the event BPXP fails to comply with any of the provisions of this Implementation Plan, including meeting any of the interim milestones, BPXP will provide prompt notice and a proposal for corrective action to the Probation Officer and other recipients listed in Attachment A to this Implementation Plan. If DOJ identifies a deficiency in compliance, DOJ shall provide BPXP with notice of the deficiency and a reasonable opportunity to cure.

Nothing in this Implementation Plan or the Remedial Order will relieve BPXP of its obligation to comply with all applicable federal or other laws and regulations, including but not limited to more stringent standards or requirements that may be promulgated after the effective date of this Implementation Plan or the Remedial Order. In addition, nothing in this Implementation Plan or the Remedial Order will be construed to prohibit or prevent the United States from developing, implementing and enforcing more stringent standards subsequent to the Effective Date of this Implementation Plan through rulemaking, the permit process or as otherwise authorized or required under federal laws and regulations. In addition, nothing contained in this Implementation Plan or the Remedial Order will be construed to prevent or limit the rights of the United States to seek or obtain other remedies or sanctions available under other federal, state, regional or local statutes or regulations, by virtue of BPXP's violation of the Implementation Plan or Remedial Order or of the statutes and regulations upon which the Implementation Plan and Remedial Order are based, or for BPXP's violations of any applicable provision of law. The requirements of this Implementation Plan and the Remedial Order do not exempt BPXP from complying with any and all new or modified federal or other applicable statutory or regulatory requirements that may require technology, equipment, monitoring or other upgrades after the Effective Date of this Implementation Plan.

H. **Specific Remedial Order Requirements and BPXP's Proposed Implementation Measures to Meet those Requirements**

**5.1     Remedial Order Requirements – Paragraph 5**

*5. For every contracted drilling rig currently in the defendant's fleet with a remaining contract term of at least three but less than six years as of the Effective Date, the defendant shall conduct at least one Safety and Environmental Management System ("SEMS") audit as described in 30 C.F.R. Part 250 during the remaining contract term. For every contracted drilling rig currently in the defendant's fleet with a remaining contract term of six years or more as of the Effective Date, the defendant shall conduct at least two SEMS audits during the remaining contract term under applicable BSEE regulations. For drilling rigs that are contracted after the Effective Date, the defendant shall comply with applicable BSEE regulations concerning SEMS audits.*

**5.2     Implementation**

1.     Identification of Contracted Drilling Rigs

    a.   The following contracted Drilling Rigs in BPXP's fleet currently have a remaining contract term of at least three (3) years but less than six (6) years:



    b.   The following contracted Drilling Rigs in BPXP's fleet currently have a remaining contract term of six (6) years or longer:



2.     Audit Frequency and Procedure

    a.   For every contracted Drilling Rig with a remaining contract term of at least three but less than six years as of the Effective Date, BPXP shall conduct at least one SEMS audit during the remaining contract term pursuant to the SEMS Audits Schedule in this Implementation Plan.

    b.   For every contracted Drilling Rig with a remaining contract term of six years or more as of the Effective Date, BPXP shall conduct at least two SEMS audits during the remaining contract term pursuant to the SEMS Audits Schedule in this Implementation Plan.

c.  For Drilling Rigs contracted after the Effective Date, BPXP shall conduct audits as described in 30 C.F.R. Part 250 Subpart S, as amended. These audits will be added to the SEMS Audits Schedule included in this Implementation Plan.

d.  All SEMS audits shall be conducted as described in 30 C.F.R. Part 250 Subpart S, as amended, and the SEMS Audits Schedule included in this Implementation Plan.

3.  SEMS Audits Schedule Revisions

a.  BPXP shall revise the SEMS Audits Schedule to reflect changes in: (i) BPXP's fleet of Drilling Rigs, Platforms and Platform Rigs; (ii) Contractor needs; (iii) auditing efficiencies; or (iv) other reasons for schedule modifications.

b.  Such revisions must be made pursuant to Paragraph 32 of the Remedial Order and Section F above.

## 5.3    Milestones and Deliverables

1.  Within 30 Days of the Date of Approval of the Implementation Plan, BPXP shall Certify that the above contracted Drilling Rigs listed in 5.2.1, is a complete list of the BPXP rigs subject to the requirements of Remedial Order Paragraph 5 or amend the list and the SEMS Audits Schedule as appropriate. In addition, BPXP must provide the remaining contract length for each Drilling Rig.

2.  BPXP will submit all documentation required for each SEMs audit as described by 30 C.F.R. Part 250 Subpart S, as amended.

3.  BPXP shall include the following information in the BPXP Annual Report

a.  For SEMS audit activities conducted during the prior calendar year: (i) the completion dates of the SEMS audit activities; (ii) the contracted Drilling Rigs included in the SEMS audit activities; and (iii) the third party SEMS auditor used on the SEMS audits; and

b.  For SEMS audit activities scheduled for the current calendar year: (i) the dates of the scheduled SEMS audit activities; (ii) the contracted Drilling Rigs included in such SEMS audit activities; and (iii) the third party SEMS auditor to be used to conduct the SEMS audits.

## 6.1    Remedial Order Requirements – Paragraph 6

*6. For its current contracts with rig contractors with respect to deepwater drilling rigs,*

*the defendant shall request that its rig contractors join the Center for Offshore Safety ("COS"), which requires its members to conduct SEMS audits. For new contracts with rig contractors with respect to deepwater drilling rigs, the defendant shall require rig contractors to join COS. The defendant may choose to conduct joint SEMS audits with its contractors for contracted deepwater drilling rigs.*

## 6.2    Implementation

1.    Identification of Drilling Rig Contractors: The following Drilling Rig Contractors have current contracts under which they supply Drilling Rig(s) to BPXP for Deepwater Drilling Operations:



2.    Procedure

    a.   In any new Drilling Rig contracts with Drilling Rig Contractors in the Waters of the United States, BPXP shall include a provision that requires the Drilling Rig Contractor to join the COS.

    b.   Within sixty (60) Days of the Date of Approval of this Implementation Plan, BPXP shall send a letter to its current Drilling Rig Contractors requesting that they join, or confirm that they already have joined, the COS.

    c.   BPXP may choose to conduct joint SEMS audits with its Contractors for contracted Drilling Rigs. To the extent that BPXP chooses to conduct joint SEMS audits with its Contractors, the SEMS audit shall be conducted as described in 30 C.F.R. Part 250 Subpart S, as amended.

## 6.3    Milestones and Deliverables

1.    Within 30 Days of the Date of Approval of this Implementation Plan, BPXP shall Certify that the above Deepwater Drilling Rig Contractor listed in 6.2(1) is a complete list of BPXP's contractors, or amend the list as appropriate.

2.    Within 120 Days of the Date of Approval of this Implementation Plan, BPXP shall Certify that it has sent letters as required to its current Deepwater Drilling Rig Contractors requesting that they join or confirm that they have joined the COS. BPXP will provide the correspondence to and from the Contractors pursuant to this Paragraph and will note where a Contractor has not responded in

a timely fashion. BPXP will provide any correspondence received after 120 Days of approval of this Implementation Plan when it is received.

3.    Within 30 Days of contracting with a new Deepwater Drilling Rig, BPXP shall Certify that the contract includes the provision required by this Paragraph 4. To the extent that BPXP chooses to conduct joint SEMS audits with its Contractors, BPXP will submit all documentation required for each SEMS audit as described in 30 C.F.R. Part 250 Subpart S, as amended.

4.    BPXP shall include the following information in the BPXP Annual Report:

    a.  A list of 6.2(1) Deepwater Drilling Rig Contractors and their COS affiliation status;

    b.  A list of all non-6.2(1) Deepwater Drilling Rig Contractors and their COS affiliation status; and

    c.  For SEMS audits conducted with Drilling Rig Contractors during the prior calendar year: (i) the Drilling Rig Contractor involved; (ii) the completion dates of the SEMS audit activities; (iii) the Drilling Rigs included in the SEMS audit activities; and (iv) the third party SEMS auditor used on the SEMS audits.

## 7.1    Remedial Order Requirements – Paragraph 7

*7. The defendant shall conduct one SEMS audit for each of its operated platforms, including BP-owned platform rigs, within five years of the Effective Date.*

## 7.2    Implementation

1.    Identification of BPXP-operated Platforms and Platform Rigs: BPXP currently operates the following Platforms and Platform Rigs:

- Thunder Horse Platform (including Platform Rig)
- Mad Dog Platform (including Platform Rig)
- Atlantis Platform
- NaKika Platform

2.    Audit Frequency and Procedure

    a.  BPXP shall conduct one (1) SEMS audit for each of its operated Platforms and Platform Rigs within five (5) years of the Effective Date.

b.   In the event BPXP commences operation of any additional Platforms or Platform Rigs in the Waters of the United States within three (3) years of the Effective Date, BPXP shall conduct one (1) SEMS audit for these additional Platforms or Platform Rigs, within five (5) years of the Effective Date.

c.   All SEMS audits shall be conducted as described in 30 C.F.R. Part 250 Subpart S, as amended, and the SEMS Audits Schedule included in this Implementation Plan.

3.   SEMS Audits Schedule Revisions

a.   BPXP shall revise the SEMS Audits Schedule to reflect changes in: (i) BPXP's fleet of Drilling Rigs Platforms and Platform Rigs; (ii) Contractor needs; (iii) auditing efficiencies; or (iv) other reasons for schedule modifications.

b.   Such revisions must be made pursuant to Paragraph 32 of the Remedial Order and Section F above.

## 7.3   Milestones and Deliverables

1.   Within 30 Days of the Date of Approval of the Implementation Plan, BPXP shall Certify that the list of Platforms and Platform Rigs in 7.2.1 is a complete list of all BPXP operated Platforms and Platform Rigs subject to the requirements of Paragraph 7, or amend the list and the SEMS Audits Schedule, as appropriate.

2.   When BPXP commences operation of any additional Platforms or Platform Rigs in the Waters of the United States after the Effective Date, BPXP shall provide Notice and a new SEMS Audits Schedule within 30 Days.

3.   BPXP will submit all documentation required for each SEMS audit and corrective action plan as described in 30 C.F.R. Part 250 Subpart S, as amended.

4.   BPXP shall include the following information in the BPXP Annual Report:

a.   For SEMS audit activities conducted during the prior calendar year: (i) the completion dates of the SEMS audit activities; (ii) the Platforms and Platform Rigs included in the SEMS audit activities; and (iii) the third party SEMS auditor used to conduct the SEMS audits.

b.   For SEMS audit activities scheduled for the current calendar year, BPXP shall include the following information : (i) the dates of the planned SEMS audit activities; (ii) the Platforms and Platform Rigs included in such SEMS audit

activities; and (iii) the third party SEMS auditor to be used to conduct the SEMS audits.

## 8.1   Remedial Order Requirements – Paragraph 8

*8. With respect to defendant-operated platforms, the defendant shall follow Third Party SEMS Auditing and Certification of Deepwater Operations Requirements as specified by COS.*

## 8.2   Implementation

BPXP shall follow Third Party SEMS Auditing and Certification of Deepwater Operations Requirements as specified by the COS for BPXP-operated Platforms identified in Section 7. For audits conducted prior to certification by the COS of third party SEMS auditors, or if such third party SEMS auditors are not available, BPXP shall submit a proposed third party SEMS auditor to BSEE for timely approval.

## 8.3   Milestones and Deliverables

1.   Subject to the exception noted in Section 8.2 for audits conducted with BSEE-approved auditors, with each SEMS audit report submitted for a SEMS audit on a BPXP-operated Platform pursuant to the SEMS Audits Schedule, BPXP will require the party conducting the audit to include in his/her report a statement indicating that the SEMS audit was conducted pursuant to the Third Party SEMS Auditing and Certification of Deepwater Operations Requirements as specified by the COS.

2.   BPXP shall include the following information in the BPXP Annual Report:

   a.   For audit activities conducted during the prior calendar year: (i) the completion dates of the SEMS audit activities; (ii) the Platforms and Platform Rigs included in the SEMS audit activities; and (iii) the third party SEMS auditor used on the SEMS audits.

   b.   For audit activities scheduled for the current calendar year, BPXP shall include the following information: (i) the dates of the scheduled SEMS audit activities; (ii) the Platforms and Platform Rigs included in such SEMS audit activities; and (iii) the third party SEMS auditor to be used on the SEMS audits.

## SEMS Audits Schedule

The following schedule incorporates the scheduling requirement of Paragraphs 5 through 8. The provisions in Paragraph 5 provide for the scheduling of certain SEMS audits beyond the five (5) year term of the probation agreement. BPXP's agreement in this Implementation Plan to the scheduling of audits beyond that period does not extend the probation period, which is expressly set forth in the Plea Agreement. By no later than six (6) months before expiration of the probation period, BPXP will provide Notice of the schedule of audits to be completed after the end of the probation period. By no later than the expiration of the probation period, BPXP shall enter into an Administrative Agreement with BSEE, enforceable by BSEE order, to perform these audits as scheduled, unless the audits have been completed before the expiration of the probation period.

For purposes of this schedule, a SEMS audit is considered complete upon the performance of the physical audit. Appropriate documentation, including the SEMS Third Party Audit Report, and the development of a corrective action plan, described in 30 C.F.R. Part 250 Subpart S, as amended will be conducted in accordance with the regulations. Those audits described in the table below and designated as "Regulatory" signify audits that are required under applicable regulations; additional audits beyond those required by regulation but required under the Remedial Order are indicated by "Additional."

| Platform or Drilling Rig | Audit Type | Completion Date (No Later Than the End of) |
|---|---|---|
| Paragraph 5 – Drilling Rigs contracted for ≥3 and <6 years | | |
| ███████ | Regulatory | Nov 2013 |
| ███████ | Additional | Dec 2014 |
| ███████ | Additional | Dec 2015 |
| Paragraph 5 – Drilling Rigs contracted for ≥6 years | | |
| ███████ | Additional | Dec 2015 |
| | Additional | Dec 2018 |
| ███████ | Regulatory | Dec 2016 |
| | Additional | Dec 2020 |
| ███████ | Additional | Dec 2017 |
| | Additional | Dec 2020 |
| Paragraph 7 – BPXP-Owned Platform Rigs | | |
| ███████ | Additional | Dec 2014 |
| | Regulatory | Dec 2019 |
| ███████ | Additional | Dec 2017 |
| | Regulatory | Dec 2022 |
| Paragraph 7 – BPXP-Operated Platforms including BPXP-Owned Platform Rigs | | |
| ███████ | Regulatory | Nov 2013 |
| ███████ | Additional | Dec 2014 |

Appendix 6-12

| | Regulatory | Dec 2019 |
|---|---|---|
| ███████ | Regulatory | Dec 2022 |
| | Additional | Dec 2017 |
| ███ | Additional | Dec 2016 |

**9.1 Remedial Order Requirement – Paragraph 9: Third Party Verification of Blowout Preventers**

> *9. Each time the defendant or its contractors brings a subsea blowout preventer system as referenced in 30 C.F.R. § 250.440 ("BOP") into service on a moored or dynamically positioned drilling rig, and each time a subsea BOP from a moored or dynamically positioned drilling rig is brought to the surface, the defendant or its contractors, through a third party, will verify that all required and recommended testing and maintenance of the BOP were performed in accordance with manufacturer recommendations and API Recommended Practice 53 (and Standard 53 when it becomes final).*

**9.2    Implementation**

1.    Within 30 days of the Date of Approval of the Implementation Plan, for each new Application for a Permit to Drill in the Waters of the United States for Deepwater Drilling Operations that includes a subsea BOP on a moored or dynamically positioned Drilling Rig, BPXP shall state in supplemental attachment to the Application for a Permit to Drill that: "Each time BPXP or its Contractors initially latch a subsea BOP at the well site and each time the subsea BOP is brought to the surface after it has been latched to a well, BPXP or its Contractors, through a third party, will verify that all required and recommended testing and maintenance of the BOP were performed in accordance with manufacturer recommendations and API Recommended Practice 53 (to be replaced by Standard 53 when it becomes final)."

2.    For each moored or dynamically positioned Drilling Rig operating for BPXP in the Waters of the United States that has a subsea BOP, BPXP shall maintain a register of each time a subsea BOP is latched into service at the well site and each time the subsea BOP from a moored or dynamically positioned Drilling Rig is brought to the surface after it has been latched to a well. The register will include: (a) the date the subsea BOP is latched at the well site; (b) the date the subsea BOP is unlatched and brought to the surface after it has been latched to a well; (c) the date or dates of verification for testing and maintenance of the BOP was performed on the surface in accordance with manufacturer recommendations and API Recommended Practice 53 (to be replaced by Standard 53 when it becomes final); and (d) the third party who performed the verification of testing and maintenance. The register need not include instances where the BOP has been submerged and returned to the surface but not latched to a well.

3.    For each moored or dynamically positioned Drilling Rig operating for BPXP in the Waters of the United States that has a subsea BOP, BPXP shall maintain documentation of verification issued by a third party verifying that all required and recommended testing and maintenance of the BOP were performed on the surface in accordance with manufacturer recommendations and API Recommended Practice 53 (to be replaced by Standard 53 when it becomes final).

## 9.3    Milestones and Deliverables

1.    BPXP shall include the following information in the BPXP Annual Report:

a.    A list of each moored or dynamically positioned Drilling Rig operated for BPXP in the Waters of the United States that has a subsea BOP over the prior calendar year;

b.    A list of the third parties that verified the testing and maintenance on each rig; and

c.    A Certification that every time during the prior calendar year when BPXP or its Contractors initially latch a subsea BOP at the well site, and each time the subsea BOP is brought to the surface after it has been latched to a well, a third party verified that all required and recommended testing and maintenance of the BOP was performed on the surface in accordance with manufacturer recommendations and API Recommended Practice 53 (to be replaced by Standard 53 when final). In the event that BPXP cannot so Certify, it shall provide a list of all instances in the prior calendar year where testing and maintenance of the BOP were not performed as required by Paragraph 9 of the Remedial Order and this Section, along with the reasons for noncompliance and the corrective actions taken or proposed and a Certification that all other deployments were verified as required by Paragraph 9 and this Section.

## 10.1    Remedial Order Requirements – Paragraph 10: Deepwater Well Control Competency Assessments

*10. The defendant shall implement the following measures to strengthen its well control competencies:*

*a. The defendant shall develop, within 6 months of the Effective Date, a deepwater well control competency assessment plan for the defendant personnel responsible for oversight of deepwater drilling operations on defendant-owned or contracted rigs. The plan shall exceed the competency requirements set forth in 30 C.F.R. §§ 250.1500-1510 (Subpart O), and shall include, but not be limited to: identifying skill sets and other competencies needed to recognize, evaluate, respond, and remediate*

*well control events; providing for the training, assessment of skills and competencies; and undertaking appropriate corrective actions for personnel who do not demonstrate the identified skills or competencies.*

*b. The defendant shall provide to BSEE, on an annual basis, a summary report regarding competency assessment plan implementation, including the types and aggregate number of people assessed, found competent, found in need of further training, and the number who have completed training and reassessment.*

**10.2   Implementation**

1.  BPXP shall develop, by no later than July 29, 2013, a Well Control competency assessment plan for Wellsite Leaders who are responsible for oversight of Deepwater Drilling Operations on BPXP contracted or BPXP-owned Drilling Rigs and Wells Team Leaders who supervise them (collectively "Well Control Personnel"). The plan shall include competency requirements with respect to Well Control Personnel that exceed the competency requirements in BPXP's current Subpart O plan in effect as of the Effective Date. The Well Control competency assessment plan shall address the following elements: (a) identifying skill sets and other competencies needed to recognize, evaluate, respond and remediate Well Control events; (b) providing for training and assessment of skills and competencies, including those associated with interfacing with Drilling Rig Contractors as provided in Well Control bridging documents; and (c) undertaking appropriate corrective actions for personnel who do not demonstrate the identified skills or competencies.

2.  BPXP's Subpart O plan will continue to require International Association of Drilling Contractors ("IADC") WellCap training at supervisory levels for BPXP Wellsite Leaders. BPXP will also continue to require Contractors who perform Well Control duties on BPXP-contracted and BPXP-owned Drilling Rigs to complete IADC WellCap training (or successor IADC training program).

**10.3   Milestones and Deliverables**

1.  No later than May 29, 2013, BPXP shall meet with United States representatives to discuss the elements of a Well Control competency assessment plan. In addition, BPXP shall meet periodically with United States representatives at their request during the development of the Well Control competency assessment plan, to review BPXP's progress.

2.  No later than July 29, 2013, BPXP shall submit for BSEE approval (in accordance with Paragraph 32 of the Remedial Order and Section F above) the Well Control competency assessment plan. The plan shall be applicable to all Well Control

Personnel. Upon submission, BPXP shall begin implementation of the Well Control competency assessment plan.

3.      BPXP shall include the following information in the BPXP Annual Report:

    a.     A summary regarding the IADC WellCap training (or successor IADC training program) at supervisory levels for BPXP Well Control Personnel who are responsible for oversight of Deepwater Drilling Operations on BPXP-owned or BPXP-contracted Drilling Rigs, including the roles and number of people trained during the previous calendar year;

    b.     A summary regarding the Well Control competency assessment plan implementation for the previous calendar year, including: (i) the percentage of Well Control Personnel assessed; (ii) the percentage of those assessed found competent; (iii) the percentage of those assessed found in need of further training; and (iv) the percentage of those found in need of further training that have completed the further training and reassessment; and

    c.     Subsequent BPXP Annual Reports should address the number and/or percentage of new individuals that have been trained and/or assessed since the previous BPXP Annual Reports.

## 11.1   Remedial Order Requirements – Paragraph 11: Cement Design and Competency

*11. a. The defendant shall require review and approval by subject matter experts of the defendant, BP plc, or the Affiliates of cement designs used for primary cementing of casing and exposed hydrocarbon-bearing zones during drilling operations at deepwater wells.*

*b. The defendant shall require that lab testing of cement slurries for primary cementing of casing and exposed hydrocarbon bearing zones relating to drilling operations of deepwater wells be conducted or witnessed by a defendant engineer competent to evaluate such lab testing or a competent third party independent of the cement provider. The defendant shall provide lab results to the applicable BSEE field office within a reasonable period of time.*

*c. The defendant shall develop and provide to BSEE, within 6 months of the Effective Date, a framework document setting forth the defendant's competency requirements for cement subject matter experts, subject to review and approval at BSEE's option.*

## 11.2    Implementation

1.    BPXP shall require that subject matter experts ("SMEs") review and approve cement designs used for primary cementing of casing and exposed hydrocarbon-bearing zones during Deepwater Drilling Operations. SMEs may include BPXP's cementing SME, regional cementing SME, cementing technical specialist, regional zonal isolation SME, zonal isolation technical specialist, or other similar job titles.

2.    BPXP shall require that lab testing of cement slurries for primary cementing of casing and exposed hydrocarbon bearing zones relating to Deepwater Drilling Operations be conducted or witnessed by an engineer competent to evaluate such lab testing, or a competent third party independent of the cement provider. An "engineer competent to evaluate lab testing" may include BPXP's cementing SME, regional cementing SME, cementing technical specialist, regional zonal isolation SME, zonal isolation technical specialist, or other similar job titles.

3.    BPXP shall develop a candidate screening process that sets forth competency requirements for cement SMEs that includes: (a) essential knowledge; (b) experience criteria; (c) qualifications; and (d) development.

## 11.3    Milestones and Deliverables

1.    Within 60 Days of the Date of Approval of the Implementation Plan, BPXP shall submit a list of names and titles of its cementing SMEs, regional cementing SMEs, cementing technical specialist, regional zonal isolation SMEs, zonal isolation technical specialists, and any other individuals it is then currently using to satisfy the requirements of Sections 11.2.1 and 11.2.2. BPXP also shall submit a list of the names and titles of third parties BPXP is then currently using to satisfy the review and approval requirements of Section 11.2.2. An annual update of these lists shall be submitted by the same dates that BPXP's Annual Reports are due. BPXP will Certify that all of these individuals have completed the candidate screening process.

2.    Within 30 days of the Date of Approval of the Implementation Plan, BPXP shall submit with each Application for Permit to Drill for Deepwater Drilling Operations submitted within five years of the Effective Date a supplemental attachment including (a) the name and title of the SME who reviewed and approved the cement designs contained in the APD for primary cementing of casing and exposed hydrocarbon-bearing zones related to the well, and (b) a statement in a supplemental attachment to the APD that lab testing of cement slurries for primary cementing of casing and exposed hydrocarbon bearing zones relating to the well will be conducted or witnessed by an engineer competent to

evaluate such lab testing or a competent third party independent of the cement provider.

3.     BPXP shall submit with relevant Well Activity Reports ("WAR") provided to the applicable BSEE field office for Deepwater Drilling Operations submitted within five years of the Effective Date the results of lab testing of cement slurries for primary cementing of casing and exposed hydrocarbon bearing zones relating to the well. The results must include the name and title of the engineer competent to evaluate such lab testing or the competent third party independent of the cement provider who conducted or witnessed the lab testing.

4.     By no later than July 29, 2013, BPXP shall submit for approval (in accordance with Paragraph 32 of the Remedial Order and Section F above) a framework document for a candidate screening process that sets forth competency requirements for cement SME that includes: (1) essential knowledge; (2) experience criteria; (3) qualifications; and (4) development.

    a.     BPXP will meet with BSEE representatives at their request prior to July 29, 2013 to review BPXP's progress in developing the candidate screening process.

    b.     By no later than October 29, 2013, BPXP shall submit an evaluation of the adequacy of the candidate screening process by an independent third-party cement expert; and

    c.     BPXP may modify the submitted candidate screening process to reflect opportunities for continuous improvement if it provides Notice within 30 Days of any such modifications; and complies with the requirements of Paragraph 32 of the Remedial Order and Section F above.

5.     BPXP shall include the following information in the BPXP Annual Report:

    a.     A Certification that the requirements of 11.3.2 were met during the prior calendar year;

    b.     A Certification that the requirements of 11.3.3 were met during the prior calendar year; and

    c.     A summary regarding the implementation of the cement SME candidate screening process during the prior calendar year. The summary must include the number and percentage of SMEs screened, the number and percentage of those screened found competent, the number and percentage of those screened found in need of further training, and the number and percentage of those

found in need of further training that have completed further training and screening. Subsequent BPXP Annual Reports should specifically address the number and/or percentage of new individuals that have been screened since the previous BPXP Annual Report.

## 12.1   Remedial Order Requirements – Paragraph 12: Houston Monitoring Center ("HMC")

*12. The defendant shall maintain a real-time drilling operations monitoring center at its Houston office or other appropriate location. The well control data to be monitored will include, at a minimum, active pit volume, pump pressure, flow rate out, gas units, and trip displacement. The HMC shall monitor such data for all defendant-owned or contracted rigs conducting drilling with a subsea BOP installed on the wellhead. The defendant shall provide BSEE personnel with reasonable access to the HMC.*

## 12.2   Implementation

1.   BPXP shall maintain a real-time drilling monitoring center for five years from the Effective Date. The Houston Monitoring Center (the "HMC") is currently located at BPXP's Houston headquarters. The Well Control data to be monitored will include, at a minimum: (a) active pit volume; (b) pump pressure; (c) flow rate out; (d) gas units; and (e) trip displacement.

2.   BPXP shall continuously staff the HMC with personnel who possess IADC WellCap certification to monitor such data for all BPXP-owned or contracted Drilling Rigs conducting Deepwater Drilling Operations with a subsea BOP installed on the wellhead.

3.   In the event of a planned maintenance event or an unplanned disruption of operations at the HMC, BPXP shall take reasonable steps to return the HMC to operation promptly. BPXP shall maintain a written contingency plan addressing appropriate steps and procedures when operation of the HMC has been disrupted, and shall apply the HMC contingency plan in such circumstances.

4.   The Third Party Auditor and representatives of the United States will be provided access to the HMC at any time.

## 12.3   Milestones and Deliverables

1.   Within 60 Days of the Date of Approval of the Implementation Plan, BPXP shall submit a written description of the location of its HMC, and for the HMC: (a) the well control data being monitored; (b) the number and titles of staff; (c) the

general staffing schedule; and (d) a description of the data retention policy. BPXP also shall submit the contingency plans for the HMC.

2.     If the HMC is unavailable to monitor one (1) or more rigs for eight (8) consecutive hours or longer, BPXP will maintain a log of such instances, and provide to BSEE and the Third Party Auditor upon request summary documentation regarding the cause and duration of unavailability.

3.     BPXP shall include the following information for the prior calendar year in the BPXP Annual Report: (a) the location of the HMC; (b) titles of staff; (c) staffing schedule; (d) length of data retention; (e) a list of the days when the Auditor or representative of the United States requested access to the HMC and whether they were granted such access; and (f) any circumstances in which the HMC was unavailable to monitor one (1) or more rigs for eight (8) consecutive hours or longer.

## 13.1   Remedial Order Requirements – Paragraph 13: Incident Reporting

*13. The defendant shall provide to BSEE, on an annual basis, a summary report documenting incidents operators are required to report under 30 C.F.R. § 250.188. For each item reported, the defendant shall describe the actions implemented to correct the item and/or to prevent recurrence. This report shall be submitted by March 31st of each year covering incidents during the previous calendar year.*

## 13.2   Implementation

In accordance with the schedule set forth in Paragraph 23.3.2, BPXP shall prepare an Incident Summary Report documenting all incidents operators are required to report under 30 C.F.R. § 250.188. For each incident reported, BPXP shall describe the actions taken to correct the item and/or to prevent recurrence. BPXP shall: (a) identify the most frequent incident types; and (b) describe actions implemented to prevent recurrence, including whether or not any corresponding changes were made to the SEMS plan.

## 13.3   Milestones and Deliverables

BPXP shall submit the Incident Summary Report as an appendix to each BPXP Annual Report.

## 14.1   Remedial Order Requirements —— Paragraph 14

*14. The defendant shall train each Command Officer and Staff, General Section Chiefs, and Staff including the Oil Spill Response Coordinator and alternates of the GoM Incident Management organization at least once per year and require their participation*

*in at least one table top oil spill response exercise per year.*

**14.2    Implementation**

1.    BPXP shall require position-specific training prior to assignment, and annual training thereafter, inclusive of training on the oil spill response procedures specific to the position identified in the Oil Spill Response Plan ("OSRP"), , and participation in at least one (1) table top oil spill response exercise, for personnel in the following positions:

- Incident Commander
- Operations Section Chief
- Operations Section Staff
- Planning Section Chief
- Planning Section Staff
-         Source Control Branch Director
-         Source Control Branch Staff
- Logistics Section Chief
- Logistics Section Staff
- Oil Spill Response Coordinator
- Finance Section Chief
- Finance Section Staff

2.    For purposes of Section 14.2.1, "Staff" shall mean alternates of Section Chief and the Oil Spill Response Coordinator positions.

3.    Table top oil spill response exercises at a minimum must exercise procedures identified in the applicable Oil Spill Response Plan being exercised and designed to meet specific and measurable objectives. "Exercise" or "drill" means an activity involving the actual or simulated performance and coordination of response activities by several individuals and/or teams, or the actual or simulated mobilization of personnel and resources.

**14.3    Milestones and Deliverables**

1.    By November 30th of each year, BPXP shall develop and submit to BSEE a document describing: (a) the training BPXP intends to use to satisfy the requirements of Paragraph 14 for the following calendar year; (b) the goals of that training, including covering the subject matter, as appropriate, outlined in ICS 100, 200, 300 and IS 700/800; and (c) the duration of the training.

2.     BPXP shall record this training in accordance with 30 C.F.R. § 254.41(d) and shall retain required training records including training certificates and attendance records at the location designated by BPXP. BPXP shall keep the training records related to the requirements of Paragraph 14 for 5 years after the Effective Date. These records must be made available to the Third Party Auditor and United States upon request.

3.     BPXP shall include the following information in the BPXP Annual Report:

   a.     A Certification identifying those BPXP personnel who held any of the positions identified in Section 14.2.1 for the entire prior calendar year, and the training completed by those personnel prior to assignment, and annually thereafter regarding spill response procedures set forth in the OSRP;

   b.     A Certification that those BPXP personnel who held any of the positions identified in Section 14.2.1 for the entire prior calendar year participated in at least one table top oil spill response exercise that exercised the parts of the applicable OSRP that apply to Paragraph 14;

   c.     A description of the oil spill response training and table top oil spill response exercises conducted during the prior calendar year, including a summary of lessons learned; and

   d.     BPXP's Preparedness for Response Exercise Program ("PREP") Triennial Cycle Documentation Form or equivalent triennial exercise record required in 30 C.F.R. § 254.42(e) for the prior calendar year.

## 15.1   Remedial Order Requirements – Paragraph 15

*15. The defendant shall maintain a crisis management organization, including two crisis management centers, consisting of at least 6 crisis management professionals (including a supervisor) to assist in oil spill response training and drills.*

## 15.2   Implementation

1.     BPXP shall maintain a crisis management organization to support the Unified Command during an oil spill response, as needed, and in oil spill response training and drills consisting of:

   a.     Two (2) BPXP facilities that can be used as crisis management centers including one (1) in its Houston headquarters, and a second in Houma, Louisiana or another appropriate location which can be used as an alternate facility; and

b.      A least six (6) BPXP crisis management professionals, including one (1) supervisor.

2.      BPXP shall include the crisis management facilities in the appropriate sections of future submissions of its OSRP.

## 15.3    Milestones and Deliverables

1.      Within 60 Days of the Date of Approval of the Implementation Plan, BPXP shall submit a document describing the locations of its crisis management centers and for each crisis management center: (1) the center resources, (2) the number, titles, and general qualifications of staff, and (3) the staffing schedule.

2.      If at any time no crisis management center is available, BPXP will notify BSEE and the U.S. Coast Guard and submit an explanation pursuant to Section C "Notices," of the situation, describing: (a) the length of time during which no crisis management center will be available; (b) the reasons why an alternative crisis management center location could not be used; and (c) the actions taken, or that will be taken, to make a crisis management center available.

3.      If at any time no crisis management center is available, this may be considered a change which significantly reduces BPXP's response capability triggering a revision to the BPXP OSRP for approval by BSEE within 15 Days of the change, per 30 C.F.R. § 254.30(b)(1).

4.      BPXP shall include the following information for the prior calendar year in the BPXP Annual Report:

a.      The locations of its crisis management centers, and for each crisis management center: (i) the center resources; (ii) the number, titles, and general qualifications of staff; (iii) staffing schedule; and (iv) any variations from the prior year;

b.      Any instances when a crisis management center was not available, including the period of time it was unavailable and the location of the crisis management center that was available during that time period. If no alternative crisis management center location was available, BPXP must include: (i) the length of time during which no crisis management center was available; (ii) the reasons why an alternative crisis management center location was not available; and (iii) the actions taken or that will be taken to make a crisis management center available; and

c.      A description of each oil spill response training and/or drill that involved the crisis management centers and/or staff.

## 16.1    Remedial Order Requirements – Paragraph 16

*16. The defendant shall conduct annual training with the Marine Well Containment Company ("MWCC"), or a similar organization, for its Operations Section chiefs and Source Control Section chiefs in the Gulf of Mexico.*

## 16.2    Implementation

1.      BPXP shall conduct annual training with the MWCC or a similar organization for its Operations Section Chiefs and Source Control Branch Directors. The types of annual training permitted under this Paragraph shall be consistent with the subsea well containment responsibilities, including management of source control within the response organization.

## 16.3    Milestones and Deliverables

1.      Within 60 Days of the Date of Approval of the Implementation Plan, BPXP shall submit a document describing the types of training provided by MWCC and other similar organizations that BPXP intends to use to satisfy the requirements of Paragraph 16. The description must include but is not limited to the training goals, and length.

2.      Within 60 Days of a change in source control equipment supplier, BPXP shall submit to BSEE a document describing: (a) the types of training provided by the new supplier; and (b) whether that training will be used by BPXP to satisfy the requirements of Paragraph 16. If the new supplier training will be used by BPXP to satisfy the requirements of Paragraph 16, BPXP shall explain how the training is consistent with the training listed in 16.2.1. The description shall include but is not limited to the training goals, and length.

3.      BPXP shall record this training in accordance with 30 C.F.R. § 254.41(d) and shall retain training records including training certificates, if issued, and attendance records at the location designated by BPXP. BPXP shall keep the training records related to the requirements of Paragraph 16 for five (5) years after the Effective Date. BPXP shall make the training records available to the Third Party Auditor and United States upon request.

4.      BPXP shall include the following information for the prior calendar year in the BPXP Annual Report:

a.    A Certification identifying all personnel who held any of the positions identified in Section 16.2.1 during the entire prior calendar year and the training they completed with the MWCC, or a similar organization; and

b.    A description of all the training conducted.

## 17.1   Remedial Order Requirements – Paragraph 17

*17. The defendant shall participate in MWCC or industry oil spill response drills at least once per year.*

## 17.2   Implementation

1.    BPXP shall require annually that the Gulf of Mexico Oil Spill Response Coordinator or his/her designee participate in at least one (1) MWCC- or other industry-initiated oil spill response drill, which includes a source control objective.

2.    The MWCC or other industry oil spill response exercise must either (a) test response activities represented in BPXP's OSRP, or (b) if BPXP is observing an exercise testing the implementation of another company's OSRP, BPXP must be able to demonstrate how the lessons learned apply to BPXP's OSRP.

## 17.3   Milestones and Deliverables

1.    BPXP shall record these exercises in accordance with 30 C.F.R. § 254.41(d) and shall retain all required records including attendance records, at the location designated by BPXP. BPXP shall keep the records related to the requirements of Paragraph 17 for five (5) years after the Effective Date. These records must be made available to the Third-Party Auditor and United States upon request.

2.    BPXP shall include the following information for the prior calendar year in the BPXP Annual Report:

a.    A Certification that all personnel who held any of the positions in 17.2.1 during the entire prior calendar year participated in at least one MWCC or industry oil spill response exercise;

b.    A description of the oil spill response exercises in which BPXP participated, including lessons learned; and

   c.  BPXP's Preparedness for Response Exercise Program (PREP) Triennial Cycle Documentation Form or equivalent triennial exercise record required in 30 C.F.R. § 254.42(e).

## 18.1 Remedial Order Requirements – Paragraph 18

*18. The defendant shall, at least once per year, conduct or participate in a table top exercise involving activation of MWCC to simulate mobilization of assets and personnel necessary to cap or cap/contain a subsea loss of well control.*

## 18.2 Implementation

1. BPXP shall require annually that personnel in the following positions participate in at least one (1) table top exercise as described below:

- Incident Commander
- Operations Section Chief
- Operations Section Staff
- Planning Section Chief
- Planning Section Staff
- Source Control Branch Director
- Source Control Branch Staff]
- Logistics Section Chief
- Logistics Section Staff
- Oil Spill Response Coordinator
- Finance Section Chief
- Finance Section Staff

2. "Activation of the MWCC" means that MWCC personnel will participate in the exercise after it has been convened.

3. The table top exercises shall have as primary objective the simulation of one or more of the source control notification, procurement, personnel, logistics, and all other actions necessary to cap or cap/contain a subsea loss of well control as described in BPXP's OSRP.

## 18.3 Milestones and Deliverables

1. By November 30th of each year, BPXP shall submit a tentative schedule for the following year of the planned table top exercises BPXP intends to use to satisfy the requirements of Paragraph 18, including the sections of BPXP's OSRP that will be exercised, and the exercise objectives.

2.      BPXP shall document the exercises and retain records of such exercises in a manner sufficient to demonstrate compliance with 30 C.F.R. § 254.41(d) and will retain all required records including attendance records, or copies thereof, at the location designated by BPXP. BPXP shall keep the records related to the requirements of Paragraph 18 for five (5) years after the Effective Date. These records must be made available to the Third Party Auditor and United States upon request.

3.      BPXP shall include the following information for the prior calendar year in the BPXP Annual Report:

   a.      A certification that all personnel on BPXP's rosters of individuals who held any of the positions in 18.2.1 during the entire prior calendar year participated in table top exercises that had as a primary objective the activation of MWCC to simulate mobilization of assets and personnel necessary to cap or cap/contain a subsea loss of Well Control, as described in BPXP's OSRP;

   b.      A description of the table top exercise that had as an objective the simulation of one or more of the source control notification, procurement, personnel, logistics, and all other actions necessary to cap or cap/contain a subsea loss of well control as described in BPXP's OSRP conducted by BPXP, including lessons learned; and

   c.      BPXP's Preparedness for Response Exercise Program (PREP) Triennial Cycle Documentation Form or equivalent triennial exercise record required in 30 C.F.R. § 254.42(e).

## 19.1   Remedial Order Requirements – Paragraph 19

*19. The defendant shall invite the United States Coast Guard and BSEE to participate in at least one internal oil spill response drill per year.*

## 19.2   Implementation

1.      By November 30th of each year, BPXP shall submit to BSEE and the United States Coast Guard a tentative schedule for the following year for any oil spill response exercises it will conduct and that BPXP intends to use to satisfy the requirements of Paragraph 19.

2.      If the exercise is within BPXP's control or influence, BPXP shall allow BSEE and the United States Coast Guard to participate in the exercise.

19.3    **Milestones and Deliverables**

1.      BPXP shall include the following information in the BPXP Annual Report:

a.      A Certification that Notice was provided to the United States at least 30 Days prior to any oil spill response exercises it intends to use to satisfy the requirements of Paragraphs 14, 17, and 18 during the prior calendar year; and

b.      A list of the exercises in which the United States participated during the prior calendar year.

20.1    **Remedial Order Requirements – Paragraph 20: Oil Spill Response Plan (OSRP)**

*20. Within 60 days of entry of this Order, the defendant shall revise its Oil Spill Response Plan as necessary to include:*

*a. Provisions to maintain access to a supply of dispersant and fire boom for use in the event of an uncontrolled long-term blowout for the length of time required to drill a relief well;*

*b. Contingencies for maintaining an ongoing response for the length of time required to drill a relief well;*

*c. Description of measures and equipment necessary to maximize the effectiveness and efficiency of the response equipment used to recover the discharge on the water's surface, including methods to increase encounter rates;*

*d. Information regarding remote sensing technology and equipment to be used to track oil slicks, including oil spill detection systems and remote thickness detection systems (e.g., X-band/infrared systems);*

*e. Information regarding the use of communication systems between response vessels and spotter personnel;*

*f. Shoreline protection strategy that is consistent with applicable area contingency plans; and*

*g. For operations using a subsea BOP or a surface BOP on a floating facility, a discussion regarding strategies and plans related to source abatement and control for blowouts from drilling.*

20.2    **Implementation**

1.     BPXP shall maintain an OSRP for BPXP's Deepwater Drilling Operations in the Waters of the United States that meets the requirements of Paragraph 20 for five (5) years following the Effective Date.

2.     BPXP shall provide Notice for any proposed modifications to OSRPs in accordance with Paragraph 32 of the Remedial Order and Section F above. Any revisions to the information required to be included in the OSRP can be incorporated in regular, two year OSRP reviews or as required by 30 C.F.R. § 254.30(b).

**20.3    Milestones and Deliverables:**

1.     Within 60 Days of the Date of Approval of the Implementation Plan, BPXP shall submit a document describing where the requirements of Paragraph 20 are addressed in (1) currently approved OSRPs or (2) the most recent version of any OSRP submitted to BSEE for approval.

2.     Every time BPXP submits an OSRP to BSEE for approval, it also shall submit a document describing where the requirements of Paragraph 20 are addressed in the OSRP.

3.     BPXP shall include the following information in the BPXP Annual Report:

   a.     A Certification that all approved OSRPs or OSRPs submitted to BSEE for approval meet the requirements of Paragraph 20, and

   b.     A description of where the requirements of Paragraph 20 are addressed in currently approved OSRPs.

**21.1    Remedial Order Requirements – Paragraph 21: Safety Technology Developed with Industry**

*21. The defendant shall collaborate with industry and academic efforts to develop discrete technologies to enhance operational safety with respect to deepwater drilling. Within one year of the Effective Date, the defendant shall propose and initiate collaboration on at least two pilot projects to evaluate technology enhancements over the course of the five year period following the Effective Date of this Order. Upon conclusion of the pilot projects, the defendant will propose to BSEE at least two pilot projects for implementation and implement them unless the defendant demonstrates that one or more pilot projects is technically unsound or economically infeasible.*

**21.2    Implementation**

1.      BPXP shall work collaboratively with industry and/or academia on developing, testing, and evaluating the pilot projects required under this Paragraph, consisting of at least two discrete projects that represent advancements beyond the current industry standards for operational safety with respect to Deepwater Drilling Operations.

2.      The pilot project development process shall include procedures for independent feasibility tests and third party economic evaluation. Upon conclusion of the pilot project development and testing, BPXP shall implement at least two (2) of the pilot technologies unless feasibility testing and economic evaluations, evaluated by an independent third party, demonstrate that one (1) or more of the pilot projects is technically unsound or economically infeasible to implement.

3.      BPXP shall enter into an Administrative Agreement with BSEE, enforceable by BSEE order, for implementation of the technology enhancements beyond five (5) years after the Effective Date to the extent that implementation extends beyond five (5) years after the Effective Date. The Agreement shall not extend the term of probation.

4.      BPXP's intellectual property rights to data and technology arising out of these pilot projects shall be made available to a third party or third parties under commercially reasonable terms and conditions, provided that such terms do not violate the intellectual property rights of other stakeholders, such as other industry or academic participants in pilot projects.

**21.3    Milestones and Deliverables**

1.      Within six (6) months of the Effective Date, BPXP shall schedule a meeting with BSEE to discuss the proposed pilot projects.

2.      Within one year of the Effective Date, BPXP shall prepare and submit plans to BSEE for each of the proposed pilot projects (" Project Plan") for United States approval pursuant to Paragraph 32 of the Remedial Order and Section F above. Each Pilot Project Plan shall consist of:

    a.      Statement of performance goals;

    b.      Schedule for development, testing, and conducting the pilot project;

    c.      Estimated pilot project costs;

    d.      A schedule for developing testing protocols and evaluation procedures;

e.      A schedule for developing feasibility testing procedures (independent analysis); and

f.      A schedule for developing economic evaluation procedures (third-party).

3.      Following the conclusion of each pilot project, and no later than four (4) years and six (6) months following the Effective Date, BPXP shall submit to BSEE a Final Report on Pilot Performance for each pilot project. The Final Report on Pilot Performance must include: (a) the results of the feasibility testing; (b) the results of the economic evaluation; and (c) a detailed discussion of the incremental costs and benefits of the evaluated technology enhancements. Unless BPXP demonstrates that one (1) or more projects is technically unsound or that incremental benefits are insufficient to justify the incremental costs for these pilot projects, BPXP shall implement the technology enhancements at locations where such enhancements are applicable for BPXP's Deepwater Drilling Operations, in accordance with a reasonable schedule to be proposed by BPXP in the Final Report on Pilot Performance.

4.      In the event BPXP determines that the project is technically unsound, or that the incremental benefits are insufficient to justify the incremental costs, BPXP shall provide the basis for that determination, including the independent evaluation.

5.      BPXP shall include the following information for the prior calendar year in the BPXP Annual Report:

a.      A description of the progress made on the pilot projects; and

b.      If applicable, a description of the technology enhancements to be implemented.

## 22.1   Remedial Order Requirements – Paragraph 22: Other Safety Technology Development

*22. Over the course of the three years following the Effective Date of this Order defendant will advance to BSEE three proposals in one or more of the following categories for pilot projects regarding the development of specific new technology in: (1) enhancing functionality, intervention, testing and activation of BOP systems such as acoustics and subsea communications capabilities; (2) enhancing well design; or (3) enhancing real-time monitoring on rig and onshore. Upon conclusion of the pilot projects, the defendant will implement at least two pilot projects, unless the defendant demonstrates that one or more pilot projects is technically unsound or economically infeasible.*

**22.2    Implementation**

1.    BPXP shall advance to BSEE three (3) proposals for pilot projects in one (1) or more of the following categories: (a) enhancing functionality, intervention, testing and activation of BOP systems such as acoustics and subsea communications capabilities; (b) enhancing well design; or (c) enhancing real-time monitoring on rig and onshore.

2.    The pilot project development process shall include procedures for independent feasibility tests and third party economic evaluation. Upon conclusion of the pilot project development and testing, BPXP shall implement at least two (2) of the pilot technologies unless the feasibility testing and economic evaluations, evaluated by an independent third party demonstrate that one (1) or more of the pilot projects is technically unsound or economically infeasible to implement.

3.    Prior to the end of the Probation period, BPXP shall enter into an Administrative Agreement with BSEE, enforceable by BSEE order, for implementation of the new technology beyond five (5) years after the Effective Date to the extent that implementation shall extend beyond five (5) years after the Effective Date. The Agreement shall not extend the term of probation.

4.    BPXP's intellectual property rights to data and technology arising out of these pilot projects shall be made available to a third party or third parties under commercially reasonable terms and conditions, provided that such terms do not violate the intellectual property rights of other stakeholders, such as other industry or academic participants in pilot projects.

**22.3    Milestones and Deliverables**

1.    Within two (2) years of the Effective Date, BPXP shall prepare and submit to BSEE plans for each of the proposed pilot projects("Pilot Project Plan") for United States approval pursuant to Paragraph 32 of the Remedial Order and Section F above. Each Pilot Project Plan shall consist of:

   a.    Statement of performance goals;

   b.    Schedule for development, testing, and conducting the pilot project;

   c.    Estimated pilot project costs;

   d.    A schedule for the developing testing protocols and evaluation procedures;

      e.      A schedule for the developing feasibility testing procedures (independent analysis); and

      f.      A schedule for the developing economic evaluation procedures (third-party).

2.      Following the conclusion of each pilot project, and no later than four (4) years and six (6) months following the Effective Date, BPXP shall submit to BSEE a Final Report on Pilot Performance for each pilot project. The Final Report on Pilot Performance must include a detailed discussion of the incremental costs and benefits of the evaluated new technology. Unless BPXP demonstrates that one (1) or more projects is technically unsound or that the incremental benefits are insufficient to justify the incremental costs for these pilot projects, as demonstrated by the independent feasibility testing and economic evaluation, BPXP shall implement at least two (2) of the new technologies at locations where such technologies are applicable for BPXP's Deepwater Drilling Operations, in accordance with a reasonable scheduled to be proposed by BPXP in the Final Reports on Pilot Performance.

3.      BPXP shall include in the BPXP Annual Report:

      a.      A description of the progress made on the pilot projects; and

      b.      If applicable, a description of the new technology to be implemented.

## 23.1   Remedial Order Requirements – Paragraph 23: Transparency

*23. The defendant will create, within 90 days after the Effective Date, a public website that contains the following information:*

*a. Lessons learned from the Deepwater Horizon incident;*

*b. Annual progress reports on its compliance with the special terms of probation contained in this Order;*

*c. Annual summaries of recordable safety incidents, days away from work, hydrocarbon spills and the volume thereof; and*

*d. An annual list of all incidents of non-compliance with BSEE or BOEM regulations or probation for which the defendant is cited, including corrective actions taken and penalties assessed.*

## 23.2   Implementation

1.  BPXP shall develop and maintain a website on the internet that is: (a) readily searchable by conventional internet and website means; and (b) available to the public free of charge by BPXP, including the downloading of all content from the site.

2.  The website shall contain:

    a.  The following reports, generated by BPXP that related to: (i) the underlying causes or factors giving rise to the *Deepwater Horizon* incident; and (ii) recommendations for improvements in oil spill response and prevention resulting from the *Deepwater Horizon* incident: (a) *Deepwater Horizon Containment and Response: Harnessing Capabilities and Lessons Learned*; (b) *Deepwater Horizon Accident Investigation Report*; (c) presentation slides on *Advancing Global Deepwater Capabilities*; and (d) any updates to items (a)-(c), above.

    b.  An annual progress report summarizing the BPXP Annual Reports, without including confidential business information or names of employees, employee records or other documents containing personal information;

    c.  For the prior calendar year, annual summaries of recordable safety incidents, days away from work, hydrocarbon spills, and the volume thereof; and

    d.  For the prior calendar year, an annual list of all incidents of non-compliance with BSEE or BOEM regulations or probation for which BPXP is cited, including corrective actions taken and penalties assessed.

3.  Documents must remain on the website for five (5) years following the Effective Date.

**23.3   Milestones and Deliverables**

1.  On or before 90 Days after the Effective Date, BPXP shall activate the website required by Paragraph 23. BPXP shall submit to the Probation Officer and DOJ the publically-available link to the website and a list of all documents available on the website.

2.  Annual documents required to be posted by Sections 23.2(b) through (d) above shall be posted on or before March 31, 2014, March 31, 2015, March 31, 2016, March 31, 2017 and January 28, 2018.

3.  BPXP Annual Reports must describe measures taken to comply with each of the requirements in Paragraphs 5 through 31 of the Remedial Order. Each report shall

also contain the information specified expressly in this Implementation Plan, subject to Section E of this Implementation Plan.

4.     BPXP Annual Reports will be due as follows: March 31, 2014; March 31, 2015; March 31, 2016; March 31, 2017; and January 28, 2018.

## 24.1   Remedial Order Requirements – Paragraph 24: Rig Equipment: Two Blind Shear Rams

*24. The defendant will use, and require its contractors to use, subsea BOPs equipped with no fewer than two blind shear rams and a casing shear ram on all drilling rigs under contract to the defendant for deepwater drilling operations in dynamic positioning mode. As to moored drilling rigs under contract to the defendant which use subsea BOPs, the defendant will require that each BOP used in deepwater drilling operations be equipped with two shear rams, including at least one blind shear ram and either an additional blind shear ram or a casing shear ram.*

## 24.2   Implementation

1.     Within 30 days of the Date of Approval of the Implementation Plan, for each new Application for a Permit to Drill ("APD") in the Waters of the United States for Drilling Rigs under contract to BPXP for Deepwater Drilling Operations in dynamic positioning mode, BPXP shall state in a supplemental attachment to the APD that "BPXP will use, and require its Contractors to use, subsea BOPs equipped with no fewer than two (2) blind shear rams and a casing shear ram."

2.     Within 30 days of the Date of Approval of the Implementation Plan, for each new APD in the Waters of the United States for moored Drilling Rigs under contract to BPXP for Deepwater Drilling Operations which use subsea BOPs, BPXP shall state in a supplemental attachment to the APD that: "BPXP will require that each BOP be equipped with two (2) shear rams, including at least one (1) blind shear ram and either an additional blind shear ram or a casing shear ram."

3.     All blind shear rams must be tested pursuant to 30 C.F.R. § 250.449, as amended, or as directed by BSEE.

## 24.3   Milestones and Deliverables

1.     BPXP shall include the following information in the BPXP Annual Report:

     a.     A Certification that all BPXP Applications for Permits to Drill submitted 30 days after the Date of Approval of the Implementation Plan for dynamically positioned Drilling Rigs under contract to BPXP for Deepwater Drilling

Operations include a commitment that such Drilling Rigs will use subsea BOPs equipped with no fewer than two blind shear rams and a casing shear ram;

b.       A Certification that all BPXP Deepwater Drilling Operations with a dynamically positioned Drilling Rig have a subsea BOPs equipped with no fewer than two blind shear rams and a casing shear ram;

c.       A Certification that all BPXP Applications for Permits to Drill submitted 30 days after the Date of Approval of the Implementation Plan for moored Drilling Rigs under contract to BPXP for Deepwater Drilling Operations include a commitment that such Drilling Rigs will use subsea BOPs equipped with two (2) shear rams, including at least one (1) blind shear ram and either an additional blind shear ram or a casing shear ram; and

d.       A Certification that all BPXP Deepwater Drilling Operations with a moored Drilling Rig for Deepwater Drilling Operations include a subsea BOP equipped with two shear rams, including at least one blind shear ram and either an additional blind shear ram or a casing shear ram.

## 25.1   Remedial Order Requirements – Paragraph 25: Safety Organization

*25. The defendant shall maintain a safety organization that has the authority to intervene or stop any operation that it deems unsafe.*

## 25.2   Implementation

BPXP shall maintain a safety organization that has the authority to intervene or stop any operation that it deems unsafe in particular empowering employees and contractors to exercise "stop work" authority where appropriate. This organization shall be capable of promoting a safe operating culture across all levels of BPXP's Deepwater Drilling Operations. It shall be comprised of senior professionals and personnel with technical expertise appropriate to conduct independent review of operating risks. This organization shall have the authority and ability to evaluate all BPXP Deepwater Drilling Operations, without limitation. It shall have the authority to be proactive in its review of such operations. It also shall have the ability to quickly assess and respond to complaints regarding potentially unsafe conditions and/or violations of law.

## 25.3   Milestones and Deliverables

1.       Within six (6) months of the Date of Approval of this Implementation Plan, BPXP shall submit a document describing its safety organization for Deepwater Drilling Operations. The description must include the following:

a.      A discussion of its authority to intervene or stop any operation that it deems unsafe;

b.      A description of the qualifications of the professionals and specialists working in the organization;

c.      A plan for how BPXP will encourage its employees and contractors to, where appropriate, exercise "stop work" authority and to seek assistance from the organization; and

d.      A description of how the organization will set clear requirements, including developing and updating management system standards.

2.      BPXP shall include the following information in the BPXP Annual Report:

a.      A description of BPXP's safety organization for Deepwater Drilling Operations and the numbers of personnel involved in the organization and the positions held; and

b.      A summary of the safety organization's work during the prior calendar year, including, but not limited to: (i) a discussion of when it used its authority to intervene or stop an operation; (ii) a list of examples in which a BPXP employee exercised his/her authority to intervene or stop an operation and the actions (if any) taken by BPXP in response; (iii) a list of examples reported to BPXP in which a BPXP contractor exercised his/her authority to intervene or stop an operation and the actions (if any) taken by BPXP in response; and (iv) a description of any major new safety-related requirements published by the safety organization during the prior calendar year

c.

## **Third Party Auditor**

**26.1    Remedial Order Requirements**

*26. The defendant will enter into a contract with an independent third-party (referred to herein as "the Auditor") who shall review and report to the Probation Officer, DOJ, and the defendant on the defendant's compliance with paragraphs 5 through 25 of this Order. The reasonable compensation and expenses of the Auditor shall be paid by the defendant. The Auditor shall be compensated in accordance with its typical hourly rates or a reasonable fee determined by the Auditor based on applicable market rates.*

*27. The defendant will propose auditor(s) to perform these functions to DOJ within 90 days after the Effective Date, and the selection shall be subject to DOJ's approval.*

*28. On an annual basis, the Auditor shall perform his/her responsibilities by reviewing documentation and taking such other reasonable measures as may be appropriate to sample or test the defendant's compliance with paragraphs 5 through 25 of this Order. The Auditor shall identify and report annually its findings on the defendant's compliance with the terms of this Order to the Probation Officer, DOJ, and the defendant.*

*29. If the Auditor finds deficiencies in the defendant's compliance with paragraphs 5 through 25 of this Order, the Auditor will provide the Probation Officer, DOJ, and the defendant prompt notice and the defendant will, within 30 days, provide a plan to address the deficiencies and an opportunity to cure. In the event DOJ finds the defendant's plan to address the deficiencies unacceptable, DOJ will submit a written opinion to the defendant identifying its objections and advising the defendant of an acceptable means of addressing the deficiencies. Within 30 days of receiving any such objections from DOJ, the defendant will provide an updated plan to the Auditor and DOJ which either provides for implementation of an option suggested by DOJ or an alternative means which DOJ determines to satisfactorily address its objections.*

*30. In addition to an annual report, the auditor shall periodically evaluate and report to the Probation Officer, BSEE, DOJ, and the defendant whether the defendant has complied with any plan to address deficiencies identified by the Auditor.*

*31. In the event the Auditor resigns, the defendant will propose to DOJ replacement auditor(s) to perform these functions promptly after such resignation. Selection of a replacement auditor shall be subject to the same process set forth immediately above.*

**26.2     Implementation**

1.    BPXP shall comply with the requirements of Paragraphs 26 through 31.

2.    BPXP shall make available to the Third Party Auditor all submissions and underlying documentation contemplated under this Implementation Plan at any time.

3.    BPXP shall provide the Third Party Auditor with reasonable access to BPXP personnel as necessary to perform the duties required by the Remedial Order and the Implementation Plan.

4.    The Third Party Auditor shall only have the duties, responsibilities and authority conferred by the Remedial Order and Implementation Plan, shall not have executive or management functions, and shall not replace or assume the role of any of BPXP's officers, executives, directors, managers or supervisors.

**26.3   Milestones and Deliverables**

1.    Within ninety (90) Days of the Effective Date, BPXP shall submit to DOJ a list of proposed Third Party Auditor(s), and the selection shall be subject to DOJ's approval.

2.    On or before August 31 of each calendar year (excepting 2013) during the term of probation, the Third Party Auditor shall issue the Auditor Annual Report provided for in Paragraph 28 of the Remedial Order.

3.    In the event that the Third Party Auditor resigns, BPXP shall have ninety (90) Days from the date of such resignation to propose a replacement Third Party Auditor to DOJ pursuant to the process identified in Paragraphs 26 and 27 of the Remedial Order.

4.    Within thirty (30) Days of the Third Party Auditor providing BPXP with written notice of a deficiency in BPXP's compliance with Paragraphs 5 through 25 of the Remedial Order, BPXP shall provide notice and submit to DOJ and the Probation Officer a plan in accordance with Section C of this Implementation Plan to address the deficiencies, and an opportunity to cure.

5.    BPXP shall include the following information in the BPXP Annual Report:

  a.  All instances where the Third Party Auditor found a deficiency in BPXP's compliance with Paragraphs 5 through 25 during the prior calendar year and how BPXP addressed those deficiencies.

## ATTACHMENT A

Notifications, submittals, reports or communications required by this Implementation Plan to be submitted to BPXP shall be made in writing and sent by (a) overnight or certified mail or courier and (b) email or facsimile to:



Notifications, submittals, reports or communications required by this Implementation Plan to be submitted to the United States shall be made in writing and sent by overnight or certified mail or courier to:

Michael J. Saucier
Regional Supervisor for District Field Operations
Bureau of Safety and Environmental Enforcement
1201 Elmwood Park Boulevard
Harahan, Louisiana 70123
Telephone: (504) 736-2503

Dianne M. Shawley
Senior Advisor for Enforcement Programs
Bureau of Safety and Environmental Enforcement
1849 C Street, N.W.
Room 5428
Washington, D.C. 20240
Telephone: (202) 219-3899

Robert G. Pond
Senior Technical Advisor
Office of Marine Environmental Response
United States Coast Guard
2100 2nd Street, S.W.
Stop 7363
Washington, D.C. 20593
Telephone: (202) 372-2240

Notifications, submittals, reports or communications required by this Implementation Plan to be submitted to the United States shall be made by email or facsimile to:

Colin Black, United States Department of Justice
colin.black@usdoj.gov

Sarah Doverspike, United States Department of the Interior
Sarah.doverspike@sol.doi.gov

John Fogarty, United States Environmental Protection Agency
Fogarty.johnpc@epamail.gov

Cate Tierney, United States Environmental Protection Agency
Tierney.Cate@epamail.gov

Jason R. Hamilton, United States Coast Guard
Jason.R.Hamilton@uscg.mil

Jeff R. Bray, United States Coast Guard
Jeff.R.Bray@uscg.mil

Jason R. Hamilton, United States Coast Guard
Jason.R.Hamilton@uscg.mil

Rhianna N. Macon, United States Coast Guard
Rhianna.N.Macon@uscg.mil

Eric J. Miller, United States Coast Guard
Eric.J.Miller2@uscg.mil

Edward L. Bock, United States Coast Guard
Edward.L.Bock@uscg.mil

Michael Farber, Bureau of Safety and Environmental Enforcement
Michael.farber@bsee.gov

Dianne Shawley, Bureau of Safety and Environmental Enforcement
Michael Saucier, Bureau of Safety and Environmental Enforcement
Michael.Saucier@bsee.gov

Kelly Schnapp, Bureau of Safety and Environmental Enforcement
Kelly.Schnapp@bsee.gov

**Appendix 7: List of BP Entities**

Any branch and/or representative office of any entity listed herein, is, for purposes of this Appendix 7, included within the definition of the affiliated entity listed herein.

- BP Exploration & Production Inc.
- BP Corporation North America Inc.
- BP p.l.c.
- A Flygbranslehantering AB
- A.P.P. Chemicals Limited
- ABG Autobahn-Betriebe GmbH
- ABS Auto Business Services GmbH
- Abu Dhabi Marine Areas Limited
- ACP (Malaysia), Inc.
- Actomat B.V.
- Adamol Mineralolhandels GmbH
- Advance Petroleum Holdings Pty Ltd
- Advance Petroleum Pty Ltd
- AE Cedar Creek Holdings LLC
- AE Goshen II Holdings LLC
- AE Goshen II Wind Farm LLC
- AE Power Services LLC
- AE Wind PartsCo LLC
- AEGP General LLC
- AEGP Limited LLC
- AFC Aviation Fuel Company GmbH
- AFC Aviation Fuel Company oHG
- AFCO AB
- AFS Aviation Fuel Services GmbH
- Agencia Operadora Guarapiche S.A.
- AGES International GmbH & Co. KG
- AGES Maut System GmbH & Co. KG
- AGES Maut System Verwaltungs-GmbH
- Air BP Albania SHA
- Air BP Brasil Ltda.
- Air BP Canada Limited
- Air BP Canada LLC
- Air BP Copec S.A.
- Air BP Croatia d.o.o.
- Air BP Denmark ApS
- Air BP Georgia LLC
- AIR BP Hungaria Kft.
- Air BP Italia Spa
- Air BP Limited
- Air BP Norway AS
- Air BP Sales Romania S.R.L.
- Air BP Sweden AB
- Air Refuel Pty Ltd
- Air Transportation Solutions, Inc.
- Aircraft Fuel Supply B.V.
- Aircraft Refuelling Company GmbH
- Akron Wind Energy, LLC
- Alaska Tanker Company, LLC
- Alexander Duckham & Co., Limited
- Alexis Wind Farm LLC
- Alhama Fotovoltaica, S.L.U.
- Allgreen Pty Ltd
- Alyeska Pipeline Service Company
- AM/PM International Inc.
- Ambarli Depolama Hizmetleri Limited Sirketi
- American Oil Company
- Ammenn GmbH
- Amoco (Fiddich) Limited
- Amoco (U.K.) Exploration Company LLC
- Amoco Abu Dhabi Exploration Company
- Amoco Angola B.V.
- Amoco Angola Offshore, Inc.
- Amoco Arabia Company
- Amoco Australia Development Company
- Amoco Austria Petroleum Company
- Amoco Bolivia Oil and Gas Aktiebolag
- Amoco Bolivia Petroleum Company
- Amoco Bolivia Services Company Inc.
- Amoco Brazil, Inc.
- Amoco Canada International Holdings B.V.
- Amoco Capline Pipeline Company
- Amoco Caribbean Trading Company

- Amoco Caspian Sea (Phase 1) Finance Ltd.
- Amoco Caspian Sea Petroleum Company
- Amoco Caspian Sea Petroleum Limited
- Amoco Chemical (Europe) S.A.
- Amoco Chemical Holding B.V.
- Amoco Chemical Malaysia Holding I B.V.
- Amoco Chemical U.K. Limited
- Amoco Chemicals (FSC) B.V.
- Amoco CNG (Trinidad) Limited
- Amoco Corporate Development Company
- Amoco Cushing-Chicago Pipeline Company
- Amoco Cypress Pipeline Company
- Amoco D. T. Company
- Amoco Denmark Exploration Company
- Amoco Destin Pipeline Company
- Amoco Development Corporation
- Amoco Dinarides Petroleum Company
- Amoco Egypt West Nile Delta B.V.
- Amoco Endicott Pipeline Company
- Amoco Environmental Services Company
- Amoco Equipment Leasing Company
- Amoco España Exploration Company
- Amoco Ethanol Development Company
- Amoco Eurasia Oil Company
- Amoco Eurasia Petroleum Company
- Amoco Europe Limited
- Amoco Exploration Holdings B.V.
- Amoco Fabrics (U.K.) Limited
- Amoco Fabrics and Fibers Ltd.
- Amoco Guatemala Petroleum Company
- Amoco High Island Pipeline Company
- Amoco Inam Petroleum Company B. V.
- Amoco Indonesia Exploration Company
- Amoco International (Guernsey) Limited
- Amoco International B.V.
- Amoco International Finance Corporation

- Amoco International Gas Development Limited
- Amoco International Petroleum Company
- Amoco Japan Limited
- Amoco Kazakhstan (CPC) Inc.
- Amoco Kazakhstan Offshore Petroleum Company, LLC
- Amoco Kazakhstan Petroleum Company
- Amoco Kimya Limited Sirketi
- Amoco Leasing Corporation
- Amoco Longhorn GP Pipeline Company
- Amoco Longhorn Pipeline Company
- Amoco Louisiana Fractionator Company
- Amoco Main Pass Gathering Company
- Amoco Marketing Environmental Services Company
- Amoco MB Fractionation Company
- Amoco MBF Company
- Amoco Mediterranean Petroleum Company
- Amoco Mexico, Inc.
- Amoco Morocco Oil Company
- Amoco Myanmar Petroleum Company
- Amoco Netherlands Petroleum Company
- Amoco New Zealand Exploration Company
- Amoco Nigeria Exploration Company Limited
- Amoco Nigeria Oil Company Limited
- Amoco Nigeria Petroleum Company
- Amoco Nigeria Petroleum Company Limited
- Amoco North Sea Limited
- Amoco Norway Oil Company
- Amoco Ob River Petroleum Company
- Amoco Oil Holding Company
- Amoco Olefins Corporation
- Amoco Oman Petroleum Company
- Amoco Orient Company
- Amoco Overseas Exploration Company
- Amoco Papua New Guinea Exploration Company

- Amoco Peru Petroleum Company
- Amoco Pipeline Asset Company
- Amoco Pipeline Holding Company
- Amoco Properties Incorporated
- Amoco Rancho Pipeline Company
- Amoco Ras Al Khaimah Oil Company
- Amoco Raven Ridge Pipeline Company
- Amoco Realty Company
- Amoco Remediation Management Services Corporation
- Amoco Research Operating Company
- Amoco Rio Grande Pipeline Company
- Amoco Services Limited
- Amoco Somalia Petroleum Company
- Amoco South Africa Petroleum (BVI) Corporation
- Amoco Sulfur Recovery Company
- Amoco Supply and Trading Company
- Amoco Sweden Petroleum Company
- Amoco Tax Leasing X Corporation
- Amoco Tax Leasing XV Corporation
- Amoco Teesside Gas Limited
- Amoco Trinidad Gas B.V.
- Amoco Trinidad LNG LLC
- Amoco Trinidad Power Resources Corporation
- Amoco Tri-States NGL Pipeline Company
- Amoco Tunisia Petroleum Company
- Amoco U.K. Petroleum Limited
- Amoco Venezuela Energy Company B.V.
- Amoco Venezuela Petroleum Company
- Amoco Vietnam Petroleum Company
- Amoco Yemen Petroleum Company
- AmProp Finance Company
- Amprop Illinois I Ltd. Partnership
- Amprop Maryland I Ltd. Partnership
- Amprop Riverside I Ltd. Partnership
- Amprop, Inc.
- Anaconda Arizona, Inc.
- Antelope Creek Wind Energy, LLC
- Apex BP Solar
- Apex Energies

- Apex Service Stations Limited
- Arabian Production And Marketing Lubricants Company
- Aral Aktiengesellschaft
- Aral Direkt GmbH
- Aral Luxembourg S.A.
- Aral Mineralölvertrieb GmbH
- Aral Services Luxembourg Sarl
- Aral Tankstellen Services Sarl
- Aral Tankstellenführungsgesellschaft mbH
- ARCO Algeria Inc.
- ARCO Aluminum, Inc.
- ARCO Asia Inc.
- ARCO British International, Inc.
- ARCO British Limited, LLC
- ARCO China Coal Bed Methane Inc.
- ARCO Coal Australia Inc.
- ARCO de Colombia Inc.
- ARCO Denmark Limited
- Arco do Brasil Ltda.
- ARCO Dubai Inc.
- ARCO El-Djazair Holdings Inc.
- ARCO El-Djazair LLC
- ARCO Environmental Remediation, L.L.C.
- ARCO Eurasia and Africa Limited
- ARCO Exploration, Inc.
- ARCO Gaviota Company
- ARCO Ghadames Inc.
- ARCO Global Energy Ventures Asia, Inc.
- ARCO Global Energy Ventures, Inc.
- ARCO Global Services Company Inc.
- ARCO Integrated Power (Zhuhai) Ltd.
- ARCO International Investments Inc.
- ARCO International Services Inc.
- ARCO Ireland Power Ltd.
- ARCO Material Supply Company
- ARCO Mediterranean Inc.
- ARCO Mexico Projects, Inc.
- ARCO Mexico Ventures, Inc.
- ARCO Midcon LLC
- ARCO Middle East & Central Asia Inc.

- ARCO Neftegaz Holdings, Inc.
- ARCO Neighborhood Support Corporation
- ARCO New Venture Co.
- ARCO Offshore (Trinidad) Limited
- ARCO Oil Company Nigeria Unlimited
- ARCO Oman Inc.
- ARCO Ordos CBM Limited
- ARCO Oriente Inc.
- ARCO Overseas Petroleum Inc.
- ARCO Petroleum New Zealand Inc.
- ARCO Philippines (Sulu) Inc.
- ARCO Polypropylene Company
- ARCO Products Company
- ARCO Resources Limited
- ARCO RF Services Inc.
- ARCO Sakhalin Inc. (B)
- ARCO Sakhalin Inc. (D)
- ARCO Solar Nigeria Ltd.
- ARCO Terminal Services Corporation
- ARCO Trinidad Exploration and Production Company Limited
- ARCO Trinidad Inc.
- ARCO Uinta Coal Company
- ARCO Unimar Holdings LLC
- ARCO Venezuela Energy Inc.
- ARCO Western Gas Pipeline Company
- ARCO Wittenberg Investments Limited
- ARCO Zhenhai I, Inc.
- ARCO Zhenhai II, Inc.
- ARCO Zhenhai Petrochemical, LLC
- Arilow Pty Ltd
- Asian Acetyls Co., Ltd
- AsPac Lubricants (Malaysia) Sdn. Bhd.
- ATAS Anadolu Tasfiyehanesi Anonim Sirketi
- Atlantic 1 Holdings LLC
- Atlantic 2/3 Holdings LLC
- Atlantic 2/3 UK Holdings Limited
- Atlantic 4 Holdings LLC
- Atlantic LNG 2/3 Company of Trinidad and Tobago Unlimited
- Atlantic LNG 4 Company of Trinidad and Tobago Unlimited
- Atlantic LNG Company of Trinidad and Tobago
- Atlantic Richfield Ambalat (Indonesia) Limited
- Atlantic Richfield Bukat (Indonesia) Limited
- Atlantic Richfield Company
- Atlantic Richfield Oil & Gas (St. James) Limited
- Atlantic Richfield Peru Inc.
- Atlas Methanol Company Unlimited
- Auwahi Holdings, LLC
- Auwahi Wind Energy Holdings LLC
- Aviation Fuel Services Limited
- Azerbaijan International Operating Company
- B.V. Petrotank
- Bahia de Bizkaia Electridad, S.L.
- Bakelite UK Limited
- Baku-Tbilisi-Ceyhan Pipeline Finance B.V.
- Baltimore Ennis Land Company, Inc.
- Bayernoil Raffineriegesellschaft mbH
- Beaver Creek Wind Energy, LLC
- Beer GmbH
- Beer GmbH & Co. Mineralol-Vertriebs-KG
- Benegas B.V.
- Benegas Vulcentrum B.V.
- Bennett/South Shore Associates
- Berea Holding Company
- BFS Berlin Fuelling Services GbR
- BGFH Betankungs-Gesellschaft Frankfurt-Hahn GbR
- BIL Grundstucksverwaltungs GmbH & Co. Lunar KG
- Biobutanol LLC
- Black Hill Industrial Estate Limited
- Black Lake Pipe Line Company
- Blendcor (Pty) Limited
- Boqueron Holdings B.V.
- Boqueron, S.A.
- Border Pipe Line Company
- BP - Castrol (Thailand) Limited

- BP & Shell Marketing Services (Pvt) Limited
- BP (Abu Dhabi) Limited
- BP (Barbados) Holding SRL
- BP (Barbican) Limited
- BP (China) Holdings Limited
- BP (China) Industrial Lubricants Limited
- BP (Gibraltar) Limited
- BP (GOM) Development & Production Limited
- BP (GOM) Exploration
- BP (GOM) Holdings Limited
- BP (Guangzhou) LPG Limited
- BP (Indian Agencies) Limited
- BP (Prime) Sunoasis Company Limited
- BP (Sabah) Sdn. Bhd.
- BP (Shanghai) LPG LIMITED
- BP (Shanghai) Trading Limited
- BP (Switzerland) AG
- BP (Tianjin) Trading Co., Ltd
- BP (UK) Power Holdings Limited
- BP (Wuxi) LPG Co. Ltd
- BP Africa Limited
- BP Akaryakit Ortakligi
- BP Alaska Gas Pipelines LLC
- BP Alaska LNG LLC
- BP Algerie Limited
- BP Alternative Energy Holdings Limited
- BP Alternative Energy International Limited
- BP Alternative Energy North America Inc.
- BP America Chembel Holding LLC
- BP America Chemicals Company
- BP America Foreign Investments Inc.
- BP America Inc.
- BP America Limited
- BP America Production Company
- BP AMI Leasing, Inc.
- BP Amoco Chemical Company
- BP Amoco Chemical Holding Company
- BP Amoco Chemical Indonesia Limited
- BP Amoco Chemical Malaysia Holding Company
- BP Amoco Chemical Singapore Holding Company
- BP Amoco Deepwater Partnership
- BP Amoco Exploration (Faroes) Limited
- BP Amoco Exploration (Forties) Limited
- BP Amoco Exploration (In Amenas) Limited
- BP Amoco Exploration (Inam) Limited
- BP Amoco Exploration (MSA) Limited
- BP Amoco Neighborhood Development Corporation
- BP Amoco Seaway Products Pipeline Company
- BP Amoco Taiwan Trading Company
- BP Angola (Block 18) B.V.
- BP Argentina Exploration Company
- BP Arobel N.V.
- BP Aromatics Holdings Limited
- BP Aromatics Limited
- BP Aromatics Limited N.V.
- BP Asia Limited
- BP Asia Pacific (Malaysia) Sdn. Bhd.
- BP Asia Pacific Holdings Limited
- BP Asia Pacific Pte Ltd
- BP Australia Capital Markets Limited
- BP Australia Employee Share Plan Proprietary Limited
- BP Australia Group Pty Ltd
- BP Australia Investments Pty Limited
- BP Australia Nominees Proprietary Limited
- BP Australia Pty Limited
- BP Australia Shipping Pty Ltd
- BP Australia Swaps Management Limited
- BP Aviation A/S
- BP Benevolent Fund Trustees Limited
- BP Berau Ltd.
- BP Biocombustíveis S.A.
- BP Biofuels Advanced Technology Inc.
- BP Biofuels Brasil Participacoes Ltda.
- BP Biofuels Brazil Investments Limited

- BP Biofuels Louisiana LLC
- BP Biofuels North America LLC
- BP Biofuels Trading Comercio, Importacao e Exportacao Ltda.
- BP Biofuels UK Limited
- BP Bomberai Ltd.
- BP Botswana (Pty) Limited
- BP Brasil Investimentos Ltda
- BP Brasil Ltda.
- BP Brazil Tracking L.L.C.
- BP Bulwer Island Pty Ltd
- BP Business Service Centre Asia Sdn Bhd
- BP Business Service Centre KFT
- BP Canada Energy
- BP Canada Energy Company
- BP Canada Energy Consolidated Production Company
- BP Canada Energy Development Company
- BP Canada Energy Group ULC
- BP Canada Energy Marketing Corp.
- BP Canada Energy Resources Company
- BP Canada Energy Trading Company
- BP Canada Finance Company
- BP Canada International Holdings B.V.
- BP Canada Investments Inc.
- BP Capellen Sarl
- BP Capital AUD V.O.F.
- BP Capital B.V.
- BP Capital EURO V.O.F.
- BP Capital Markets America Inc.
- BP Capital Markets p.l.c.
- BP Capital NOK BVBA
- BP Capital NOK V.O.F.
- BP Capital V.O.F.
- BP Caplux S.A.
- BP Car Finance Limited
- BP Caribbean (Holdings) Limited
- BP Caribbean Company
- BP Caribbean Trading Company Inc.
- BP Castrol KK
- BP Castrol Lubricants (Malaysia) Sdn. Bhd.
- BP Chembel N.V.
- BP Chemical US Sales Company
- BP Chemicals (International) Limited
- BP Chemicals (Ireland) Limited
- BP Chemicals (Korea) Limited
- BP Chemicals (Malaysia) Sdn. Bhd.
- BP Chemicals East China Investments Limited
- BP Chemicals France Holding
- BP Chemicals Investments Limited
- BP Chemicals Limited
- BP Chemicals S.E.A. Pte Ltd
- BP Chemicals Trading Limited
- BP Chile Petrolera Limitada
- BP China Exploration and Production Company
- BP China Limited
- BP China Ltd.
- BP Colombia Pipelines Limited
- BP Company North America Inc.
- BP Containment Response Limited
- BP Containment Response System Holdings LLC
- BP Continental Holdings Limited
- BP Corporate Holdings Limited
- BP Danmark A/S
- BP Developments Australia (No. 1) Pty Ltd
- BP Developments Australia Pty Ltd.
- BP Dhofar LLC
- BP Dogal Gaz Ticaret Anonim Sirketi
- BP East Arguni Ltd.
- BP East Kalimantan CBM Limited
- BP East Kalimantan Limited
- BP Eastern Mediterranean Limited
- BP Egypt Company
- BP Egypt East Delta Marine Corporation
- BP Egypt East Tanka B.V.
- BP Egypt Investments Limited
- BP Egypt LNG Limited
- BP Egypt Production B.V.
- BP Egypt Ras El Barr B.V.
- BP Egypt West Mediterranean (Block B) B.V.

- BP Employee Disaster Relief Fund, Inc.
- BP Energy America, L.L.C.
- BP Energy Asia Pte. Limited
- BP Energy Colombia Limited
- BP Energy Company
- BP Energy Company (Colombia) Ltd
- BP Energy do Brasil Ltda.
- BP Energy Europe Limited
- BP Energy Exploration Brazil, Inc.
- BP Energy Limited
- BP Energy Vietnam Limited
- BP Espana, S.A. Unipersonal
- BP Europa SE
- BP Europa SE Spolka Europejska Oddzial w Polsce
- BP Europa SE Zweigniederlassung BP Austria
- BP Europa SE, Hamburg, Zweigniederlassung BP (Switzerland) Zug
- BP Europe SE Magyarorszagi Fioktelepe
- BP Exploracion de Venezuela S.A.
- BP Exploration (Alaska) Inc.
- BP Exploration (Algeria) Limited
- BP Exploration (Alov) Limited
- BP Exploration (Alpha) Limited
- BP Exploration (Angola) Limited
- BP Exploration (Azerbaijan) Limited
- BP Exploration (Canada) Limited
- BP Exploration (Caspian Sea) Limited
- BP Exploration (Delta) Limited
- BP Exploration (El Djazair) Limited
- BP Exploration (Epsilon) Limited
- BP Exploration (Finance) Limited
- BP Exploration (Greenland) Limited
- BP Exploration (Morocco) Limited
- BP Exploration (Namibia) Limited
- BP Exploration (Nigeria Finance) Limited
- BP Exploration (Nigeria) Limited
- BP Exploration (Shafag-Asiman) Limited
- BP Exploration (Shah Deniz) Limited
- BP Exploration (South Atlantic) Limited

- BP Exploration (Vietnam) Limited
- BP Exploration (Xazar) Pte. Ltd.
- BP Exploration (Zeta) Limited
- BP Exploration Angola (Kwanza Benguela) Limited
- BP Exploration Australia Pty Ltd
- BP Exploration Beta Limited
- BP Exploration China Limited
- BP Exploration Company (Colombia) Limited
- BP Exploration Company (Middle East) Limited
- BP Exploration Company Limited
- BP Exploration do Brasil Ltda
- BP Exploration Indonesia Limited
- BP Exploration Investments B.V.
- BP Exploration Libya Limited
- BP Exploration Mexico Limited
- BP Exploration Mexico, S.A. De C.V.
- BP Exploration North Africa Limited
- BP Exploration Operating Company Limited
- BP Exploration Orinoco Limited
- BP Exploration Personnel Company Limited
- BP Exploration Services Limited
- BP Exploration Turkiye B.V.
- BP Exploration Venezuela Limited
- BP Express Shopping Limited
- BP Express Sp. z o.o.
- BP Finance (South East Asia) Limited
- BP Finance Australia Pty Ltd
- BP Finance p.l.c.
- BP Foreign Sales Inc.
- BP Foshan LPG Co., Ltd
- BP Foundation Incorporated
- BP France
- BP Fuels & Lubricants AS
- BP Fuels Deutschland GmbH
- BP Fuels Marketing Limited
- BP Fuels Romania S.R.L.
- BP FuJian Ltd
- BP Gas A/S
- BP Gas and Power Company

- BP Gas Austria GmbH Nfg. OHG
- BP Gas Espana, S. A. Unipersonal
- BP Gas Europe, S.A.U.
- BP Gas Marketing Limited
- BP Gas Nederland B.V.
- BP Gas Supply (Angola) LLC
- BP Gaz Anonim Sirketi
- BP Gelsenkirchen GmbH
- BP Gest 24-Exploração de Postos de Abastecimento e de Lojas de Conveniência-Sociedade Unipessoal Lda
- BP Ghana Limited
- BP Global Investments Limited
- BP Global Investments Salalah & Co LLC
- BP Global Special Products (America) Inc.
- BP Global Special Products Limited
- BP Global West Africa Limited
- BP Greece Limited
- BP Group Ireland Trustees Limited
- BP Guangdong Limited
- BP Guangzhou Development Oil Product Co., Ltd
- BP High Density Polyethylene France - BP HDPE
- BP Holdings (Thailand) Limited
- BP Holdings B.V.
- BP Holdings Canada Limited
- BP Holdings International B.V.
- BP Holdings North America Limited
- BP Hong Kong Limited
- BP Huizhou Limited
- BP Hydrogen Power Australia Pty Ltd
- BP IFC Belgium BVBA
- BP India Limited
- BP India Services Private Limited
- BP Indonesia Investment Limited
- BP International Limited
- BP International Services Company
- BP Interoil AG
- BP Investment Management Limited
- BP Investments Asia Limited
- BP Investments Eastern Europe Limited

- BP Iraq Limited
- BP Iraq N.V.
- BP Italia SpA
- BP Japan K.K.
- BP Japan Trading Limited
- BP Jiangmen LPG Co. Limited
- BP Kapuas I Limited
- BP Kapuas II Limited
- BP Kapuas III Limited
- BP Kazakhstan Limited
- BP Korea Limited
- BP Korea Marketing Limited
- BP Kuwait Limited
- BP Latin America LLC
- BP Lesotho (Pty) Limited
- BP Lingen GmbH
- BP LNG Shipping Limited
- BP LPG UK Limited
- BP Lubes Marketing GmbH
- BP Lubricants (UK) Limited
- BP Lubricants KK
- BP Lubricants Services Pty Ltd
- BP Lubricants USA Inc.
- BP Luxembourg S.A.
- BP Malawi Limited
- BP Malaysia Holdings Sdn. Bhd.
- BP Malta Limited
- BP Management International B.V.
- BP Management Netherlands B.V.
- BP Marine Limited
- BP Maritime Services (Isle of Man) Limited
- BP Maritime Services (Singapore) Pte. Limited
- BP Maritime Services Limited
- BP Marketing Egypt LLC
- BP Marketing Limited
- BP Mauritius Limited
- BP Middle East Enterprises Corporation
- BP Middle East Limited
- BP Middle East LLC
- BP Mocambique Limitada
- BP Mojave Germany 2 GmbH
- BP Mojave Nederland N.V.

- BP Muriah Ltd.
- BP Muturi Holdings B.V.
- BP Namibia (Proprietary) Limited
- BP Nederland Holdings BV
- BP Netherlands Exploration Holding B.V.
- BP New Zealand Holdings Limited
- BP New Zealand Share Scheme Limited
- BP Norge AS
- BP North Arafura Limited
- BP Nutrition Inc.
- BP Offshore Gathering Systems Inc.
- BP Offshore Pipelines Inc.
- BP Offshore Response Company LLC
- BP Oil (Gibraltar) Limited
- BP Oil (Thailand) Limited
- BP Oil and Chemicals International Philippines Inc.
- BP Oil Australia Pty Limited
- BP Oil Espana, S.A. Unipersonal
- BP Oil Hellenic S.A.
- BP Oil International Limited
- BP Oil Kent Refinery Limited
- BP Oil Llandarcy Refinery Limited
- BP Oil Logistics UK Limited
- BP Oil Marketing Co.
- BP Oil Marketing GmbH
- BP Oil New Zealand Limited
- BP Oil Pipeline Company
- BP Oil Refineria de Castellon, S.A. Unipersonal
- BP Oil Shipping Company, USA
- BP Oil Supply Company
- BP Oil UK Limited
- BP Oil Venezuela Limited
- BP Oil Vietnam Limited
- BP Oil Yemen Limited
- BP Olex Fanal Mineralol GmbH
- BP Overzee B.V.
- BP Pacific Investments Ltd
- BP Pakistan (Badin) Inc.
- BP Pakistan Exploration and Production, Inc.
- BP Panama SA

- BP Pension Trustees Limited
- BP Pensions (Overseas) Limited
- BP Pensions Limited
- BP Peru Limited
- BP Petrochemicals India Investments Limited
- BP PetroChina Petroleum Co., Ltd
- BP Petroleo y Gas, S.A.
- BP Petroleum (Gibraltar) Limited
- BP Petrolleri Anonim Sirketi
- BP Petronas Acetyls Sdn. Bhd.
- BP Philippines Inc.
- BP Pipelines (Alaska) Inc.
- BP Pipelines (BTC) Limited
- BP Pipelines (North America) Inc.
- BP Pipelines (SCP) Limited
- BP Pipelines (TANAP) Limited
- BP Pipelines Vietnam B.V.
- BP Polska SA
- BP Polska Services Sp. z o.o.
- BP Polypropylene France
- BP Portugal -Comercio de Combustiveis e Lubrificantes SA
- BP Power Trading Limited
- BP Products North America Inc.
- BP Properties Limited
- BP Quanzhou LPG Company Limited
- BP Raffinaderij Rotterdam B.V.
- BP Refinery (Kwinana) Proprietary Limited
- BP Refining & Petrochemicals GmbH
- BP Regional Australasia Holdings Pty Ltd
- BP Russian Investments Limited
- BP Sakhalin Inc.
- BP Santiago Pipelines Company
- BP Services International Limited
- BP Services N.V.
- BP Shafag-Asiman Limited
- BP Sharjah Limited
- BP Sharjah LPG Company
- BP Sharjah LPG Limited
- BP Sharjah Oil Company
- BP Shipcare Sdn. Bhd.

- BP Shipping Limited
- BP Singapore Pte. Limited
- BP Sinopec (ZheJiang) Petroleum Co., Ltd
- BP Social Investment Company
- BP Solar Arabia Ltd
- BP Solar Deutschland GmbH
- BP Solar do Brasil Ltda
- BP Solar Energy North America LLC
- BP Solar Espana, S.A. Unipersonal
- BP Solar France
- BP Solar Hellas S.A.
- BP Solar International Inc.
- BP Solar Italia S.R.L.
- BP Solar Malaysia Sdn. Bhd.
- BP Solar Maroc
- BP Solar Pty Ltd
- BP South East Asia Limited
- BP South West Pacific Limited
- BP Southern Africa (Proprietary) Limited
- BP Southern Cone Company
- BP Subsea Well Response (Brazil) Limited
- BP Subsea Well Response Limited
- BP Sunoasis Company Limited
- BP Sutton Limited
- BP Suzhou LPG Co., Ltd
- BP Swaziland (Pty) Limited
- BP Taiwan Limited
- BP Taiwan Marketing Limited
- BP Tanjung IV Limited
- BP Tanzania Limited
- BP Tanzania Provident Trust Limited
- BP Technology Ventures Inc.
- BP Toplivnaya Kompanya LLC
- BP Trade and Supply (Germany) GmbH, Hamburg
- BP Trading Limited
- BP TRAIN 2/3 HOLDING SRL
- BP Transportation (Alaska) Inc.
- BP Trinidad and Tobago LLC
- BP Trinidad Exploration B.V.
- BP Trinidad Processing Limited

- BP Turkey Refining Limited
- BP Venezuela Holdings Limited
- BP Venezuela Investments B.V.
- BP Venezuela Limited
- BP Vietnam Investments Limited
- BP West Arguni Ltd.
- BP West Aru I Limited
- BP West Aru II Limited
- BP West Coast Products LLC
- BP West Papua I Limited
- BP West Papua III Limited
- BP Wind Energy Limited
- BP Wind Energy North America Inc.
- BP Wiriagar Ltd.
- BP World-Wide Technical Services Limited
- BP YPC Acetyls Company (Nanjing) Limited
- BP Zambia Plc
- BP ZhongShan LPG Co.,Ltd
- BP Zhuhai Chemical Company Limited
- BP Zhuhai LPG Company Limited
- BP Zimbabwe (Pvt) Limited
- BP+Amoco International Limited
- BPA Investment Holding Company
- BP-Amoco Global Power (Europe) Limited
- BP-Husky Refining LLC
- BP-Japan Oil Development Company Limited
- BPNE International B.V.
- BPRY Caribbean Ventures LLC
- BPS BRINDISI 1 s.r.l.
- BPSA Education Foundation Trust
- BPSA Pension Fund
- BPZR (Ningbo) LPG Co., Ltd
- Braendstoflageret Kobenhavns Lufthavn I/S
- Brian Jasper Nominees Pty Ltd
- Britannic Energy Trading Limited
- Britannic Investments Iraq Limited
- Britannic Strategies Limited
- Britannic Trading Limited
- British Pipeline Agency Limited

- Britoil Limited
- Britoil Public Limited Company
- BSPE General, LLC
- BSPE Holdings, LLC
- BSPE Limited, LLC
- BSPE, L.P.
- BTC International Investment Co.
- BTC Pipeline Company
- BTC Pipeline Holding Company Limited
- Buckeye Exploration Limited
- Bunduq Company Limited
- Burmah Castrol Australia Pty Ltd
- Burmah Castrol Capital (Jersey) Limited
- Burmah Castrol Holdings Inc.
- Burmah Castrol Holdings Limited
- Burmah Castrol PLC
- Burmah Castrol South Africa (Pty) Limited
- Burmah Chile S.A.
- Burmah Endeavour Limited
- Burmah Enterprise Limited
- Burmah Fuels Australia Pty Ltd
- Burmah Oil (Louisiana) Inc.
- Burmah Oil Tankers Limited
- Burmah Vessel Operations Limited
- Burmah-Shell Oil Storage & Distributing Company of India Limited
- Butamax™ Advanced Biofuels LLC
- BXL Plastics Limited
- Cadman DBP Limited
- Caesar Oil Pipeline Company, LLC
- Campina Verde Bioenergia Ltda.
- Campina Verde Empreendimentos e Participacoes S.A.
- Candelaria Exploration Corporation
- Canmar (U.S.) Inc.
- Canstates Gas Marketing
- Cantera K-3 Limited Partnership
- Cape Vincent Wind Power, LLC
- Carpio Fotovoltaica, S.L.U.
- Carson Cogeneration Company
- Casitas Pipeline Company
- Castrol (China) Limited

- Castrol (Ireland) Limited
- Castrol (Shenzhen) Company Limited
- Castrol (Switzerland) AG
- Castrol (U.K.) Limited
- Castrol Australia Pty Limited
- Castrol Austria GmbH
- Castrol B.V.
- Castrol BP Petco Limited Liability Company
- Castrol Brasil Ltda.
- Castrol Canada Inc.
- Castrol Caribbean & Central America Inc.
- Castrol China Investments Limited
- Castrol Colombia Limitada
- Castrol Cuba S.A.
- Castrol d.o.o. Beograd
- Castrol de Venezuela C.A.
- Castrol Del Peru S.A.
- Castrol DongFeng Lubricant Co., Ltd
- Castrol Ecuador
- Castrol Hungaria Kereskedelmi Kft
- Castrol Hugaria Trading Co. Ltd.
- Castrol India Limited
- Castrol Industrial Limited
- Castrol Industrial North America Inc.
- Castrol Industrie und Service GmbH
- Castrol KK
- Castrol Limited
- Castrol Lubricants (CR), s.r.o.
- Castrol Lubricants International GmbH
- Castrol Lubricants RO S.R.L
- Castrol Lubricants Sp.z.o.o.
- Castrol Marine Oil GmbH
- Castrol Marine Oils Limited
- Castrol Mexico, S.A. de C.V.
- Castrol Middle East Limited
- Castrol Namibia (Pty) Limited
- Castrol Offshore Limited
- Castrol Overseas Equities Limited
- Castrol Overseas Investments Limited
- Castrol Overseas Nominees Limited
- Castrol Overseas Securities Limited
- Castrol Pakistan (Private) Limited

- Castrol Philippines, Inc.
- Castrol Polska Sp. z o.o.
- Castrol Russia GmbH
- Castrol Servicos Ltda.
- Castrol Slovensko, s.r.o.
- Castrol South Africa (Pty) Limited
- Castrol Swaziland (Pty) Limited
- Castrol Switzerland AG
- Castrol Trading (Guangzhou) Limited
- Castrol Ukraine LLC
- Castrol Zimbabwe (Private) Limited
- CATS North Sea Limited
- Caudete Fotovoltaica, S.L.U.
- CCWE Holdings LLC
- Cedar Creek II Holdings LLC
- Cedar Creek II, LLC
- Cedar Creek Wind Energy, LLC
- Cekisan Depolama Hizmetleri Limited Sirketi
- Central Alberta Midstream (BP3) Company
- Central Itumbiara de Bioenergia e Alimentos S.A.
- Central Itumbiara de Empreendimentos e Participacoes S.A.
- Central Midstream (CCR3) Company
- Central North Sea Fibre Telecommunications Company Limited
- Centrel Pty Ltd
- Charringtons Fuels Limited
- Chartwin Enterprises Limited
- Chengdu First Energy Company Limited
- Cherry Point Cogen LLC
- Chicap Pipe Line Company
- China American Petrochemical Company, Ltd. (CAPCO)
- China LNG Shipping (International) Company Limited
- CH-Twenty Holdings LLC
- CH-Twenty, Inc.
- Clarisse Holdings Pty Ltd
- Cleopatra Gas Gathering Company, LLC
- Coastal Oil Logistics Limited
- Coastwise Guaranty Company

- Coastwise Trading Company, Inc.
- Compania de Inversiones El Condor Limitada
- Concessionaria Stalvedro S.A.
- Condor Investments (Pvt) Limited
- Consolidada de Energia y Lubricantes, (CENERLUB) C.A.
- Conti Cross Keys Inn, Inc.
- Coro Trading NZ Limited
- CrossAlta Gas Storage & Services Ltd.
- CSGP of Southeast Texas, LLC
- CSGP Services, L.P.
- Cuyama Pipeline Company
- Cypress Pipeline Company, L.L.C.
- Danish Refuelling Service I/S
- Danish Tankage Services I/S
- Deep Creek Wind Farm LLC
- Deepwater (GOM) II LLC
- Deepwater (GOM) LLC
- Delta Housing Inc.
- Denali - The Alaska Gas Pipeline LLC
- Denver Master Limited Partnership I
- Depot Petrolier de Lyon
- Dermody Developments Pty Ltd
- Dermody Holdings Pty Ltd
- Dermody Investments Pty Ltd
- Dermody Petroleum Pty Ltd
- Destin Pipeline Company, L.L.C.
- Deutsche Castrol Vertriebsgesellschaft mbH
- DHC Solvent Chemie GmbH
- Direct Fuels Limited
- Dofima BV
- Dolvik Utvikling AS
- Dome Beaufort Petroleum Limited
- Dome Beaufort Petroleum Limited (March 1980) Limited Partnership
- Dome Beaufort Petroleum Limited 1979 Partnership No. 1
- Dome Kerrobert Pipeline ULC
- Dome NGL Pipeline ULC
- Dome Petroleum LLC
- Dome Wallis (1980) Limited Partnership

- Dorchester Oil Trading Company Limited
- Dradnats, Inc.
- Duckhams Oils (Thailand) Company Limited
- Duckhams Oils Limited
- Dussek Campbell (Cables) Limited
- Dussek Campbell Limited
- Dusseldorf Fuelling Services GbR
- Dusseldorf Tank Services GbR
- DZO Holdings B.V.
- East Siberia Holdings Limited
- East Tanka Petroleum Company "ETAPCO"
- ECM Markets SA (Pty) Ltd
- Edom Hills Project 1, LLC
- Ekma Oil Company "EKMA"
- El Temsah Petroleum Company "PETROTEMSAH"
- Electrical Installations (Pvt) Limited
- Electrical Oil Services Limited
- Elite Customer Solutions Pty Ltd
- Elk River II, LLC
- Elm Holdings Inc.
- Elvary Neftegaz Holdings B.V.
- EMDAD Aviation Fuel Storage FZCO
- Emerald Offshore Services Limited
- Emirates Petroleum Terminals LLC
- Endicott Pipeline Company
- Endymion Oil Pipeline Company, LLC
- Energenomics LLC
- Energy Americas Receivables Company, LLC
- Energy Caspian Corporation
- Energy Emerging Investments, LLC
- Energy Global Investments (USA) Inc.
- Enstar LLC
- Enter SL
- Entrepot petrolier de Chambery
- Entrepôt Pétrolier de Puget sur Argens - EPPA
- EPIC Aviation, LLC
- Erdölchemie Unterstützungskasse GmbH

- ERE Betriebsfuhrungsgesellschaft mbH
- Erfurt Fuelling Services GbR
- Eroil Mineraloel GmbH - Diehl
- ESJ US Holdings LLC
- Esma Petroleum Company "ESMA"
- Estonian Aviation Fuelling Services
- Etzel-Kavernenbetriebsgesellschaft mbH & Co. KG
- Etzel-Kavernenbetriebs-Verwaltungsgesellschaft mbH
- Europa Oil NZ Limited
- Exomet, Inc.
- Expandite Contract Services Limited
- Exploration (Luderitz Basin) Limited
- Exploration Service Company Limited
- F&H Pipeline Company
- FFS Frankfurt Fuelling Services (GmbH & Co.) OHG
- FFS Frankfurt Fuelling Services GbR
- FIBIL SA
- Fingal Aviation Services Limited
- Finsbury Colorado Properties Inc.
- Finsbury Properties Inc.
- Fip Verwaltungs GmbH
- First-Tier Energy Ltd.
- Flat Ridge 2 Holdings LLC
- Flat Ridge 2 Wind Energy LLC
- Flat Ridge 2 Wind Energy South LLC
- Flat Ridge 2 Wind Holdings LLC
- Flat Ridge 3 Wind Energy LLC
- Flat Ridge Wind Energy, LLC
- Flughafen Hannover Pipeline Verwaltungsgesellschaft mbH
- Flughafen Hannover Pipelinegesellschaft mbH & Co. KG
- Ford County Wind Farm LLC
- Fork LPG GmbH
- Formosa BP Chemicals Corporation
- Foseco Chile Ltda.
- Foseco Holding International B.V.
- Foseco Holding, Inc.
- Foseco Management, Inc.
- Foseco Properties, Inc.
- Foseco Venezolana C.A.

- Foseco, Inc.
- Fosroc Expandite Limited
- Fosroc GmbH
- Fosven, CA
- Fowler I Holdings LLC
- Fowler II Holdings LLC
- Fowler III Holdings LLC
- Fowler Ridge Holdings LLC
- Fowler Ridge I Land Investments LLC
- Fowler Ridge II Holdings LLC
- Fowler Ridge II Wind Farm LLC
- Fowler Ridge III Holdings LLC
- Fowler Ridge III Wind Farm LLC
- Fowler Ridge IV Wind Farm LLC
- Fowler Ridge Wind Farm LLC
- Freebees B.V.
- Frühmesser Gesellschaft mit beschränkter Haftung
- Frühmesser GmbH & Co. KG, Landau
- Fuel & Retail Aviation Sweden AB
- Fuelling Aviation Service - FAS
- FUELPLANE- Sociedade Abastecedora de Aeronaves, Unipessoal, Lda
- Fundacioin BP Espana
- Fundación para la Eficiencia Energética de la Comunidad Valenciana
- Galaxy Biofuels LLC
- Gardena Holdings Inc.
- Gas Tanks Nederland B.V.
- Gasolin GmbH
- Gatwick Refuelling Services Limited
- Georg Reitberger Mineralole GmbH & Co. KG
- Georg Reitberger Mineralöle Verwaltungs GmbH
- Georgetown Holding Company
- Georgian Pipeline Company
- Geostock Holding
- Gesmin SNC
- Gezamenlijke Tankdienst Schiphol B.V.
- GFC AB
- GISSCO S.A.
- Global Aviation Services Limited
- GlobeFuel Systems & Services GmbH
- GNR San Juan Limited Partnership
- Golden Hills Wind Energy LLC
- Golden Hills Wind Farm LLC
- Goldlink Petroleum Distributors Pty Ltd
- GOAM 1 SAS
- GOMH Holdings, Inc.
- Goshen Phase II LLC
- Gothenburgh Fuelling Company AB (GFC)
- Grampian Aviation Fuelling Services Limited
- Grangemouth Holdings Limited
- Grangemouth Properties Limited
- Gravcap, Inc.
- Great Republic Power Partners, LLC
- Greater Pacific Limited
- Green Mountain Energy Company
- Green Power G.P., LLC
- Green Power Holdings, LLC
- Green Power Limited, LLC
- Groupement de Distribution de Carburants de Rungis
- Groupement Pétrolier de Strasbourg
- Groupement pour l'Avitaillement de Lyon Saint-Exupéry
- Groupement pour l'Avitaillement de Marseille Provence
- Groupement pour l'Avitaillement de Nice Cote d'Azur
- Groupement pour l'Avitaillement de Toulouse
- Groupement pour l'Avitaillement d'Orly
- Guangdong Dapeng LNG Company Limited
- Guangdong Investments Limited
- Guangzhou Wittenberg Petroleum Ltd
- Gulf Of Suez Petroleum Company "GUPCO"
- H & G Contracting Services Limited
- HAM Fuel & Retail Aviation Deutschland GmbH
- Hamburg Tank Service (HTS) GbR
- Handygas Limited
- Hargreaves Oil Trading Limited

- Havacilik Yakit Ikmali Operasyon Ortakligi
- Heating Innovations Austria GmbH
- HECA London Limited
- Heinrich Fip GmbH & Co. KG
- HFS Hamburg Fuelling Services GbR
- Hiergeist Heizolhandel GmbH & Co. KG
- Hiergeist Verwaltung GmbH
- Highlands Ethanol, LLC
- Holdings BBG Limited
- Hudspeth County Wind Farm LLC
- Hydrogen Energy Australia Pty Ltd
- Hydrogen Energy California LLC
- Hydrogen Energy International Limited
- Hydrogen Energy International LLC
- IGI Resources, Inc.
- Inam Operating Company Limited
- Independent Petroleum Laboratory Limited
- India Gas Solutions Private Limited
- ING Leasing GmbH & Co. Alpha-Quebec oHG
- Inland Corporation
- International Card Centre Limited
- Inversiones Bulo Bulo S.A.
- Iputi Empreendimentos e Participacoes S.A.
- ISLA Mayor Solar, S.L.U.
- Ituiutaba Bioenergia Ltda.
- Ituiutaba Empreendimentos e Participacoes S.A.
- J & A Petrochemical Sdn. Bhd.
- J & S Motors (Pvt) Limited
- J.H.C. Realisations Limited
- Jade Global UK Limited
- Jamaica Aircraft Refuelling Services Limited
- Jiu Feng ARCO Shipping Co. Ltd.
- Joint Basin Corporation
- Joshua Tree Solar Farm, LLC
- Jupiter Insurance Limited
- Kabulonga Properties Limited
- Keijzer-Durieux B.V.

- Kemwell Limited
- Ken-Chas Reserve Company
- Kenilworth Oil Company Limited
- Kime Properties (Pvt) Limited
- Kingston Research Limited
- Kitt Energy Corporation
- Klaus Köhn GmbH
- Klaus Köhn GmbH & Co. Mineralöl KG, Oldenburg
- KnifeSpoonFork B.V.
- Köhn & Plambeck GmbH & Co. KG
- Konsortium Nord West Olleitung GbR
- Konsortium Tanklager Betriebsgesellschaft Nurnberg GbR
- Korea Energy Investment Holdings B.V.
- K-Power Co., Ltd.
- Kurt Ammenn GmbH & Co. KG
- Kuwait Oil Company Limited
- LAO Chemicals Holding Company
- Latin Energy Argentina S.A.
- Lebanese Aviation Technical Services S.A.L.
- LFS Langenhagen Fuelling Services GbR
- Lilac Properties Limited
- Logan Aluminum Inc.
- Long Island Solar Farm LLC
- Los Palacios Exploration Corporation
- Lotos - Air BP Polska Spółka z ograniczoną odpowiedzialnością
- LP Autogas B.V.
- LP Gas B.V.
- LubeCon Canada Ltd.
- Lubricants UK Limited
- Ludgate Sixty Nine Limited
- Maatschap Europoort Terminal
- Macgas Limited
- Magaz Fotovoltaica, S.L.U.
- Main Pass Oil Gathering Company
- Major and Company Limited
- Malmo Fuelling Services AB
- Manchester Airport Storage & Hydrant Company Limited
- Marchena Fotovoltaica, S.L.U.

- Mardi Gras Endymion Oil Pipeline Company, LLC
- Mardi Gras Transportation System Inc.
- Markoil, S.A. Unipersonal
- Mars Oil Pipeline Company
- Masana Petroleum Solutions(PTY) LTD
- Matelub S.A.R.L. (Baldersheim/Frankreich)
- Mayaro Initiative for Private Enterprise Development
- McFall Fuel Limited
- Medina Holding Company
- Mediteranean Gas Co. "MEDGAS"
- Medway Oil and Storage company, Limited
- Mehoopany Holdings LLC
- Mehoopany Wind Energy LLC
- Mehoopany Wind Holdings LLC
- Melrose Oil Trading Company Limited
- Menehall Investments Limited
- Mes Technologia En Servicios Y Energia, S.A. DE C.V.
- Metro-Service B.V.
- Middle East Lubricants Company LLC
- Mid-Valley Pipeline Company
- Milne Point Pipeline, LLC
- Mineralol-Handels-Gesellschaft mbH, Celle
- Minza Pty Ltd
- Mobene GmbH & Co. KG
- Mobene Verwaltungs-GmbH
- Mojave County Wind Farm LLC
- Montilla Fotovoltaica, S.L.U.
- Moron Solar, S.L.U.
- Mountain City Remediation, LLC
- Munster, Simms & Co., Limited
- N.V. Rotterdam-Rijn-Pijpleiding Maatschappij (RRP)
- National Benzole Company Limited
- Natural Gas Vehicles Company "NGVC"
- Nederlandse Maatschappij voor Petroleumgassen 'Benegas' B.V.
- New Zealand Oil Services Limited
- NEWCO LPG Spolka z ograniczona odpowiedzialnoscia
- NFX Combustíveis Marítimos Ltda.
- NGL Ventures (Partnership)
- Nigermed Petroleum S.A.
- Ninnescah Wind Energy LLC
- No. 1 Riverside Quay Proprietary Limited
- Nodaway Wind Energy, LLC
- Nordic Lubricants A/S
- Nordic Lubricants AB
- Nordic Lubricants Oy
- Nord-West Oelleitung GmbH
- Norman Properties (Pvt) Limited
- North America Funding Company
- North Ghara Petroleum Company (NOGHCO)
- North October Petroleum Company "NOPCO"
- North Sea Carbon Management Company Limited
- Northern Plains Wind Energy, LLC
- Northstar Pipeline Company, LLC
- Nova Lubricants (Pvt) Limited
- Oak Hill Venture Fund Limited Partnership
- Oelwerke Julius Schindler GmbH
- Okeanos Gas Gathering Company, LLC
- Olympic Pipe Line Company
- OMD87, Inc.
- Omega Oil Company
- Orion Aardolieprodukten Onderneming B.V
- Orion Delaware Mountain Wind Farm LP
- Orion Energy Holdings, LLC
- Orion Energy L.L.C.
- Orion Lincoln County Wind Farm LLC
- Orion Post Land Investments, LLC
- Orion Sherbino Mesa Delaware LLC
- P. Marin Energia Solar, S.L.U.
- P.T. Amoco Mitsui PTA Indonesia
- P.T. Jasatama Petroindo
- Paardeil Investments (Pty) Limited

- Pacroy (Thailand) Co., Ltd.
- PAE E & P Bolivia Limited
- PAE Oil & Gas Bolivia Ltda.
- Pan American Energy Chile Limitada
- Pan American Energy do Brasil Ltda.
- Pan American Energy Holdings Ltd.
- Pan American Energy Iberica S.L.
- Pan American Energy Investments Ltd.
- Pan American Energy LLC
- Pan American Energy LNG LLC
- Pan American Energy Uruguay S.A.
- Pan American Fueguina S.A.
- Pan American Petroleum Company of California
- Pan American Petroleum Corporation
- Pan American Sur S.A.
- Pan Marine Services SA
- Pars Investment Corporation
- Paul Harling Mineralole GmbH & Co. KG
- Peaks America Inc.
- Pearl River Delta Investments Limited
- Pembina Wind Energy, LLC
- Penagree Limited
- Peninsular Aviation Services Company Limited
- Pentland Aviation Fuelling Services Limited
- Pet Gaz Anonim Sirketi
- Peterhead Hydrogen Power Limited
- Petro Shadwan Petroleum Company "PETRO SHADWAN"
- Petroperija, S.A.
- Petrostock SA
- Pharaonic Petroleum Company "PhPC"
- Phoenix Petroleum Services, Limited Liability Company
- PHP Construction Holdings, Inc.
- PHP Construction Limited
- PHP Operations
- PHP Trading Holdings, Inc.
- PHP Trading Limited
- Phu My 3 BOT Power Company Limited

- Pine Creek Resources, LLC
- Pipers Holdings Limited
- Platina Bioenergia Ltda.
- PLG Pflichtlagergesellschaft fuer Mineraloele AG
- PLR Oil Company Inc.
- Polyethylene Malaysia Sdn. Bhd.
- Premier Lubricants (S) Pte Ltd
- Premium Lubricants Romania S.R.L.
- Prince William Sound Oil Spill Response Corporation
- Products Cogeneration Company
- Produits Métallurgie Doittau SA - PROMEDO
- ProGas Enterprises Limited
- ProGas Limited
- ProGas U.S.A., Inc.
- Proteus Oil Pipeline Company, LLC
- PT BP Petrochemicals Indonesia
- PT Cakrawala Tata Sentosa
- PT Castrol Indonesia
- PT Cemerlang Pelumas Prima
- PT Jasatama Petroindo
- PT Petro Storindo Energi
- PT Vico Enterprises Indonesia
- PTE Pipeline LLC
- Pyramid Motor Corporation (Pvt) Limited
- Raffinerie de Strasbourg
- Rahamat Petroleum Company (PETRORAHAMAT)
- Raimund Mineraloel GmbH
- RAPI SA
- RD Petroleum Limited
- Reading Investment (Nominee) Limited
- Reax Industria e Comercio Ltda.
- Remediation Management Services Company
- Resolution Partners LLP
- Rhein-Main-Rohrleitungstransportgesellschaft mbH
- Richfield Oil Corporation
- Riley County Wind Farm LLC
- Rio Grande Pipeline Company

- Rodas Exploration Corporation
- Rolling Thunder I Power Partners, LLC
- Rolling Thunder II Power Partners, LLC
- Romanian Fuelling Services S.R.L.
- Ropemaker Deansgate Limited
- Ropemaker Gilston Limited
- Ropemaker Hams Hall Limited
- Ropemaker Heywood Limited
- Ropemaker Maidenhead Limited
- Ropemaker Nottingham Limited
- Ropemaker Properties Limited
- Ropemaker Stockley Limited
- Ropemaker Stratton (No.1) Limited
- Ropemaker Stratton (No.2) Limited
- Routex B.V.
- Rudeis Oil Company "RUDOCO"
- Ruehl Gesellschaft m.b.H. & Co KG.
- Ruhr Oel GmbH (ROG)
- Rundel Mineraloelvertrieb GmbH
- Rural Fuel Limited
- Russian Holdings Limited
- S&JD Robertson North Air Limited
- SABA- Sociedade Abastecedora de Aeronaves, Lda
- SAFCO SA
- Salzburg Fuelling GmbH
- Samsung-BP Chemicals Co., Ltd
- Sanilac County Wind Farm LLC
- Santa Cruz Exploration Corporation
- Saturn Insurance Inc.
- SBB Dortmund GmbH
- Scottish Oils Limited
- Servicios Logísticos de Combustibles de Aviación, S.L
- Setra Lubricants
- Setra Lubricants Kazakhstan LLC
- Shanghai Bi Ke Clean Energy Technology Co., Ltd
- Shanghai SECCO Petrochemical Company Limited
- Sharjah Aviation Services Co. LLC
- Sharjah Pipeline Company LLC
- Shell and BP Red Sea Trading Limited
- Shell and BP Scotland Limited
- Shell and BP Services Limited
- Shell and BP South African Petroleum Refineries (Pty) Ltd
- Shell Red Sea Limited
- Shell Zimbabwe (Pvt) Limited
- Shell-Mex and B.P. Limited
- Shenzhen Cheng Yuan Aviation Oil Company Limited
- Shenzhen Dapeng LNG Marketing Company Limited
- Sherbino I Holdings LLC
- Sherbino I Wind Farm LLC
- Sherbino II Holdings LLC
- Sherbino II Wind Farm LLC
- Sherbino Mesa I Land Investments LLC
- Shine Top International Investment Limited
- SIGAS-Armazenagem de Gas, ACE
- Silva Exploration Corporation
- Silver Brook Wind Farm LLC
- Silver Star I Power Partners, LLC
- Silver Star II Power Partners, LLC
- Simpson Creek Wind Farm LLC
- Sisseton Wind Farm LLC
- SKA Energy Holdings Limited
- SM Realisations Limited
- Sociedade de Promocao Imobiliaria Quinta do Loureiro, SA
- Société d'Avitaillement et de Stockage de Carburants Aviation "SASCA"
- Société de Gestion de Dépots d'Hydrocarbures - GDH
- Société de Gestion de Produits Pétroliers - SOGEPP
- SOFAST Limited
- SOL BR1
- Solar Services Inc.
- Solarex Electric Ltd.
- SOPEFRA 3
- South Caucasus Pipeline Company Limited
- South Caucasus Pipeline Holding Company Limited

- South Caucasus Pipeline Option Gas Company Limited
- South Houston Green Power, LLC
- South Louisiana Biofuels LLC
- Southeast Texas Biofuels LLC
- Southern Ridge Pipeline GP LLC
- Southern Ridge Pipeline Holding Company
- Southern Ridge Pipeline LP LLC
- Southern Ridge Pipeline Partners LP
- ST BP Holdings Limited
- ST-Airport Services Pte Ltd
- Standard Oil Alternate Energy Development Company
- Standard Oil Company, Inc.
- STDG Strassentransport Dispositions Gesellschaft mbH
- STDG Strassentransport Dispositions GMBH Spolka z ograniczona odpowiedzialnoscia - Oddzial w Polsce
- Stellaria Property Company Limited
- Stonewall Resources Ltd.
- Stuttgart Fuelling Services GbR
- Sunderland Oil Storage Limited
- Sunrise Oil Sands Partnership
- TAA - Tankanlagen Auhafen AG
- Tankanlage AG Mellingen
- TAR - Tankanlage Ruemlang AG
- Taradadis Pty Ltd
- Tata BP Solar India Limited
- TAU Tanklager Auhafen AG
- TBG Tanklager Betriebs GmbH
- TBN Tanklager-Betriebsgesellschaft Nurnberg GmbH
- TEA Comercio E Participacoes Ltda.
- Tecklenburg GmbH
- Tecklenburg GmbH & Co. Energiebedarf KG
- Teknik Petrol Urunleri Servis Yonetim ve Elektrik Uretim ve Dagitim Limited Sirketi
- Telcom General Corporation
- Terminales Canarios, S.L.
- Terrapin Creek Holdings LLC
- Terrapin Creek Wind Energy LLC
- Terre de Grace Partnership
- Texas Cotton Valley Sand Limited Partnership
- TFSB Turbo Fuel Services Berlin GbR (Schonefeld)
- TGFH Tanklager-Gesellschaft Frankfurt-Hahn GbR
- TGH Tankdienst-Gesellschaft Hamburg GbR
- TGHL Tanklager-Gesellschaft Hannover-Langenhagen GbR
- TGS Tankdienst-Gesellschaft Stuttgart GbR
- The Anaconda Company
- The Baku-Tbilisi-Ceyhan Pipeline Company
- The BP Share Plans Trustees Limited
- The British Petroleum Company Limited
- The Burmah Oil Company (Pakistan Trading) Limited
- The Consolidated Petroleum Company Limited
- The Consolidated Petroleum Supply Company Limited
- The Marine Alliance (UK) Limited
- The Marine Alliance B.V.
- The Marine Alliance Rotterdam B.V.
- The Power Petroleum Company Limited
- The Standard Oil Company
- The Sullom Voe Association Limited
- Titan Wind, LLC
- TLM Tanklager Management GmbH
- TLS Tanklager Stuttgart GmbH
- TNK Industrial Holdings Limited
- TNK-BP Limited
- TOC-Rocky Mountains Inc.
- Toledo Refinery Holding Company LLC
- Top Notch Wind Farm LLC
- Torsina Oil Company "TORSINA"
- Towson Commons Ltd. Partnership
- Trafineo GmbH & Co. KG
- Trafineo Verwaltungs-GmbH
- TransTank GmbH

- Trinity Hills Wind Farm LLC
- Tropical BioEnergia S.A.
- TSG Polska Spolka z ograniczona odpowiedzialnocia
- TSG Tankstellen Support GmbH
- TXC Green Power LLC
- UKCS Carbon Management Company Limited
- Unimar LLC
- Union Texas (Argentina) Ltd.
- Union Texas (Transnational) Limited
- Union Texas Adriatic, Inc.
- Union Texas Azerbaijan Limited
- Union Texas do Brasil Limited
- Union Texas Energy Development Limited
- Union Texas Hellas, Inc.
- Union Texas International Corporation
- Union Texas Kazakhstan Limited
- Union Texas Kazakhstan Offshore Limited
- Union Texas Petroleum
- Union-Tank Eckstein GmbH
- Union-Tank Eckstein GmbH & Co. KG
- United Gas Derivatives Company "UGDC"
- United Kingdom Oil Pipelines Limited
- UT Acadia, LLC
- UT Petroleum Energy, LLC
- UT Petroleum Services, LLC
- UTA Espana S.L.
- UTA Italia S.r.l., Verona /Italien
- UTA Nederland B.V.
- UTA Tank A.G.
- Utah Oil Refining Company
- Utrera Fotovoltaica, S.L.U.
- Vastar Energy, Inc.
- Vastar Gas Marketing, Inc.
- Vastar Holdings, Inc.
- Vastar Pipeline, Inc.
- Vastar Power Marketing, Inc.
- Veba Oil & Gas Cerro Negro GmbH
- Veedol International Limited
- Verano Collateral Holdings LLC

- Veruba Pty Ltd
- VIC CBM Limited
- Viceroy Investments Limited
- Virginia Indonesia Co. CBM Limited
- Virginia Indonesia Co., LLC
- Virginia International Co., LLC
- Virginia Services Ltd., LLC
- Vivergo Fuels Limited
- Vostok-Shmidt Neftegaz Holdings B.V.
- VTA Verfahrenstechnik und Automatisierung GmbH
- Walton-Gatwick Pipeline Company Limited
- Warrenville Development Ltd. Partnership
- Water Way Trading and Petroleum Services LLC
- Watson Cogeneration Company
- Waunita Wind Energy, LLC
- Welchem Canada Ltd.
- Welchem Trinidad, Inc.
- Welchem, Inc.
- West Kimberley Fuels Pty Ltd
- West London Pipeline and Storage Limited
- West Morgan Petroleum Company (PETROMORGAN)
- WESTBIT AB
- Westlake Houston Development, LLC
- Westoil Petroleum Pty Ltd
- Westside Solar, LLC
- White Pines Wind Farm LLC
- Whiting Clean Energy, Inc.
- Whitney Point Solar, LLC
- Wilburton Hub, Inc.
- Wilprise Pipeline Company, L.L.C.
- Windpark Energy Nederland B.V.
- Wiri Oil Services Limited
- Yangtze River Acetyls Co., Ltd
- Yasdan Limited
- Young's Paraffin Light and Mineral Oil Company (Limited)
- Yuma County Wind Farm LLC
- Yuma Wind Energy, LLC

- Zamlube Re-refiners Limited
- ZAO Baltic Petroleum
- ZAO Bi Neft
- Zapad-Shmidt Neftegaz Holdings B.V.
- 0936326 B.C. Unlimited Liability Company
- 123456 Delaware LLC
- 1594416 Alberta Ltd.
- 200 PS Aircraft Holdings Inc.
- 200 PS Investment Company
- 200 PS Overseas Holdings Inc.
- 3101805 Nova Scotia Company
- 33 North Lorel Limited Partnership
- 338 Resources Company
- 4321 North 800 West LLC
- 563916 Alberta Ltd.
- 5836 West Washington Limited Partnership
- 858965 Alberta Ltd.

**Appendix 8: BP Corporation North America Inc. Guaranty**

**Primary Guaranty by**

**BP Corporation North America Inc.**

**IN FAVOR OF**

**THE UNITED STATES AND THE STATES OF ALABAMA, FLORIDA, LOUISIANA, MISSISSIPPI, AND TEXAS**

**RELATING TO THE CONSENT DECREE BETWEEN THE UNITED STATES, THE GULF STATES, BPXP, BPCNA, AND BP p.l.c. IN MDL 2179 (E.D. La.) WITH RESPECT TO THE *DEEPWATER HORIZON* INCIDENT**

1.      Guaranty

2.      Unconditional Guaranty

3.      Waiver

4.      Subrogation

5.      Notices

6.      A Valid Demand, When Required, and Payment

7.      No Waiver; Remedies

8.      Term; Termination

9.      Assignment; Successors and Assigns

10.     No Third Party Beneficiaries

11.     Amendments

12.     Captions

13.     Representations and Warranties

14.     Severability

15.     Jurisdiction

16.     Governing Law

## PRIMARY GUARANTY

This Primary Guaranty (the "Guaranty") is made the ___ day of _____, 2015 and effective as of the Effective Date (as defined in the Consent Decree) by BP Corporation North America Inc., an Indiana corporation ("Primary Guarantor"), in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi and Texas (collectively the "Beneficiaries").

WHEREAS, the Beneficiaries, BP Exploration & Production Inc. ("BPXP"), the Primary Guarantor, and BP p.l.c., have entered into a Consent Decree with respect to claims arising from the Deepwater Horizon Incident, to which this Guaranty is attached (the "Consent Decree");

WHEREAS, the Primary Guarantor is an indirect parent of BPXP; and;

WHEREAS, for the benefit of the Beneficiaries, the Primary Guarantor has agreed to provide this Guaranty pursuant to Section IX (Financial Assurance) of the Consent Decree;

NOW, THEREFORE, in consideration of good and valuable consideration to the Primary Guarantor, including the Consent Decree, the adequacy, receipt and sufficiency of which are hereby acknowledged, the Primary Guarantor hereby agrees as follows:

1.  **GUARANTY**

    (a)   The Primary Guarantor hereby irrevocably and unconditionally guaranties subject to the terms of this Guaranty, including without limitation the provisions of Section 6 of this Guaranty, that if (i) BPXP has failed to make a payment required under the Consent Decree (the "Guarantied Obligations") within 60 days after such payment has become due under the Consent Decree; or (ii) BPXP has filed for bankruptcy under the United States Bankruptcy Code or other applicable statute(s) or code(s) pertaining to insolvency; or (iii) any third-party has petitioned a court to place BPXP in bankruptcy under the United States Bankruptcy Code or other applicable statute(s) or code(s) pertaining to insolvency, an order for relief is entered, and any such filing or petition is not dismissed within 60 days of entry of such order for relief (any of (i), (ii) or (iii) immediately above, a "BPXP Default"), the Primary Guarantor shall, within 60 days, pay to the Beneficiaries the unpaid Guarantied Obligations then due and payable by BPXP to the Beneficiaries in accordance with the payment terms of the Consent Decree.

    (b)   The Primary Guarantor shall reimburse the Beneficiaries for all sums paid

to the Beneficiaries by BPXP with respect to such Guaranteed Obligations which the Beneficiaries are subsequently required to return to BPXP or a representative of BPXP's creditors as a result of BPXP's bankruptcy, insolvency, liquidation, or similar proceeding.

(c)     In respect of subsection 1(b), this Guaranty shall be a continuing guaranty of all of the Guaranteed Obligations and shall apply to and secure any ultimate balance due or remaining unpaid to the Beneficiaries; and this Guaranty shall not be considered as wholly or partially satisfied by the payment or liquidation at any time of any sum of money for the time being due or remaining unpaid to the Beneficiaries.

(d)     This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Beneficiaries on the insolvency, bankruptcy, or reorganization of BPXP or the Primary Guarantor or otherwise, all as though such payment had not been made.

The Primary Guarantor's obligations and liability under this Guaranty shall be limited to payment obligations only.

**2.     UNCONDITIONAL GUARANTY.** Save due performance by BPXP or the Primary Guarantor, the liability of Primary Guarantor under this Guaranty shall not be limited, lessened or discharged by any of the following:

(a)     any incapacity or disability or lack or limitation of status or power of BPXP or that BPXP may not be a legal entity;

(b)     the bankruptcy or insolvency of BPXP; or

(c)     any law, regulation, or order now or hereafter in effect in any jurisdiction affecting any of the Guaranteed Obligations or the rights of the Beneficiaries with respect thereto.

The obligations of the Primary Guarantor hereunder are several and not joint with BPXP or any other person, and are primary obligations for which the Primary Guarantor is the principal obligor. There are no conditions precedent to the enforcement of this Guaranty, except as expressly contained herein or as set forth in the Consent Decree. It shall not be necessary for the Beneficiaries, in order to enforce payment by the Primary Guarantor under this Guaranty, to exhaust any of their remedies or recourse against BPXP, any other guarantor, or any other person liable for the payment and the Primary Guarantor's obligations hereunder shall apply regardless of whether recovery of all such Guaranteed Obligations may be discharged or uncollectible in any bankruptcy, insolvency or other proceeding, or otherwise unenforceable.

3. **WAIVER**. Except as set forth in the Consent Decree or this Guaranty, the Primary Guarantor hereby waives:

    (a)    notice of acceptance of this Guaranty, notice of the creation or existence of any of the Guarantied Obligations, and notice of any action by the Beneficiaries in reliance hereon or in connection herewith;

    (b)    presentment, demand for payment, notice of dishonor or nonpayment, protest, and notice of protest or any other notice of any other kind with respect to the Guarantied Obligations;

    (c)    any requirement that suit be brought against, or any other action by the Beneficiaries be taken against, or any notice of default or other notice to be given to, or any demand be made on BPXP or any other person, or that any other action be taken or not taken as a condition to the Primary Guarantor's liability for the Guarantied Obligations under this Guaranty or as a condition to the enforcement of this Guaranty against the Primary Guarantor; and

    (d)    any other circumstance which might otherwise constitute a defense, set-off, or counterclaim available to, or a legal or equitable discharge of BPXP in respect of the Guarantied Obligations or the Primary Guarantor in respect of this Guaranty.

4. **SUBROGATION**. The Primary Guarantor shall be subrogated to all rights of the Beneficiaries against BPXP in respect of any amounts paid by the Primary Guarantor pursuant to the Guaranty, provided that the Primary Guarantor waives any rights it may acquire by way of subrogation under this Guaranty, by any payment made hereunder or otherwise (including, without limitation, any statutory rights of subrogation under Section 509 of the Bankruptcy Code 11 U.S.C. § 509, or otherwise), reimbursement, exoneration, contribution, indemnification, or any right to participate in any claim or remedy of the Beneficiaries against BPXP or any collateral which the Beneficiaries now have or acquire, until all of the Guarantied Obligations due the Beneficiaries shall have been irrevocably and indefeasibly paid to the Beneficiaries in full. If (a) the Primary Guarantor shall perform and shall make payment to the Beneficiaries of all or any part of the Guarantied Obligations due such Beneficiaries, and (b) all such Guarantied Obligations due the Beneficiaries shall have been indefeasibly paid in full, the Beneficiaries shall, at the Primary Guarantor's request, execute and deliver to the Primary Guarantor appropriate documents necessary to evidence the transfer by subrogation to the Primary Guarantor of any interest in such Guarantied Obligations resulting from such payment of the Primary Guarantor.

5. **NOTICES**. Notice will be provided in accordance with the terms of Section XIX of the Consent Decree.

6.      **A VALID DEMAND, WHEN REQUIRED, AND PAYMENT**.

    (a)      With respect to any payments required pursuant to the following provisions of the Consent Decree: Section XI (Stipulated Penalties), Paragraph 21.a. as it applies to accelerated interest, Paragraph 30, and Paragraph 31, the Primary Guarantor is only liable to pay under this Guaranty in accordance with Section 1 hereof if the Primary Guarantor receives from the Beneficiaries a demand in writing that: (i) references the Guaranty, the Guarantied Obligations due but unpaid to the Beneficiaries, and the existence and continuance of a BPXP Default; (ii) is signed by a duly authorized representative of the Beneficiaries; and (iii) is delivered to the Primary Guarantor. The Primary Guarantor shall pay, or cause to be paid, Guarantied Obligations for which a demand is required within 60 days of receipt of such demand, unless, within such 60 day period, the BPXP Default giving rise to such demand has been paid in full or otherwise remedied by agreement of the Beneficiaries and BPXP.

    (b)      With respect to all other payment obligations set forth in the Consent Decree, no demand shall be required under this Guaranty.

7.      **NO WAIVER; REMEDIES**. No failure on the part of the Beneficiaries to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

8.      **TERM; TERMINATION**. This Guaranty shall not take effect until the Effective Date (as defined in the Consent Decree) of the Consent Decree. This Guaranty shall be and continue to be in full force and effect from the Effective Date until (the earlier of) (i) the date the Guarantied Obligations to the Beneficiaries under the Consent Decree have been fully and indefeasibly paid, or (ii) the date the Consent Decree has been terminated or is held invalid or unenforceable by a court. This Guaranty shall terminate in full on the earlier date upon which any of conditions (i) or (ii) in the foregoing sentence has been satisfied.

9.      **ASSIGNMENT; SUCCESSORS AND ASSIGNS**.

(a)      The Primary Guarantor payment obligations under this Guaranty shall be binding on any legal successor or assign of the Primary Guarantor in accordance with the requirements of Paragraph 7 of the Consent Decree.

(b)      No portion of this Guaranty shall provide any rights to, or be enforceable by, any person or entity other than the Beneficiaries and the Primary Guarantor, and no Beneficiary may assign or otherwise convey any right to enforce any provision of this Guaranty. Without limiting the foregoing, any assignment of any Beneficiary's rights of payment under the Consent Decree shall be with recourse

to such Beneficiary only and without recourse to the Primary Guarantor.

**10.** **NO THIRD PARTY BENEFICIARIES**. This Guaranty is for the exclusive benefit and convenience of the Primary Guarantor and the Beneficiaries. Nothing contained herein shall be construed as granting, vesting, creating, or conferring any right of action or any other right or benefit upon any other third party.

**11.** **AMENDMENTS**. No amendment or other modification of the terms of this Guaranty, including without limitation, those related to payment terms, shall be effective unless it is in writing, is signed by Primary Guarantor and the Beneficiaries, and states that it is expressly intended to give effect to the applicable amendment or modification hereto. No waiver of any provision of this Guaranty nor consent to any departure by the Primary Guarantor therefrom, including, without limitation, those related to payment terms, shall in any event be effective unless such waiver or consent shall refer to this Guaranty, be in writing and be signed by the all Beneficiaries. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

**12.** **CAPTIONS**. The captions in this Guaranty have been inserted for convenience only and shall be given no substantive meaning or significance whatsoever in construing the terms and provisions.

**13.** **REPRESENTATIONS AND WARRANTIES**. The Primary Guarantor represents and warrants as follows:

    (a)    the Primary Guarantor is duly organized, validly existing, and in good standing under the laws of the State of Indiana;

    (b)    the Primary Guarantor has full power and authority to execute, deliver, and perform its obligations under this Guaranty and no limitation on the powers of the Primary Guarantor will be exceeded as a result of entering into this Guaranty;

    (c)    the execution, delivery, and performance of this Guaranty have been and remain duly authorized by all necessary corporate action and do not contravene the Primary Guarantor's constitutional documents; and

    (d)    this Guaranty constitutes the legal, valid and binding obligation of the Primary Guarantor, enforceable against it by the Beneficiaries in accordance with its terms, subject to applicable law.

**14.** **SEVERABILITY**. Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

15.     **JURISDICTION**. The Primary Guarantor and the Beneficiaries (other than the United States) each hereby irrevocably agree to the exclusive jurisdiction and venue of the United States District Court for the Eastern District of Louisiana in MDL 2179 ("the Court"). The United States hereby irrevocably agrees to the exclusive jurisdiction and venue in the United States District Court for the Eastern District of Louisiana in MDL 2179, except with respect to claims exceeding $10,000 brought by BP p.l.c., BP Corporation North America Inc. or BPXP against the United States that are subject to the exclusive jurisdiction in the United States Court of Federal Claims under the Tucker Act (28 U.S.C. § 1491) or to the exclusive jurisdiction of any other federal court created by Congress for those purposes. The United States District Court for the Eastern District of Louisiana (and appellate courts thereof) are to have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Guaranty except those subject to the exclusive jurisdiction in the United States Court of Federal Claims under the Tucker Act or other court created by Congress for those purposes, as above. Further, upon termination of MDL 2179, any legal action or proceedings arising out of or in connection with this Guaranty shall be brought in the Court, and the Primary Guarantor and the Beneficiaries irrevocably submit to the exclusive jurisdiction and venue of the Court with respect to this Guaranty, except for those claims subject to the exclusive jurisdiction in the United States Court of Federal Claims under the Tucker Act, as above.

16.     **GOVERNING LAW**. This Guaranty shall be governed by, and construed in accordance with, the laws of Texas, without regard or reference to the conflict of laws principles of any jurisdiction.

IN WITNESS WHEREOF, the Primary Guarantor has caused this Guaranty to be duly executed and delivered by its duly authorized officer on this 28 day of *September*, 2015 but shall be effective as the Effective Date (as defined in the Consent Decree).


BP CORPORATION NORTH AMERICA INC.

By: _____

      Eric L. Nitcher
      Assistant General Counsel, BPCNA
      501 Westlake Blvd
      Houston, TX 77079

The undersigned acknowledges and agrees to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

FOR THE UNITED STATES:

Date: _____   Oct 1, 2015

JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

Appendix 8-10

The undersigned acknowledges and agrees to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:


Date: _9/14/2015_

_____
ROBERT BENTLEY
Governor
State of Alabama

The undersigned acknowledges and agrees to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:


Date: _9-14-15_                          _Luther Strange_
                                         LUTHER STRANGE
                                         Attorney General
                                         State of Alabama

The undersigned acknowledges and agrees to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: _9/15/2015_

_____

RICK SCOTT
Governor
State of Florida

The undersigned acknowledges and agrees to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: 9/15/15

PAM BONDI
Attorney General
State of Florida

The undersigned acknowledges and agrees to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: September 15, 2015

_____

BOBBY JINDAL
Governor
State of Louisiana

The undersigned acknowledges and agrees to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date:  9|16|15

JAMES D. CALDWELL
Attorney General
State of Louisiana

Appendix 8-16

The undersigned acknowledges and agrees to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: _Sept. 17, 2015_

PHIL BRYANT
Governor
State of Mississippi

The undersigned acknowledges and agrees to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: 9/15/2015

_____
JIM HOOD
Attorney General
State of Mississippi

The undersigned acknowledges and agrees to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: __9/14/15__

_____
GREG ABBOTT
Governor
State of Texas

Appendix 8-19

The undersigned acknowledges and agrees to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:


Date: _9/15/15_


_____

KEN PAXTON
Attorney General
State of Texas

Appendix  8-20

The undersigned acknowledge and agree to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

TEXAS GENERAL LAND OFFICE
Natural Resource Trustee

By: _____
        Anne Idsal, Chief Clerk
        Texas General Land Office


TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
Natural Resource Trustee

By: _____
        Richard Hyde, Executive Director
        Texas Commission on Environmental Quality


TEXAS PARKS AND WILDLIFE DEPARTMENT
Natural Resource Trustee

By: _____
        Carter Smith, Executive Director
        Texas Parks and Wildlife Department

Appendix  8-21

The undersigned acknowledge and agree to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

TEXAS GENERAL LAND OFFICE
Natural Resource Trustee


By: _____
      Anne Idsal, Chief Clerk
      Texas General Land Office


TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
Natural Resource Trustee

By: _____
      Richard Hyde, Executive Director
      Texas Commission on Environmental Quality


TEXAS PARKS AND WILDLIFE DEPARTMENT
Natural Resource Trustee


By: _____
      Carter Smith, Executive Director
      Texas Parks and Wildlife Department

The undersigned acknowledge and agree to the foregoing Primary Guaranty by BP Corporation North America Inc. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

TEXAS GENERAL LAND OFFICE
Natural Resource Trustee

By: _____
       Anne Idsal, Chief Clerk
       Texas General Land Office


TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
Natural Resource Trustee

By: _____
       Richard Hyde, Executive Director
       Texas Commission on Environmental Quality


TEXAS PARKS AND WILDLIFE DEPARTMENT
Natural Resource Trustee

By: _____
       Carter Smith, Executive Director
       Texas Parks and Wildlife Department

**Appendix 9: BP p.l.c. Guaranty**

**Secondary Guaranty by**

**BP p.l.c.**

**IN FAVOR OF**

**THE UNITED STATES AND THE STATES OF ALABAMA, FLORIDA, LOUISIANA, MISSISSIPPI, AND TEXAS**

**RELATING TO THE CONSENT DECREE BETWEEN THE UNITED STATES, THE GULF STATES, BPXP, BPCNA, AND BP p.l.c. IN MDL 2179 (E.D. La.) WITH RESPECT TO THE *DEEPWATER HORIZON* INCIDENT**

1.    Definitions and Interpretation

2.    Guaranty

3.    Limitation on Exercise of Secondary Guarantor's Rights

4.    A Valid Demand; When Required Under the Guaranty

5.    No Implied Waivers

6.    Representations and Warranties

7.    Amendment to the Consent Decree

8.    Assignment and Transfer

9.    Communications

10.   Amendments

11.   Third Party Rights

12.   Governing Law and Jurisdiction

## SECONDARY GUARANTY

This Secondary Guaranty is made the 1st day of October, 2015 and effective as of the Effective Date (as defined in the Consent Decree) by BP p.l.c., a company incorporated in England whose registered office is at 1 St. James's Square, London, SW1Y 4PD, United Kingdom ("Secondary Guarantor"), in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi and Texas (collectively the "Beneficiaries").

WHEREAS, the Beneficiaries, on the one hand, and BP Exploration & Production Inc. ("BPXP"), a wholly-owned indirect subsidiary of the Secondary Guarantor, BP Corporation North America Inc. ("BPCNA"), and the Secondary Guarantor, on the other hand, have entered into a Consent Decree with respect to claims arising from the Deepwater Horizon Incident, to which this Guaranty is attached (the "Consent Decree");

AND WHEREAS, BPCNA (the "Primary Guarantor"), another wholly-owned indirect subsidiary of the Secondary Guarantor, and indirect parent company of BPXP, has agreed to guaranty for the benefit of the Beneficiaries the Guarantied Obligations (such guaranty, the "Primary Guaranty");

AND WHEREAS, also for benefit of the Beneficiaries, the Secondary Guarantor has agreed to provide this Guaranty pursuant to Section IX (Financial Assurance) of the Consent Decree;

AND WHEREAS, in consideration of good and valuable consideration to the Secondary Guarantor, including the Consent Decree, the adequacy, receipt and sufficiency of which are hereby acknowledged by the Secondary Guarantor.

NOW THIS GUARANTY PROVIDES as follows:

1. **DEFINITIONS AND INTERPRETATION.**

    1.1  **Definitions.** In this Guaranty, except to the extent that the context requires otherwise, terms defined and references construed in the Consent Decree shall have the same meanings and construction when used in this Guaranty and, in addition, any reference to:

    (a)  "**BPCNA Default**" means a BPXP Default has occurred and either (i) BPCNA has failed to make a payment required under the Primary Guaranty within 60 days after a BPXP Default; or (ii) BPCNA has filed for bankruptcy under the United States Bankruptcy Code or other applicable statute(s) or code(s) pertaining to insolvency; or (iii) any third party has petitioned a court to place BPCNA in bankruptcy under the United States Bankruptcy Code or other applicable statute(s) or code(s)

pertaining to insolvency, an order for relief is entered, and any such filing or petition has not been dismissed within 60 days of such order for relief.

(b)     "**BPXP Default**" means either (i) BPXP has failed to make a payment required under the Consent Decree within 60 days after such payment has become due under the Consent Decree; or (ii) BPXP has filed for bankruptcy under the United States Bankruptcy Code or other applicable statute(s) or code(s) pertaining to insolvency; or (iii) any third party has petitioned a court to place BPXP in bankruptcy under the United States Bankruptcy Code or other applicable statute(s) or code(s) pertaining to insolvency, an order for relief is entered, and any such filing or petition has not been dismissed within 60 days of such order for relief.

(c)     "**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London and New York.

(d)     "**Day**" means a calendar day unless expressly stated to be a Business Day.

(e)     "**Guarantied Obligations**" means any sum of money of any kind owed by BPXP to one or more of the Beneficiaries under the Consent Decree.

(f)     "**Valid Demand**" means a demand issued by the Beneficiaries in accordance with Section 4.

**1.2     Interpretation of Certain References.**

(a)     This "**Guaranty**" means this Secondary Guaranty Agreement as amended, supplemented, novated, restated or replaced by any document from time to time and any document which amends, supplements, novates, restates or replaces this Guaranty.

(b)     A "**law**" includes common or customary law and any constitution, decree, judgment, legislation, order, ordinance, regulation, statute, treaty or other legislative measure, in each case of any jurisdiction whatever.

(c)     Any "**obligation**" of any Person under this Guaranty or any other document referenced herein is a reference to an obligation expressed to be assumed by that Person or imposed on that Person under this Guaranty or that other document, as the case may be.

(d)     A "**Person**" includes any individual, company, corporation, firm, partnership, joint venture, association, organization, trust, state or agency of a state.

(e)     A BPXP Default and/or a BPCNA Default is "**continuing**" if it has not been remedied.

## 2.     <u>GUARANTY</u>.

**2.1     Guaranty.** As consideration for the Beneficiaries' entry into the Consent Decree and subject to the terms of this Guaranty, including, without limitation, the occurrence and continuance of a BPXP Default and a BPCNA Default and the provisions of Section 4 hereof, the Secondary Guarantor hereby irrevocably, unconditionally, and absolutely guaranties for the benefit of the Beneficiaries, that if (i) there exists and is continuing a BPXP Default, and (ii) there exists and is continuing a BPCNA Default, the Secondary Guarantor shall, within 15 Business days of such BPCNA Default, pay to the Beneficiaries the unpaid Guarantied Obligations then due and payable by BPXP to such Beneficiaries. Obligations under this Paragraph 2.1 shall have no effect unless both a BPXP Default and a BPCNA Default shall have occurred and are continuing, and in such instances this Guaranty remains irrevocable, unconditional, and absolute as described in this Guaranty. The Secondary Guarantor's obligations and liability under this Guaranty shall be limited to payment obligations only.

**2.2     Secondary Guarantor as Principal Debtor.** As between the Secondary Guarantor and the Beneficiaries, but without affecting BPXP's obligations, the Secondary Guarantor shall be liable under this Guaranty as if it were the sole principal debtor and not merely a surety. Accordingly, except as otherwise provided in this Guaranty (including, without limitation, Paragraph 2.4), the liability of the Secondary Guarantor under this Guaranty shall not be released, affected or discharged by any act, matter, or omission which (but for this paragraph) would have released, affected, or discharged the liability of the Secondary Guarantor, including without limitation, any of the following:

(a)     any incapacity or disability or lack or limitation of status or power of BPXP or BPCNA or that BPXP or BPCNA may not be a legal entity;

(b)     the bankruptcy or insolvency of BPXP or BPCNA; or

(c)     any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of the Guarantied Obligations or the rights of the Beneficiaries with respect thereto.

**2.3     Secondary Guarantor's Obligations Additional.** This Guaranty shall be in addition to and not in substitution for any other rights, remedy, security or guaranties which the Beneficiaries may now or hereafter hold from or on account of the Guarantied Obligations and subject to a BPXP Default and a BPCNA Default having occurred and being continuing, may be enforced without first

having recourse to such other rights, remedy, security or guaranties.

2.4     **Secondary Guarantor's Obligations Continuing.** The Secondary Guarantor's obligations under this Guaranty are and remain in full force and effect by way of continuing security until the earlier of the following:

(a)     all Guarantied Obligations payable by BPXP to the Beneficiaries under the Consent Decree have been paid in full;

(b)     the date the Consent Decree has been terminated in accordance with its terms, or is held invalid or unenforceable by a court.

This Guaranty shall terminate in full on the earlier date upon which either of the conditions (a) or (b) of this Paragraph 2.4 has been satisfied with respect to the Guarantied Obligations due to the Beneficiaries. Unless terminated pursuant to Paragraphs 2.4 (a) or (b), the Secondary Guarantor's obligations remain in effect in each case, notwithstanding absorption, amalgamation or any other changes in the Secondary Guarantor's constitution.

2.5     **No Avoidance of Payment.** If all or part of any payment received or recovered by the Beneficiaries in respect of the Guarantied Obligations is, on the subsequent bankruptcy, insolvency, corporate reorganization or other similar event of BPXP, avoided or set aside under any laws relating to bankruptcy, insolvency, corporate reorganization or other such similar events, and the amount of such payment is required to be refunded to BPXP or other Persons entitled through BPXP, such payment shall not be considered as discharging or diminishing the liability of the Secondary Guarantor and this Guaranty shall continue to apply as if such amount had at all times remained owing by BPXP.

3.     <u>**LIMITATION ON EXERCISE OF SECONDARY GUARANTOR'S RIGHTS.**</u> Notwithstanding any payment or payments made by the Secondary Guarantor hereunder, so long as any Guarantied Obligation remains outstanding:

(a)     the Secondary Guarantor hereby irrevocably waives any right of subrogation to the rights of the Beneficiaries against BPXP and any right to be reimbursed or indemnified by BPXP or by any other guarantor of all or any part of the Guarantied Obligations until such time as all the Guarantied Obligations due the Beneficiaries shall have been irrevocably and indefeasibly paid to the Beneficiaries in full; and

(b)     if, notwithstanding the foregoing, any amount is received or recovered by the Secondary Guarantor as a result of exercising such rights, such amount shall be held by the Secondary Guarantor in trust for the Beneficiaries and shall, forthwith upon receipt by the Secondary Guarantor, be paid to the

Beneficiaries, to be applied against the Guaranteed Obligations due to the Beneficiaries in such order as the United States, in consultation with the States of Alabama, Florida, Louisiana, Mississippi, and Florida, may determine.

4.    **A VALID DEMAND; WHEN REQUIRED UNDER THE GUARANTY.**

    4.1    **When Secondary Guarantor's Liability is Subject to Valid Demand.** With respect to any payments required pursuant to the following provisions of the Consent Decree: Section XI (Stipulated Penalties), Paragraph 21(a) as it applies to accelerated interest, Paragraph 30, and Paragraph 31, the Secondary Guarantor is only liable to pay under this Guaranty in accordance with Paragraph 2.1 if it receives from the Beneficiaries a demand in writing complying with this Section 4 ("Valid Demand; When Required Under the Guaranty"). With respect to all other payment obligations set forth in the Consent Decree, no demand shall be required under this Guaranty.

    4.2    **Valid Demand.**

        (a)    The Beneficiaries may only issue a Valid Demand to the Secondary Guarantor under this Guaranty at least 5 Business Days after it has sent a written demand to BPXP and the Primary Guarantor for any payment described in Paragraph 4.1 requiring a Valid Demand stating the reasons for making such demand and identifying the Guaranteed Obligations due but unpaid to the Beneficiaries sending the Valid Demand in respect of which there has been a BPXP Default and a BPCNA Default.

        (b)    Any Valid Demand made of the Secondary Guarantor under this Guaranty shall be accompanied with a copy of a written notification referred to in Section 4, dated and sent to BPXP and the Primary Guarantor no less than 5 Business Days before the date of the demand, and delivered or sent by post or facsimile to the Secondary Guarantor at its address as provided under Section 9.

5.    **NO IMPLIED WAIVERS.** No failure on the part of the Beneficiaries to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof, or the exercise of any other right.

6.    **REPRESENTATIONS AND WARRANTIES**. The Secondary Guarantor hereby represents and warrants to the Beneficiaries that:

        (a)    the Secondary Guarantor is duly incorporated and is a validly existing company under the laws of its place of incorporation, has the capacity to

sue or be sued in its own name and has power to carry on its business as now being conducted and to own its property and other assets;

(b)   the Secondary Guarantor has full power and authority to execute, deliver and perform its obligations under this Guaranty and no limitation on the powers of the Secondary Guarantor will be exceeded as a result of the Secondary Guarantor entering into this Guaranty;

(c)   the execution, delivery, and performance by the Secondary Guarantor of this Guaranty and the performance of its obligations under this Guaranty have been duly authorized by all necessary corporate action and do not contravene or conflict with the Secondary Guarantor's memorandum and articles of association; and

(d)   this Guaranty constitutes the legal, valid and binding obligation of the Secondary Guarantor, enforceable against it by the Beneficiaries in accordance with its terms, subject to applicable law.

**7.**   **AMENDMENT TO THE CONSENT DECREE.** The Secondary Guarantor's obligations under this Guaranty are subject to modification of the terms of the Consent Decree made in accordance with the provisions of the Consent Decree.

**8.**   **ASSIGNMENT AND TRANSFER.**

**8.1**   **Burden and Benefit.** This Guaranty shall be binding upon the Secondary Guarantor, its successors and assigns and shall inure to the benefit of the Beneficiaries and their successors or assigns. Any reference in this Guaranty to the Secondary Guarantor or the Beneficiaries shall be construed to refer to relevant successors and assigns accordingly.

**8.2**   **Transfer by Secondary Guarantor.** The Secondary Guarantor's payment obligations under this Guaranty shall be binding on any legal successor or assign of the Secondary Guarantor, in accordance with the requirements of Paragraph 7 of the Consent Decree.

**8.3**   **Transfer by Beneficiaries.** No portion of this Guaranty shall provide any rights to, or be enforceable by, any person or entity other than the Beneficiaries and the Secondary Guarantor. and no Beneficiary may assign or otherwise convey any right to enforce any provision of this Guaranty. Without limiting the foregoing, any assignment of any Beneficiary's rights of payment under the Consent Decree shall be with recourse to such Beneficiary only and without recourse to the Secondary Guarantor.

**9.**   **COMMUNICATIONS.**

**9.1**    **Addresses.**

(a)    Secondary Guarantor: Any demand or other communication made of the Secondary Guarantor under this Guaranty shall be delivered or sent by post registered or certified, return receipt requested, postage prepaid or facsimile to the Secondary Guarantor at its office located at 1 St James's Square, London, SW1Y 4PD, United Kingdom, Fax Number +44 (0)20 7948 7979, Attention: Group Treasurer, with a copy to the Group General Counsel at the same address, Fax Number: +44 (0)20 7496 4242, or to such other address and/or addressed to such other officers as may be provided in writing by the Secondary Guarantor to the Beneficiaries for such purpose and shall be deemed to have been made when received by the Secondary Guarantor.

(b)    Beneficiaries: Any communication made of the Beneficiaries under this Guaranty shall be delivered or sent by post and email to the Beneficiaries in accordance with the terms of Section XIX (Notices and Service of Process) of the Consent Decree.

**10.    AMENDMENTS.** No amendment or other modification of the terms of this Guaranty, including, without limitation, those related to payment terms, shall be effective unless in writing and signed by Secondary Guarantor and all the Beneficiaries and stating that it is expressly intended to give effect to the applicable amendment or modification hereto. No waiver of any provision of this Guaranty nor consent to any departure by the Secondary Guarantor therefrom, including, without limitation, those related to payment terms, shall in any event be effective unless such waiver or consent shall refer to this Guaranty, be in writing, and be signed by all the Beneficiaries. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

**11.    THIRD PARTY RIGHTS.** This Guaranty is for the exclusive benefit and convenience of the Secondary Guarantor and the Beneficiaries. Nothing contained herein shall be construed as granting, vesting, creating, or conferring any right of action or any other right or benefit upon any other third party, and no third party shall have any right to enforce or enjoy the benefit of any term of this Guaranty.

**12.    GOVERNING LAW AND JURISDICTION.**

**12.1    Governing Law.** This Guaranty shall in all respects be governed by, and construed in accordance with, the laws of New York, without regard or reference to the conflict of laws principles of any jurisdiction (other than the provisions of Section 5-1401 of the General Obligations Law of the State of New York, which shall be applicable).

**12.2    Jurisdiction.** The Secondary Guarantor and the States of Alabama, Florida,

Louisiana, Mississippi, and Texas each hereby irrevocably agree to the exclusive jurisdiction and venue in the United States District Court for the Eastern District of Louisiana in MDL 2179 ("the Court") (and appellate courts therefrom). The United States hereby irrevocably agrees to the exclusive jurisdiction and venue of the United States District Court for the Eastern District of Louisiana in MDL 2179 except with respect to claims exceeding $10,000 brought by BP p.l.c., BPCNA or BPXP against the United States that are subject to the exclusive jurisdiction in the United States Court of Federal Claims under the Tucker Act (28 U.S.C. § 1491) or other court created by Congress for those purposes. The United States District Court for the Eastern District of Louisiana (and appellate courts thereof) are to have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Guaranty except those subject to the exclusive jurisdiction in the United States Court of Federal Claims under the Tucker Act or other court created by Congress for those purposes, as above. Further, upon termination of MDL 2179, any legal action or proceedings arising out of or in connection with this Guaranty shall be brought in the United States District Court for the Eastern District of Louisiana and the Primary Guarantor and the Beneficiaries irrevocably submit to the exclusive jurisdiction and venue of that court with respect to this Guaranty, except for those claims subject to the exclusive jurisdiction in the United States Court of Federal Claims under the Tucker Act or other court created by Congress for those purposes as above.

**IN WITNESS WHEREOF,** this Guaranty has been executed as of the date indicated in the beginning.

EXECUTED by:  *Eric L. Nitcher*

BP p.l.c.

Eric L. Nitcher
Assistant General Counsel, BPCNA
501 Westlake Blvd
Houston, TX 77079

The undersigned acknowledges and agrees to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

FOR THE UNITED STATES:

Date: _____Oct. 1, 2015_____

JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

The undersigned acknowledges and agrees to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: _9/14/2015_

_Robert Bentley_
ROBERT BENTLEY
Governor
State of Alabama

The undersigned acknowledges and agrees to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:


Date: _9-14-15_                          _Luther Strange_
                                         LUTHER STRANGE
                                         Attorney General
                                         State of Alabama

The undersigned acknowledges and agrees to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: _9/15/2015_

RICK SCOTT
Governor
State of Florida

The undersigned acknowledges and agrees to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date:  9/15/15

PAM BONDI
Attorney General
State of Florida

The undersigned acknowledges and agrees to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:


Date:  September 15, 2015


_____

BOBBY JINDAL
Governor
State of Louisiana

The undersigned acknowledges and agrees to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: 9|16|15

JAMES D. CALDWELL
Attorney General
State of Louisiana

Appendix 9-17

The undersigned acknowledges and agrees to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: _Sept. 17, 2015_

PHIL BRYANT
Governor
State of Mississippi

The undersigned acknowledges and agrees to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: 9/15/2015

JIM HOOD
Attorney General
State of Mississippi

The undersigned acknowledges and agrees to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

Date: ___9/14/15___

GREG ABBOTT
Governor
State of Texas

Appendix 9-20

The undersigned acknowledges and agrees to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:


Date: _9/15/15_                    _Ken Paxton_

                                   KEN PAXTON
                                   Attorney General
                                   State of Texas

The undersigned acknowledge and agree to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

TEXAS GENERAL LAND OFFICE
Natural Resource Trustee

By: _____
        Anne Idsal, Chief Clerk
        Texas General Land Office


TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
Natural Resource Trustee

By: _____
        Richard Hyde, Executive Director
        Texas Commission on Environmental Quality


TEXAS PARKS AND WILDLIFE DEPARTMENT
Natural Resource Trustee

By: _____
        Carter Smith, Executive Director
        Texas Parks and Wildlife Department

The undersigned acknowledge and agree to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:


TEXAS GENERAL LAND OFFICE
Natural Resource Trustee


By: _____
      Anne Idsal, Chief Clerk
      Texas General Land Office


TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
Natural Resource Trustee


By: _____
      Richard Hyde, Executive Director
      Texas Commission on Environmental Quality


TEXAS PARKS AND WILDLIFE DEPARTMENT
Natural Resource Trustee


By: _____
      Carter Smith, Executive Director
      Texas Parks and Wildlife Department

The undersigned acknowledge and agree to the foregoing Secondary Guaranty by BP p.l.c. in favor of the United States and the States of Alabama, Florida, Louisiana, Mississippi, and Texas:

TEXAS GENERAL LAND OFFICE
Natural Resource Trustee

By: _____
     Anne Idsal, Chief Clerk
     Texas General Land Office


TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
Natural Resource Trustee

By: _____
     Richard Hyde, Executive Director
     Texas Commission on Environmental Quality


TEXAS PARKS AND WILDLIFE DEPARTMENT
Natural Resource Trustee

By: _____
     Carter Smith, Executive Director
     Texas Parks and Wildlife Department

Appendix 9-24

**Appendix 10: Schedule of Submissions to DOJ ENRD Under Paragraph 37**

**Administrative Agreement Documents**

| | Administrative Agreement Section | Administrative Agreement Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Specific Document or Information to be Submitted to DOJ ENRD |
|---|---|---|---|---|
| 1. | Section IV, ¶ 6 | Report of New Foreign Covered Transactions (list of new contracts between non-US BP companies and the US government since the time of the amendment of the EPA Administrative Agreement) | Submit with the Administrative Agreement Annual Report | Provide list of new contracts, if any, between non-US BP Entities and the US government since December 24, 2014 |
| 2. | Section V, ¶ 1(E) | BP's Formal Notification of Non-Compliance with the Terms of Probation, Exhibit B or the Implementation Plan | Submit within 30 Days of such notice being sent to the EPA Authorized Representative | Formal notice letter to EPA Authorized Representative |

| | Administrative Agreement Section | Administrative Agreement Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Specific Document or Information to be Submitted to DOJ ENRD |
|---|---|---|---|---|
| 3. | Section V, ¶ 2(A) | Notice of discovery of violation of the Securities and Exchange Commission Judgment Order | Submit within 30 Days of such notice being sent to the EPA Authorized Representative | Formal notice letter to EPA Authorized Representative |
| 4. | Section VII, ¶ 1 | Ethics Monitor Reports under the Administrative Agreement | Within 60 Days of Effective Date if a final report is received prior to the Effective Date

Within 60 Days after receipt of final Ethics Monitor Report for reports received after the Effective Date | Final Ethics Monitor Reports |
| 5. | Section VII, ¶ 3 | BP Group US Businesses Ethics & Compliance Annual Audit Schedule | Submit with the Administrative Agreement Annual Report | Schedule of E&C Compliance Audits |
| 6. | Section VII, ¶ 10(A) (4) | OpenTalk Summary Report - Nature, Status and Outcome of Significant Investigations | Submit with the Administrative Agreement Annual Report | Either provide a summary in the Administrative Agreement Annual Report or provide the OpenTalk Summary Report as a separate submission |
| 7. | Section IX, ¶ 2 | BSEE Notice of Unacceptable Performance (notice from BSEE to EPA) | Within 30 days of BP's receipt of such notice | BSEE formal notice of a referral of a determination of unacceptable performance by a BPXP/BPXA Entity to BOEM |

| | Administrative Agreement Section | Administrative Agreement Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Specific Document or Information to be Submitted to DOJ ENRD |
|---|---|---|---|---|
| 8. | Section IX, ¶ 4 | SEMS audit schedules, authorized plans, and final reports, with corrective action plans (SEMS is a safety and environmental management system required by BSEE in the GOM. EPA and PSM are receiving copies of the audits, reports and CAPs) | Submit with the Administrative Agreement Annual Report | Summary to be contained in the annual report of SEMS audit activities for prior year |
| 9. | Section IX, ¶ 7 | Leading and Lagging Safety Indicator Metrics | Submit with the Administrative Agreement Annual Report | The Annual Report shall contain these metrics |
| 10. | Section X, ¶ 1 | Administrative Agreement Annual Reports sent to EPA Authorized Representative prior to the Effective Date of the Consent Decree | Submit within 60 Days of the Effective Date of the Consent Decree | Administrative Agreement Annual Report |
| 11. | Section X, ¶ 1 | Administrative Agreement Annual Reports sent to EPA Authorized Representative after the Effective Date of the Consent Decree | Same as Administrative Agreement deadline for submittal to EPA's Authorized Representative (*e.g.* March 31 of each year unless extended by EPA) | Administrative Agreement Annual Report |

| | Administrative Agreement Section | Administrative Agreement Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Specific Document or Information to be Submitted to DOJ ENRD |
|---|---|---|---|---|
| 12. | Section XI, ¶ 2(B) | Auditor annual certification of independence | Submitted with the Administrative Agreement Annual Report, provided that it is timely received from the Auditor. If not timely received, submitted within 30 Days of receipt from the Auditor | Certification of independence from the Auditor |
| 13. | Section XI, ¶ 3(A)(4) | Auditor Annual Report | Within 60 Days of Effective Date if a final report is received prior to the Effective Date<br><br>Within 60 Days after receipt of final report for reports received after the Effective Date | Letter setting forth any final findings of deficiency and corrective actions taken or to be taken |
| 14. | Section XI, ¶ 3(A)(5) | Formal Auditor notice to EPA Authorized Representative of a potential legal violation | Within 30 Days of receipt by BP Entities | Formal Auditor notice to EPA Authorized Representative of a potential legal violation |
| 15. | Section XI, ¶ 3(A)(6) | Formal BPA or Auditor notice to EPA Authorized Representative of a deficiency in compliance | Submitted with the Administrative Agreement Annual Report | Summary contained in Annual Report of final findings of deficiencies and corrective actions |
| 16. | Section XII, ¶ 5 | Quarterly notification of initiation of certain legal proceedings | Submitted with the Administrative Agreement Annual Report | Summary contained in Annual Report of initiation of legal proceedings for prior year |

| | Administrative Agreement Section | Administrative Agreement Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Specific Document or Information to be Submitted to DOJ ENRD |
|---|---|---|---|---|
| 17. | Section XII, ¶ 7 | Written disclosures and notifications to EPA Authorized Representative of credible evidence of certain violations related to federal procurement and nonprocurement transactions, notification of the outcome of investigations of such credible evidence of certain violations, and summary reports of the status of such investigations contained in the Annual Reports | Submitted with the Administrative Agreement Annual Report | Summary reports of the status of investigations conducted pursuant to this Paragraph 7 |
| 18. | Section XII, ¶ 9 | Notice to EPA Authorized Representative of sale, assignment, or transfer of 50% of a Respondent's assets to an unaffiliated third party<br><br>Notice to EPA Authorized Representative of Respondent's sale or transfer of ownership of any BP Covered Entity in its entirety to an unaffiliated third party | Submitted with the Administrative Agreement Annual Report | Actual notice sent to EPA Authorized Representative or a summary of the sale or transaction contained in the Annual Report |

| | Administrative Agreement Section | Administrative Agreement Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Specific Document or Information to be Submitted to DOJ ENRD |
|---|---|---|---|---|
| 19. | Section XII, ¶ 10 | Notice of purchase of new entity which enters into procurement or covered nonprocurement transactions with the United States<br><br>Notice of purchase or establishment of new business units in the United States or new BP Affiliates with foreign business if implementation of the Administrative Agreement in the new unit will require more than 180 Days | Submitted with the Administrative Agreement Annual Report | Actual notice sent to EPA Authorized Representative or a summary of the acquisition or transaction, and integration timeline (if applicable) contained in the Annual Report |
| 20. | Section XII, ¶ 13 | Notification to EPA Authorized Representative of employee debarment | Submitted with the Administrative Agreement Annual Report | Summary contained in Annual Report |
| 21. | Section XII ¶ 15 | Notification from EPA of material breach of the Administrative Agreement | Within 30 Days of receipt from EPA of formal written notice | Formal notice letter from EPA of material breach of the Administrative Agreement |
| 22. | Section XII ¶ 19 | Notification from EPA of initiation of suspension, debarment, or statutory disqualification based on material breach of the Administrative Agreement | Within 30 Days of receipt from EPA of formal written notice | Formal notice letter from EPA of initiation of suspension, debarment, or statutory disqualification based on material breach of the Administrative Agreement |

|  | Administrative Agreement Section | Administrative Agreement Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Specific Document or Information to be Submitted to DOJ ENRD |
|---|---|---|---|---|
| 23. | Section XII, ¶ 30 | Requests for Modification (Any request to modify or terminate the agreement early must be submitted to EPA and agreed by the parties) | Submitted with the Administrative Agreement Annual Report | Summary of request and outcome provided in Annual Report. |

**Exhibit B and Implementation Plan Documents**

| | Exhibit B and Implementation Plan Citation | Exhibit B and Implementation Plan Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Nature of Submission to DOJ ENRD |
|---|---|---|---|---|
| 24. | Ex. B, ¶ 4(c) | Reports of Ethics Monitor | Within 60 Days of Effective Date if a final report is received prior to the Effective Date<br><br>Within 60 Days after receipt of final report for reports received after the Effective Date | Ethics Monitor Report containing final monitor recommendations |
| 25. | Ex. B, ¶ 4(c) | Reports of Process Safety Monitor | Within 60 Days of Effective Date if a final report is received prior to the Effective Date<br><br>Within 60 Days after receipt of final report for reports received after the Effective Date of the Consent Decree | Process Safety Monitor Report containing final monitor recommendations |

| | Exhibit B and Implementation Plan Citation | Exhibit B and Implementation Plan Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Nature of Submission to DOJ ENRD |
|---|---|---|---|---|
| 26. | Ex. B, ¶ 4(d) | Notification that recommendations of monitor(s) are inconsistent with law, regulation, or otherwise inadvisable | Within 30 Days of submission to the Department of Justice Criminal Division for notice of objections

Within 30 Days of receipt for final alternate recommendations | Formal notice of objections to monitor(s) recommendations submitted to the Department of Justice Criminal Division

Final alternate recommendations agreed to with Department of Justice Criminal Division |
| 27. | Ex. B ¶ 23(b), Imp. Plan Section E | Annual Progress Reports submitted to the Department of Justice Criminal Division **Prior the to Effective Date** | Within 60 Days of the Effective Date | Annual Progress Report |
| 28. | Ex. B ¶ 23(b), Imp. Plan Section E | Annual Progress Reports submitted to the Department of Justice Criminal Division **After the Effective Date** | Within 60 Days of submission to the Department of Justice Criminal Division | Annual Progress Report |
| 29. | Ex. B, ¶ 32, Imp. Plan Section F | Request for modification of Implementation Plan | Within 30 Days of submission to the Department of Justice Criminal Division | Written request for modification of Implementation Plan |

| | Exhibit B and Implementation Plan Citation | Exhibit B and Implementation Plan Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Nature of Submission to DOJ ENRD |
|---|---|---|---|---|
| 30. | Ex. B, ¶ 32, Imp. Plan Section G | BPXP Notice of failure to comply with the Implementation Plan and corrective action plan for any such failure | Within 30 Days of submission to Probation Officer | BPXP's written notice of failure to comply with the Implementation Plan and applicable corrective action plan |
| 31. | Ex. B, ¶ 32, Imp. Plan Section G | The Department of Justice Criminal Division notice to BPXP of failure to comply with the Implementation Plan | Within 30 Days of receipt from the Department of Justice Criminal Division | The Department of Justice Criminal Division's formal written notice of a failure to comply with the Implementation Plan |
| 32. | Ex. B, ¶ 5, Imp. Plan Section H, ¶ 5.3.1 | Certification of list of contracted Drilling Rigs and contract length | Submit with the Plea Agreement Annual Report | Certification of list of contracted Drilling Rigs and contract length at time of Approval of Implementation Plan as required by Imp. Plan Section H, ¶ 5.3.1 |
| 33. | Ex. B, ¶ 5, 6, 7 Imp. Plan Section H, ¶ 5.3.3, 6.3.4, and 7.3.4 | Summary of SEMS audit activities | Submit with the Plea Agreement Annual Report | Summary of SEMS audit activities required by Imp. Plan Section H, ¶¶ 5.3.3, 6.3.4, and 7.3.4 |
| 34. | Ex. B, ¶ 6, Imp. Plan Section H, ¶¶ 6.3.1 through 6.3.3 | Certifications related to Deepwater Drilling Rig contractors | Submit with the Plea Agreement Annual Report | Certifications related to Deepwater Drilling Rig contractors as required by Imp. Plan Section H, ¶¶ 6.3.1 through 6.3.3 |

| | Exhibit B and Implementation Plan Citation | Exhibit B and Implementation Plan Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Nature of Submission to DOJ ENRD |
|---|---|---|---|---|
| 35. | Ex. B, ¶ 7, Imp. Plan Section H, 7.3.1 | Certification of Platform or Platform Rigs | Submit with prior years' Plea Agreement Annual Reports | Certifications of Platforms or Platform Rigs as required by Imp. Plan Section H, Par 7.3.1 |
| 36. | Ex. B, ¶ 9, Imp. Plan Section H, 9.3.1 | Third party verification of Blowout Preventers − lists and certifications | Submit with the Plea Agreement Annual Report | List of moored or dynamically positioned Drilling Rigs required by Imp. Plan Section H, ¶ 9.3.1(a)<br><br>List of third parties that verified testing and maintenance required by Imp. Plan Section H, ¶ 9.3.1(b)<br><br>Certification of maintenance required by Imp. Plan Section H. ¶ 9.3.1(c) |

| | Exhibit B and Implementation Plan Citation | Exhibit B and Implementation Plan Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Nature of Submission to DOJ ENRD |
|---|---|---|---|---|
| 37. | Ex. B, ¶ 11, Imp. Plan Section H, 11.3.1 | List of cementing SMEs and third parties used to satisfy review and approval requirements, with annual updates and certifications of completion of candidate screening process | Submit with the Plea Agreement Annual Report | Submit the summary of cementing activities required by Imp. Plan Section H, 11.3.5 as part of the Plea Agreement Annual Report |
| 38. | Ex. B, ¶ 11, Imp. Plan Section H, 11.3.2 | Addendum to each Application for Permit to Drill (name of SME that reviewed cement design and statement that cement lab test was witnessed by engineer or third party) | Submit with the Plea Agreement Annual Report | Submit the summary of cementing activities required by Imp. Plan Section H, 11.3.5 as part of the Plea Agreement Annual Report |
| 39. | Ex. B, ¶ 11, Imp. Plan Section H, 11.3.3 | Well Activity Reports − Lab Results (results must include name of engineer or third party that witnessed results) | Submit with the Plea Agreement Annual Report | Submit the summary of cementing activities required by Imp. Plan Section H, 11.3.5 as part of the Plea Agreement Annual Report |
| 40. | Ex. B, ¶ 11, Imp. Plan Section H, 11.3.4 | Cement SME competency requirements, candidate screening process, and modifications thereof | Submit with the Plea Agreement Annual Report | Submit the summary of cementing activities required by Imp. Plan Section H, 11.3.5 as part of the Plea Agreement Annual Report |
| 41. | Ex. B, ¶ 12, Imp. Plan Section H, 12.3.1 | Description of Houston Monitoring Center | Submit with the Plea Agreement Annual Report | Submit the summary of Houston Monitoring Center activities required by Imp. Plan Section H, 12.3.3 as part of the Plea Agreement Annual Report |

| | Exhibit B and Implementation Plan Citation | Exhibit B and Implementation Plan Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Nature of Submission to DOJ ENRD |
|---|---|---|---|---|
| 42. | Ex. B, ¶ 12, Imp. Plan Section H, 12.3.2 | Log of Monitoring Center outages | Submit with the Plea Agreement Annual Report | Submit the summary of Houston Monitoring Center activities required by Imp. Plan Section H, 12.3.3 as part of the Plea Agreement Annual Report |
| 43. | Ex. B, ¶ 13 Imp. Plan Section H, ¶ 13.3 | Incident Summary Report documenting all incidents operators are required to report under 30 C.F.R. § 250.188 | Submit with the Plea Agreement Annual Report | Incident Summary Report shall be submitted as a separate appendix to the Plea Agreement Annual Report and designated as confidential business information |
| 44. | Ex. B, ¶ 14, Imp. Plan Section H, ¶ 14.3.3 | Certifications, training descriptions, and certain other documentation related to Oil Spill Response Plan personnel and training | Submit with the Plea Agreement Annual Report | Certifications of BPXP personnel in certain positions and their training pursuant to Imp. Plan Section H, ¶ 14.3.3(a) and (b)<br><br>Description of Oil Spill Response Plan training and exercises pursuant to Imp. Plan Section H., ¶ 14.3.3 (c)<br><br>PREP Triennial Cycle Documentation Form pursuant to Imp. Plan Section H. ¶ 14.3.3 (d) |

| | Exhibit B and Implementation Plan Citation | Exhibit B and Implementation Plan Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Nature of Submission to DOJ ENRD |
|---|---|---|---|---|
| 45. | Ex. B, ¶ 15, Imp. Plan Section H, 15.3.4 | Crisis Management Center description (location, resources, number, titles and qualifications of staff, staffing schedule, availability, and oil spill response training/drills for staff) | Submit with the Plea Agreement Annual Report | Summary required by Imp. Plan Section H, ¶ 15.3.4 to be provided in Annual Report |
| 46. | Ex. B, ¶ 16, Imp. Plan Section H, ¶¶ 16.3.3 and 16.3.4 | Description of training by any new supplier of source control equipment (type of training provided by new supplier)<br><br>Annual certification of personnel and training | Submit with the Plea Agreement Annual Report | Certification of training and personnel required by Imp. Plan Section H, ¶ 16.3.4.a<br><br>Description of training activities required by Imp. Plan Section H, ¶ 16.3.4.b |

|  | Exhibit B and Implementation Plan Citation | Exhibit B and Implementation Plan Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Nature of Submission to DOJ ENRD |
|---|---|---|---|---|
| 47. | Ex. B, ¶ 17, Imp. Plan Section H, ¶ 17.3.2 | Certification of personnel who participated in industry oil spill response exercises<br><br>Description of oil spill response exercises and lessons learned<br><br>Triennial Cycle Documentation Form | Submit with the Plea Agreement Annual Report | Certification required by Imp. Plan Section H, ¶ 17.3.2.a<br><br>Description of oil spill response exercises required by Imp. Plan Section H, ¶ 17.3.2.b<br><br>Triennial Cycle Documentation Form required by Imp. Plan Section H, ¶ 17.3.2.c |

| | Exhibit B and Implementation Plan Citation | Exhibit B and Implementation Plan Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Nature of Submission to DOJ ENRD |
|---|---|---|---|---|
| 48. | Ex. B, ¶¶ 18,19 Imp. Plan Section H, ¶¶ 18.3.1, 18.3.3, 19.2.1, 19.3.3 | Schedules of OSRP Table Top exercises and other response exercises<br><br>Certifications of personnel participation in table top exercises<br><br>Table top exercise descriptions,<br><br>PREP Triennial Cycle Documentation Form<br><br>Certification of notice to the United States,<br><br>List of exercises that the United States participated in | Submit with the Plea Agreement Annual Report | Summary and documentation required by Imp. Plan. Section H, ¶¶ 18.3.3(a), (b), and (c)<br><br>Summary and documentation required by Imp. Plan, Section H, ¶¶ 19.3.1(a) and (b) |
| 49. | Ex. B, ¶ 20, Imp. Plan Section H, 20.3.3 | Certification that all approved OSRPs or OSRPs submitted to BSEE for approval meet the requirements of Paragraph 20 of Exhibit B and a description of where the requirements are met | Submit with the Plea Agreement Annual Report | Certification as set forth in Imp. Plan Section H, ¶ 20.3.3.(a)<br><br>Description of where Paragraph 20 requirements are addressed in currently approved OSRP as set forth in Imp. Plan Section H, ¶ 20.3.3.(b) |

| | Exhibit B and Implementation Plan Citation | Exhibit B and Implementation Plan Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Nature of Submission to DOJ ENRD |
|---|---|---|---|---|
| 50. | Ex. B, ¶ 21, 22 Imp. Plan Section H, 21.3, 22.3 | Safety Technology Pilot Project Plans, Reports and Determinations (Plan and Final Report on three pilot projects) | Submit with the Plea Agreement Annual Report | Summary of pilot project and technology enhancements required by Imp. Plan Section H, ¶ 21.3.5(a) and (b) and by Imp. Plan, Section H, ¶ 22.3.3(a) and (b) |
| 51. | Ex.B, ¶ 24, Imp. Plan Section H, ¶ 24.3 | Certifications related to blind shear rams | Submit with the Plea Agreement Annual Report | Certifications required by Imp. Plan Section H, ¶ 24.3.1(a) through (d) |
| 52. | Ex. B, ¶ 25, Imp. Plan Section H, 25.3 | Description of S&OR organization (general description and summary of work, list of stop work examples, and description of new safety requirements published during prior year) | Submit with the Plea Agreement Annual Report | Description of BPXP safety organization for deepwater drilling required by Imp. Plan Section H, ¶ 25.3.2(a)<br><br>Summary of safety organization's work during the prior calendar year required by Imp. Plan Section H, ¶ 25.3.2(b) |
| 53. | Ex. B ¶ 26-31, Imp. Plan Section H, 26.3.2 | Auditor's Annual Report (report by third party Auditor of BP's compliance with Plea Agreement and Imp. Plan) | Submit within 30 Days after final findings of deficiency have been received by BPXP | Letter setting forth Auditor's final findings of deficiency |
| 54. | Ex. B ¶ 26-31, Imp. Plan Section H, 26.3.4 | Written notices of deficiency from third party Auditor outside of Auditor's Annual Report. | Submit within 30 Days after final findings of deficiency have been received by BPXP | Formal written notice of final findings of deficiency |

|   | Exhibit B and Implementation Plan Citation | Exhibit B and Implementation Plan Report, Notice, or Other Deliverable | Deadline for Submittal to DOJ ENRD | Nature of Submission to DOJ ENRD |
|---|---|---|---|---|
| 55. | Ex. B ¶ 26-31, Imp. Plan Section H, 26.3.4 | BPXP corrective action plan to address deficiencies identified by Auditor | Submit with the Plea Agreement Annual Report | Summary of final findings of deficiencies and how BPXP addressed those deficiencies as required by Imp. Plan, Section H, ¶ 26.3.5(a) |

**Appendix 11:  Documents to be Publicly Posted by BPXP Pursuant to Paragraph 38**

**Administrative Agreement Documents/Information**

| Administrative Agreement Section | Requirement of Administrative Agreement | Document or Information to Be Posted to Website |
|---|---|---|
| Section V, ¶ 1(E) | BPXP's Notification of Non-Compliance with Terms of Probation, Exhibit B or Implementation Plan | Summary in Annual Report pursuant to Section X, ¶ 1. [¶ 38(a)(ii) of Consent Decree] |
| Section V, ¶ 2 | Formal notice of violation of SEC Judgment Order | Post formal notice of violation within 30 days of receipt. [¶ 38(a)(iii) of Consent Decree] |
| Section IX, ¶ 2 | BSEE Notice of Unacceptable Performance | Post formal notice of violation within 30 days of receipt. [¶ 38(a)(iii) of Consent Decree] |
| Section IX, ¶ 7 | Leading and Lagging Safety Indicator Metrics | Included in Annual Report pursuant to Section X, ¶ 1. [¶ 38(a)(ii) of Consent Decree] |
| Section X, ¶ 1 | Annual Report containing summaries of BP activities under core sections of agreement (Sections V through XII) | For final Annual Reports submitted to EPA Authorized Representative prior to the Effective Date of the Consent Decree, post within 60 days after the Effective Date.

For final Annual Reports submitted to the EPA Authorized Representative after the Effective Date, post within 60 days after submission of Annual Report. [¶ 38(a)(ii) of Consent Decree] |

| Administrative Agreement Section | Requirement of Administrative Agreement | Document or Information to Be Posted to Website |
|---|---|---|
| | | Annual Reports for posting to include summaries of: |
| | | • Notification of conflict between Administrative Agreement and Terms of Probation (if any) pursuant to Section V, ¶ 1(G); |
| | | • BP Ethics & Compliance Internal Audit Activities pursuant to Section VII, ¶ 2; |
| | | • BP Group US Businesses Ethics & Compliance Annual Audit Schedule pursuant to Section VII, ¶ 3; |
| | | • Summary of OpenTalk Program pursuant to Section VII, ¶ 10, A(1) through (3); |
| | | • SEMS audit activities conducted during the prior year pursuant to Section IX, ¶ 4; |
| | | • EPA Independent Auditor certification of independence pursuant to Section XI, ¶ 2(B); |
| | | • EPA Independent Auditor findings of deficiencies and corrective measures, pursuant to Section XI, ¶¶ 3(A)(4) & (5); |
| | | • EPA Independent Auditor |

| Administrative Agreement Section | Requirement of Administrative Agreement | Document or Information to Be Posted to Website |
|---|---|---|
| | | letter of deficiency not included in auditor's annual report on deficiencies in compliance pursuant to Section XI, ¶ 3(A)(6); |
| | | • BPXP's implementation of any corrective actions, remedial measures and/or recommendations for improvement required by Section VII, ¶ 1; Section IX, ¶ 6(C); and Section XI, ¶ 3 (as applicable); |
| | | • Reporting activities to EPA on the status of legal proceedings under Section XII, ¶ 5; |
| | | • Reports of Misconduct and outcome of investigations of misconduct pursuant to Section XII, ¶ 7; |
| | | • Notification of Reclassified Costs pursuant to Section XII, ¶ 17; and |
| | | • Purchase or sale of BP Group Entities pursuant to Section XII, ¶¶ 9 & 10. |

| Administrative Agreement Section | Requirement of Administrative Agreement | Document or Information to Be Posted to Website |
|---|---|---|
| Section XI, ¶ 3(A)(4) | Independent Auditor Annual Report | Letter setting forth any final findings of deficiencies within 30 days of receipt. [¶ 38(a)(v) of Consent Decree] |
| Section XII, ¶ 15 | Notification of Misconduct during Agreement | Post formal notice of misconduct within 30 days of receipt. [¶ 38(a)(iii) of Consent Decree] |
| Section XII, ¶ 19 | Notification of Breach of Agreement | Post formal notice of breach within 30 days of receipt. [¶ 38(a)(iii) of Consent Decree] |

**Exhibit B and Implementation Plan Documents/Information**

| Exhibit B and Implementation Plan Section | Requirement of Exhibit B and/or Implementation Plan | Document to be posted to website |
|---|---|---|
| Ex. B, ¶ 23(b), Implementation Plan Section E | Annual Progress Reports Submitted to DOJ Criminal | For final reports submitted to DOJ Criminal prior to the Effective Date, maintain posted version after Effective Date of Consent Decree.<br><br>For final reports submitted to DOJ Criminal after the Effective Date, post within 60 days of submittal of final report. [¶ 38(a)(iv) of Consent Decree] |
| Ex. B, ¶ 32, Imp. Plan, Section G | DOJ Criminal notice to BPXP of failure to comply with the Implementation Plan | Post formal written notice from DOJ Criminal within 30 days of receipt by BPXP. |
| Ex. B, ¶ 26, Imp. Plan Section H, ¶ 26.3.2 | Auditor's Annual Report | Letter setting forth any final findings of deficiencies. [¶ 38(a)(v) of Consent Decree] |
| Ex. B., ¶ 26, Imp. Plan Section H, ¶ 26.3.4 | Formal written notices of deficiency from Auditor Report | Summarize in BPXP Annual Progress Report. [¶ 38(a)(v) of Consent Decree] |